**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

No. __:__-CV-_____

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR., CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | ) | |

## INTRODUCTION

1.      This is a First Amendment lawsuit to vindicate the right of Plaintiffs 360 Virtual

Drone Services LLC and Michael Jones to create useful information (aerial images and related

data) and disseminate that information to willing customers. In 2017, Michael Jones's business,

360 Virtual Drone Services LLC, began harnessing cutting-edge drone technology to capture

aerial images and data about land and property—including orthomosaic aerial pictures, thermal

maps, and other visualizations of information about land. Similar small businesses have thrived

nationwide. In North Carolina, however, drone start-ups have found themselves targeted by a

centuries-old profession: land surveyors. As most people would understand it, "land surveying"

involves establishing legal boundaries between tracts of land. Yet the North Carolina Board of

Examiners for Engineers and Surveyors (Board) takes a far more aggressive view. According to the Board, capturing and disseminating data about the dimensions or elevations of land—or the size of objects on land—requires a full-blown land-surveyor license. Drawing even rough approximations of property lines on images requires a land-surveyor license. Even stitching aerial photos together using orthomosaic software requires a land-surveyor license.

2.     Michael Jones learned all this the hard way: in December 2018, the Board began investigating 360 Virtual Drone Services LLC for engaging in unlicensed land surveying. Michael has never purported to be a "surveyor," and he and his business have never purported to mark the legal boundaries of land; like many similar businesses, they sought merely to create and convey images and information. Even so, the Board told them to stop. The Board formally warned 360 Virtual Drone Services LLC that without a land-surveyor license, it was unlawful to engage in "mapping," "providing location and dimension data," and "producing orthomosaic maps, quantities, and topographic information." Unless the company "c[a]me into compliance," the Board cautioned, it would face civil and even criminal consequences.

3.     Plaintiffs' experience is far from unique; in recent years, the Board has issued similar cease-and-desist letters to at least a half-dozen drone companies. In this way, both the Board and the statutes it enforces violate the First Amendment at a bedrock level. Simply, the projects the Board targets—aerial photos, data, 3D digital models, and the like—are speech that is fully protected by the First Amendment. Plaintiffs thus bring this civil-rights lawsuit to vindicate their constitutional right to create and communicate images and data about land.

## JURISDICTION AND VENUE

4.      Plaintiffs 360 Virtual Drone Services LLC and Michael Jones bring this civil-rights lawsuit seeking declaratory and injunctive relief pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201-2202, and 42 U.S.C. § 1983.

6.      Venue lies in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

7.      Pursuant to Local Rules 40.1(b) and 40.1(c), this action is properly filed in the Western Division because Plaintiffs reside in Wayne County.

## PARTIES

8.      Plaintiff 360 Virtual Drone Services LLC is a North Carolina limited liability company. It is wholly owned by Plaintiff Michael Jones.

9.      Plaintiff Michael Jones is a resident of the City of Goldsboro in Wayne County, North Carolina. He is a United States citizen.

10.      Defendant Andrew L. Ritter is the Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, the agency responsible for enforcing the North Carolina Engineering and Land Surveying Act. He is sued in his official capacity only.

11.      Defendants John M. Logsdon, Jonathan S. Care, Dennis K. Hoyle, Richard M. Benton, Carl M. Ellington, Jr., Cedric D. Fairbanks, Brenda L. Moore, Carol Salloum, and

Andrew G. Zoutwelle are members of the North Carolina Board of Examiners for Engineers and Surveyors. They are sued in their official capacities only.

## FACTUAL ALLEGATIONS

**I.     MICHAEL JONES'S DRONE PHOTOGRAPHY BUSINESS**

     **A.     Commercial drone use**

12.     A drone is an unmanned aircraft that can fly autonomously and navigates through a combination of human input and guiding from the Global Positioning System (GPS).

13.     While drones often are used recreationally, recent years have also seen the rise of a thriving commercial-drone industry.

14.     Using cameras, drones can take photographs of—and collect data about— buildings, land, construction sites, and other property.

15.     Drone-captured photos and data can be used for many different purposes.

16.     Using drones, for example, operators can create detailed two-dimensional photographs of property by flying a drone over the area, capturing images, and then stitching those images together using computer software that combines the discrete photos into a single, high-resolution image. An image created in this way is called an orthomosaic map.

17.     Metadata are secondary data about an image (for example, the time and date an image was captured or the GPS coordinates for where it was captured). Virtually any picture taken with a modern smartphone contains metadata. Similarly, drone-captured images can include metadata as well, including data about ground elevation, heat, locations, and distances.

18.     Using this metadata, computer software can use drone-captured images to calculate the distance from Point $A$ to Point $B$. The software can calculate the size of objects as well. For example, a drone can photograph a stockpile of building materials. In doing so, the drone can capture metadata on the materials' location and elevation. That data, in turn, can be

used to quickly calculate the approximate volume of the stockpile as a whole—often called a "volumetric calculation."

19.     Drone-captured images and data can also be used to create 3D digital models of land and structures.

20.     In addition, drones can use heat-sensor imaging to identify thermal leaks in large buildings and storage units.

21.     In short, drones can capture and create information—about the conditions of land and structures and about distances, locations, elevations, and volumes.

**B.     Michael Jones's business**

22.     Michael Jones has provided professional photography and videography services in North Carolina since around 2016. Soon after launching his photography business, he recognized the extraordinary potential of drones and branched out to drone-based aerial photography too.

23.     Michael is certified by both the Federal Aviation Administration and the North Carolina Department of Transportation to fly drones commercially.

24.     Between 2017 and 2019, Michael offered drone photography services through a single-member LLC (360 Virtual Drone Services LLC) to clients, including real-estate developers, property managers, realtors, entertainment companies, retail stores, and individuals.

25.     For example, one real-estate developer hired Michael to perform weekly flyovers of the developer's property, capture images, stitch the images together using computer software, and provide him with an updated orthomosaic picture of his property. In this way, the client could regularly monitor the state of the property.

26.     Similarly, a local Walmart hired Michael to fly his drone over a distribution center and capture images using a thermal sensor, allowing the company to identify potential

heat leaks. These images, too, were stitched together to create an orthomosaic thermal map of the roof.

27. A mall in Wilmington, North Carolina, also hired Michael to capture aerial images of its parking lot for composition into an orthomosaic map.

28. Realtors hired Michael to take aerial photographs of properties to use for promotional purposes. For some of these images, Michael would add lines to his aerial photographs indicating the rough boundaries of a piece of property based on approximations provided to him by the realtor. At no point, however, did Michael create or offer to create images or documents that have legal effect (such as setting property boundaries).

29. At no point has Michael been licensed as a land surveyor in North Carolina or anywhere else.

30. At no point has 360 Virtual Drone Services LLC been licensed as a land-surveying business in North Carolina or anywhere else.

31. At no point has Michael marketed his or 360 Virtual Drone Services LLC's services as land surveying or as a substitute for a land survey.

32. At no point has Michael or 360 Virtual Drone Services LLC established or purported to establish legal descriptions of property.

33. Even so, in December 2018 Michael received a letter from the North Carolina Board of Examiners for Engineers and Surveyors. The letter announced that the Board had opened an investigation into whether 360 Virtual Drone Services LLC was engaged in the unlicensed practice of land surveying.

## II. REGULATION OF LAND SURVEYING IN NORTH CAROLINA

34. North Carolina regulates land surveying through its Engineering and Land Surveying Act (Act), N.C. Gen. Stat. §§ 89C-1 *et seq.*, through rules and regulations

promulgated pursuant to the Act, and through policies issued by the North Carolina Board of Examiners for Engineers and Surveyors.

35.     Generally speaking, land surveyors are the professionals who measure and update boundary lines. Often, their surveys have legal effect, as, for example, when a land plat is recorded in the local register of deeds.

36.     The Act prohibits any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board. *Id.* §§ 89C-2, 89C-23. To become a licensed land surveyor, an applicant must meet a combination of educational, examination, and practice requirements. 21 N.C. Admin. Code 56.0601. For example, an applicant without a surveying-related B.S. or associate degree must have sixteen years of "progressive practical experience," nine of them under a practicing licensed land surveyor. N.C. Gen. Stat. § 89C-13(b)(1a)(d). All applicants also must pass three examinations: Fundamentals of Surveying, Principles and Practice of Surveying, and a North Carolina-specific exam. And all applicants must submit a sample map complying with the state's standards for practice of land surveying. *See* N.C. Bd. of Exam'rs for Eng'rs & Surveyors, *Individual Applicants: Professional Land Surveyor*, <https://tinyurl.com/5xbstx69>.

37.     The Act also prohibits any corporation or business firm from engaging in the practice of land surveying in North Carolina without first being licensed by the Board. N.C. Gen. Stat. § 89C-24. The license is available only for entities that are at least two-thirds owned by individual North Carolina-licensed land surveyors. N.C. Gen. Stat. §§ 55B-2(6), 55B-6(a), 57D-2-02(a); N.C. Bd. of Exam'rs for Eng'rs & Surveyors, *Businesses*, <https://tinyurl.com/srfmmfrt>. "Licensure of a corporation or business firm does not affect the requirement that all . . . land surveying work done by the corporation or business firm be

performed by or under the responsible charge of individual registrants . . . ." N.C. Gen. Stat. § 89C-24.

38.    Violating the Act is a Class 2 misdemeanor and may give rise to $1,000 in fines and up to 60 days' imprisonment. *Id.* § 89C-23; *see also id.* § 15A-1340.23. In addition, the Board is empowered to enforce the Act, including through conducting investigations and suing for injunctive relief. *Id.* § 89C-10(c), (f); 21 N.C. Admin. Code 56.1302.

39.    In defining what kind of work requires a land-surveyor license, the Act sweeps exceptionally broadly: It requires a land-surveyor license before people can collect basic data and information about land and structures.

40.    As relevant here, the "[p]ractice of land surveying" is defined to include:

(a) Providing professional services such as consultation, investigation, testimony, evaluation, planning, mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape, or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth, whether the gathering of information for the providing of these services is accomplished by conventional ground measurements, by aerial photography, by global positioning via satellites, or by a combination of any of these methods, and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project. The practice of land surveying includes the following:

1.    Locating, relocating, establishing, laying out, or retracing any property line, easement, or boundary of any tract of land;

2.    Locating, relocating, establishing, or laying out the alignment or elevation of any of the fixed works embraced within the practice of professional engineering;

3.    Making any survey for the subdivision of any tract of land, including the topography, alignment and grades of streets and incidental drainage within the subdivision, and the preparation and perpetuation of maps, record plats, field note records, and property descriptions that represent these surveys;

4.     Determining, by the use of the principles of land surveying, the position for any survey monument or reference point, or setting, resetting, or replacing any survey monument or reference point;

5.     Determining the configuration or contour of the earth's surface or the position of fixed objects on the earth's surface by measuring lines and angles and applying the principles of mathematics or photogrammetry;

6.     Providing geodetic surveying which includes surveying for determination of the size and shape of the earth both horizontally and vertically and the precise positioning of points on the earth utilizing angular and linear measurements through spatially oriented spherical geometry; and

7.     Creating, preparing, or modifying electronic or computerized data, including land information systems and geographic information systems relative to the performance of the practice of land surveying.

N.C. Gen. Stat. § 89C-3(7).

41.     As enforced by the Board, the "practice of land surveying" covers all manner of data- and information-collection about land and structures. And in recent years, the Board has enforced the Act vigorously against drone operators whose work includes creating and selling images and data.

42.     On information and belief, the Board cautioned one drone operator that he would need a land-surveyor license if he were to provide a client with aerial photographs of land containing any metadata or other information about coordinates or distances.

43.     According to the Board, a drone operator needs a land-surveyor license if he or she takes aerial photographs and uses orthomosaic software to stitch the photos together.

44.     According to the Board, a drone operator needs a land-surveyor license if he or she takes aerial photographs of land or structures and uses software to process the photos into a 3D digital model.

45.    According to the Board, a drone operator needs a land-surveyor license if he or she creates "accurate aerial maps."

46.    On information and belief, the Board maintains that a drone operator needs a land-surveyor license if he or she takes aerial photographs and processes those photographs into an image showing elevations.

47.    On information and belief, the Board maintains that a drone operator needs a land-surveyor license if he or she takes aerial photographs and processes them in such a way that a client can make rough measurements of distances and volumes using computer software.

48.    According to the Board, a drone operator needs a land-surveyor license if he or she performs "[t]he service of oblique aerial imaging."

49.    On information and belief, the Board maintains that a person without a land-surveyor license would be violating the Act if he or she were to perform any of the activities detailed in Paragraphs 41 through 48 above—even if (1) he or she were to clearly inform the client that the photographs and data are not the work of a licensed land surveyor and (2) the photographs and data were not created to establish legal boundaries on property.

50.    Since 2018, the Board has issued no fewer than six cease-and-desist letters to drone companies. Those letters have ordered the recipients to stop providing (among other things) "3D model[s] of an object or land mass"; "aerial photogrammetry"; "digital elevation models, contour lines, and calculations"; and "analysis of volumes of stockpiles."

51.    On information and belief, a representative of the Board provided the following answers to the following questions:

> 1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.

**Answer:**
**If there is no meta data or other information about coordinates, distances, property boundaries or anything that falls within the definition of land surveying in GS 89C-3(7) then simple [sic] taking and providing the photographs does not require a land surveying license.**

2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.
**Answer:**
**No, this would be within the definition of land surveying.**

3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.
**Answer:**
**No, this would be within the definition of land surveying.**

4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.
**Answer:**
**No, this would be within the definition of land surveying.**

5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.
**Answer:**
**No, this would be within the definition of land surveying, as further explained in the Board's Volume Computation Surveys Policy.**

6. Would it make a difference if I delivered the photographs to the developer stating that the images are not a licensed survey?
**Answer:**
**No, it would still be within the definition of land surveying.**

52.     The Board cannot articulate any public health or safety rationale that would justify a licensing requirement for the universe of speech falling within the statutory definition of the "practice of land surveying."

53.     In fact, much of the unlicensed land surveying the Board has investigated in recent years is similar to basic data provided by online platforms such as Google Maps.

-11-

54. For example, the Board maintains that "creation of break lines, reference points, digital elevation models, contour lines, and calculations" all are the practice of land surveying. As Michael Jones would learn, the Board also maintains that creating and disseminating "topographic information" is the practice of land surveying.

55. Google Maps makes topographic information and contour lines available for many parts of North Carolina. Below is an example:



56.     Similarly, many other public websites (for example, www.randymajors.org) provide elevation data about land in North Carolina. Below, for example, is a screenshot from a website displaying the elevation and coordinates of the Board's office:



57.     As Michael would learn, the Board has said that drawing lines on images of land to approximate property lines is the practice of land surveying. The Board also maintains (on information and belief) that creating aerial images containing "meta data or other information about coordinates, distances, [or] property boundaries" is the practice of land surveying.

58.     Many public websites display lines representing property boundaries in North Carolina. Below, for example, is a screenshot from Google Maps displaying lines representing the boundary of the property where the Board's office is located:



59.     Many public websites also display aerial images that contain information about coordinates and distances. Below, for example, is a screenshot from Google Maps displaying the distance between the Board's office and a nearby art gallery:



## III.   THE BOARD INVESTIGATES MICHAEL'S BUSINESS

60.     After receiving notice of the Board's investigation into his business, Michael met with a Board investigator in early 2019.

61.     The Board investigator told Michael that giving a client an aerial photograph that contained geospatial metadata is the unlicensed practice of land surveying.

62.     The Board investigator told Michael that stitching aerial photographs together to create a larger, orthomosaic picture is the unlicensed practice of land surveying.

63.     The Board investigator told Michael that giving a client aerial photographs on which he had drawn lines is the unlicensed practice of land surveying.

64.     The Board investigator told Michael that providing a disclaimer did not matter in determining whether Michael's activities were the unlicensed practice of land surveying.

65.     On or around June 13, 2019, the Board sent Michael another letter.

66.     A true and correct copy of the Board's June 13, 2019 letter is attached to this complaint as Exhibit 1.

67.     The letter asserted that "[a]fter a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina . . . without being licensed with this Board."

68.     The letter also asserted that "[a]t its regular meeting on June 12, 2019 the Board concurred with the recommendation of the Review Committee, which was to place 360 Virtual Drone Services, LLC on notice that practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice land surveying in North Carolina without being licensed with the Board, is a violation of G.S. 89C-24, 55B and 57D."

69.     The letter listed prohibited activities as including "mapping, surveying and photogrammetry; stating accuracy; providing location and dimension data; and producing orthomosaic maps, quantities, and topographic information."

70.     Disclaimers would not suffice, the letter added. A "marketing disclaimer is not appropriate," the letter asserted, "as the services still fall within the practice of land surveying."

71.     If 360 Virtual Drone Services LLC "fails to come into compliance," the Board threatened "to apply to the court for an injunction or pursue criminal prosecution."

## IV. INJURY TO PLAINTIFFS

72. Before the Board issued its June 13, 2019 letter, Plaintiffs offered and provided drone services such as aerial orthomosaic maps, aerial images containing location information, and aerial images of land that include lines indicating the rough position of property lines.

73. Since receiving the Board's June 13, 2019 letter, Plaintiffs have heeded the Board's demand that they "come into compliance."

74. Since receiving the Board's June 13, 2019 letter, Plaintiffs have ceased offering and providing drone services such as aerial orthomosaic maps, aerial images containing location information, and aerial images of land that include lines indicating the rough position of property lines.

75. Plaintiffs have complied with the Board's demands—and they have ceased offering and providing various drone services—solely to avoid exposing themselves to government enforcement actions.

76. Michael still uses his drone for certain projects (for example, filming aerial footage at weddings). But since receiving the Board's June 13, 2019 letter, Michael has avoided projects that would expose him to enforcement at the hands of the Board.

77. Plaintiffs wish to offer and provide drone services that include the following:

   a. Capturing aerial images on behalf of paying clients and using orthomosaic software to stitch those aerial images together to form orthomosaic maps.

   b. Creating marketing images of land on behalf of paying clients and drawing on those images lines indicating the approximate position of property boundaries. (If they were to provide aerial images of land that include lines indicating the approximate position of property boundaries, Plaintiffs would include a disclaimer to the following effect: "The

-16-

property lines on this image are approximations for visualization purposes only. They are not based on a survey created by a licensed surveyor and are not to be used to replace a survey created by a licensed surveyor.")

    c.    Capturing aerial images of land and structures (along with location data, coordinates, elevation data, and volume data) and making those images and that data available to paying clients.

    d.    Capturing aerial images of and data about land and structures; processing those images and data to create 3D digital models of land and structures; and making those 3D digital models available to paying clients.

78.    If Plaintiffs were to offer and provide the services detailed at Paragraph 77, however, they would face enforcement for violating the Act and the Board's associated rules and policies.

79.    Because of the Act and the Board's associated rules and policies, Plaintiffs are not offering and providing the services detailed at Paragraph 77 to paying clients.

80.    But for the Act and the Board's associated rules and policies, Plaintiffs would offer and provide the services detailed at Paragraph 77 to paying clients.

81.    So long as the Act and the Board's associated rules and policies remain in place, Plaintiffs will be prohibited from offering and providing the services detailed at Paragraph 77 to paying clients.

82.    The Act and the Board's associated rules and policies thus prohibit and prevent Plaintiffs from offering and providing the services detailed at Paragraph 77 to paying clients, and these laws (and the Board's enforcement of them) are enough to chill or silence persons of ordinary firmness from communicating information in this way.

83.     But for the Act and the Board's associated rules and policies, Plaintiffs would be free to resume creating and collecting images, data, and information with drones; processing images, data, and information; and conveying those images, data, and information to paying clients.

84.     Plaintiffs would offer and provide the services described at Paragraph 77 but for the fact that the Act and the Board's associated rules and policies make it illegal to do so.

85.     The Act and the Board's associated rules and policies are triggered only if Plaintiffs create or disseminate images and information about certain subjects.

86.     The Act and the Board's associated rules and policies impose special burdens on Plaintiffs because of the content of their speech. If Plaintiffs were to create 3D digital artwork, for example, the Board would not suppress their speech. If Plaintiffs were to create a 3D digital model of a field, by contrast, they would be in violation of the Act.

87.     In order to create and communicate the images and information described at Paragraph 77, Plaintiffs would be forced to comply with burdensome licensing requirements.

88.     These requirements are burdens placed on Plaintiffs solely because of the content of their speech.

89.     These requirements restrict Plaintiffs from offering and providing services to willing customers without first obtaining a license.

90.     If Plaintiffs offer or provide the services described at Paragraph 77 without a land-surveyor license, they face a threat of enforcement at the hands of the Board.

## CAUSE OF ACTION

### (First Amendment's Speech Clause)

91.     Plaintiffs reassert and reallege Paragraphs 1 through 90 as if fully set forth herein.

92.     The First Amendment to the United States Constitution (incorporated against the states through the Fourteenth Amendment) provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."

93.     Plaintiffs want to create, process, and communicate information—for example, aerial images, 3D digital models, and data about land and structures. These services consist entirely of speech protected by the First Amendment.

94.     Creating, processing, and disseminating images of land and structures is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

95.     Creating, processing, and disseminating 3D digital models of land and structures is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

96.     Creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevations, and volumes) is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

97.     Creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries) is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

98.     N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating, processing, and disseminating images of land and structures. That is a content-based

restriction on speech; the law applies to Plaintiffs only because of the type of information—the communicative content—their images would convey.

99.     N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating, processing, and disseminating 3D digital models of land and structures. That is a content-based restriction on speech; the law applies to Plaintiffs only because of the type of information—the communicative content—their 3D digital models would convey.

100.    N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevations, and volumes). That is a content-based restriction on speech; the law applies to Plaintiffs only because of the communicative content the data would convey.

101.    N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries). Again, that is a content-based restriction on speech; the law applies to Plaintiffs only because of the information—the communicative content—their images would convey.

102.    As the Board's past enforcement, policies, and statements have demonstrated, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit everything from stitching together aerial photos to collecting information about distances, coordinates, elevations, and volumes.

103.    Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating, processing, and disseminating images of land and structures.

104.    Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating, processing, and disseminating 3D digital models of land and structures.

105. Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevation, and volume).

106. Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries).

107. Defendants' ban of Plaintiffs' speech is not sufficiently tailored to any state interest, much less a compelling state interest, in preventing people from receiving the images, data, and information Plaintiffs wish to convey.

108. Defendants' ban of Plaintiffs' speech is not sufficiently tailored to any other state interest, compelling or otherwise.

109. Under North Carolina law, as interpreted and enforced by the Board, only licensed land surveyors may create aerial orthomosaic maps; 3D digital models of land and structures; aerial images containing location, distance, volumetric, and elevation data; and aerial images of land that include lines indicating the approximate position of property boundaries.

110. On their face and as applied to Plaintiffs, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 restrain Plaintiffs' ability to create, use, and disseminate information.

111. On their face and as applied to Plaintiffs, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 restrain Plaintiffs' ability to create aerial orthomosaic maps, 3D digital models, aerial images containing information, and aerial images of land that indicate the approximate position of property lines.

112. On their face, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 sweep up a broad swath of speech, including orthomosaic images, 3D digital models, oblique aerial

images, and images containing data about locations, distances, elevations, and sizes of land or objects. In this way, North Carolina's land-surveying licensing law is substantially overbroad, as it sweeps in significant amounts of speech that North Carolina has no conceivable interest in regulating.

113.    Application of N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 to Plaintiffs acts as a content- and speaker-based restriction on the availability and use of information.

114.    Unless N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 are declared unconstitutional and Defendants are enjoined, Plaintiffs will suffer continuing and irreparable harm to their First Amendment rights.

## REQUEST FOR RELIEF

Plaintiffs request the following relief:

A.      A judgment declaring that N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 on their face and as applied to Plaintiffs and others similarly situated violate the Speech Clause of the First Amendment to the United States Constitution;

B.      A permanent injunction prohibiting the Board from enforcing N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 against Plaintiffs and others similarly situated for taking aerial photographs and for collecting, processing, disseminating, and selling images of and information about land and property (including distances, coordinates, elevations, and volumes);

C.      An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

D.      Any other legal and equitable relief as the Court may deem just and proper.

Respectfully submitted this 22nd day of March, 2021.

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org
   jknight@ij.org
* Notice of Special Appearance pursuant to Local
Rule 83.1(e) forthcoming

/s/ David G. Guidry
David G. Guidry
MAINSAIL LAWYERS
338 South Sharon Amity Rd., #337
Charlotte, NC 28211
Phone: (917) 376-6098
Fax: (888) 501-9309
E-mail: dguidry@mainsaillawyers.com
State Bar No.: 38675
Local Civil Rule 83.1(d) Counsel for Plaintiffs

Attorneys for Plaintiffs