Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

_____

360 VIRTUAL DRONE SERVICES LLC and   )
MICHAEL JONES,                    )
              Plaintiff,    )
v.                          )
ANDREW L. RITTER, in his official   )
capacity as Executive Director of the  )
North Carolina Board of Examiners for  )
Engineers and Surveyors; and JOHN M.  )
LOGSDON, JONATHAN S.' CARE, DENNIS K.  )
HOYLE, RICHARD M. BENTON, CARL M.    )
ELLINGTON, JR, CEDRIC D. FAIRBANKS,   )
BRENDA L. MOORE, CAROL SALLOUM, and   )
ANDREW G. ZOUTWELLE, in their official )
capacities as members of the North    )
Carolina Board of Examiners for      )
Engineers and Surveyors,          )
                          )
            Defendants.     )
_____)


REMOTE DEPOSITION OF
MICHAEL RUDOLPH JONES 30(b)(6)
Zoom Videoconference
02/22/2022
10:01 a.m. (EST)

REPORTED BY: AMANDA GORRONO, CLR
CLR NO. 052005-01

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1                      02/22/2022

2                      10:01 a.m. (EST)

3

4      REMOTE DEPOSITION OF MICHAEL RUDOLPH JONES,

5    held virtually via Zoom Videoconferencing, before

6    Amanda Gorrono, Certified Live Note Reporter, and

7    Notary Public of the State of New York.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1    A P P E A R A N C E S
 2    (Via Zoom Videoconferencing):
 3
 4    ON BEHALF OF PLAINTIFF:
         Samuel B. Gedge, Esquire
 5       Institute for Justice
         901 N. Glebe Road, Suite 900
 6       Arlington, VA 22203
         PHONE:  (703) 682.9320
 7       E-MAIL: Sgedge@ij.org
 8
 9    ON BEHALF OF DEFENDANTS:
         Douglas W. Hanna, Esquire
10       Fitzgerald Hanna & Sullivan, PLLC
         3737 Glenwood Avenue
11       Suite 375
         Raleigh, NC  27612
12       PHONE:  (919) 863-9091
         E-MAIL: Dhanna@ghslawfirm.com
13
14    ALSO PRESENT:
15    Jacqueline Poyle, Assistant - Fitzgerald Hanna &
16    Sullivan, PLLC
17
18
19
20
21
22
```

Case 5:21-cv-00137-FL   Document 39-2   Filed 03/28/22   Page 3 of 88

```
                                                    Page 4
 1                      I N D E X
 2   WITNESS              EXAMINATION BY              PAGE
     MICHAEL R. JONES       MR. HANNA                   6
 3
 4                    E X H I B I T S
 5   EXHIBIT        DESCRIPTION                       PAGE
 6   Exhibit 1     Re-Notice of Rule 30(b)(6)
                   Deposition of Plaintiff 360
 7                 Virtual Drone Services LLC.......    7
 8   Exhibit 2     Complaint for Declaratory and
                   Injunctive Relief................   10
 9   Exhibit 3     Deposition of Michael Jones......   14
10   Exhibit 4     North Carolina Board of
                   Examiners for Engineers and
11                 Surveyors Investigative Report
                   Bates NCBELS 000001 - NCBELS
12                 000076..........................   15
13   Exhibit 5     Plaintiff 360 Virtual Drone
                   Services LLC's Responses and
14                 Objections to Defendant's First
                   Set of Interrogatories...........   25
15   Exhibit 6     Plaintiff 360 Virtual Drone
                   Services LLC's Responses and
16                 Objections to Defendant's First
                   Set of Request For Admissions....   82
17   Exhibit 7     Plaintiff 360 Virtual Drone
                   Services LLC's Responses and
18                 Objections to Defendant's First
                   Set of Request For Production
19                 of Documents....................   30
20   Exhibit 8     Letter dated 2/8/2019............   83
21   Exhibit 9     E-mail Bates Plaintiffs000020....   16
22   Exhibit 10    Certificate of Completion........   84
```

Page 5

1                      R E Q U E S T S

2    DESCRIPTION                                        PAGE

3    Request for E-mails...........................     70

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 6

1    MICHAEL RUDOLPH JONES, called as a witness,

2    having been first duly sworn by a Notary Public

3    of the State of New York, was examined and

4    testified as follows:

5                    THE WITNESS:  Yes, ma'am.

6                    THE COURT REPORTER:  Thank you.

7                    Can you please state your name and

8         address for the record.

9                    THE WITNESS:  Michael Rudolph Jones.

10        Address is 4971 Wayne Memorial Drive,

11        Goldsboro 27534.

12   EXAMINATION

13   BY MR. HANNA:

14        Q.    Mr. Jones, good morning.

15        A.    Good morning.

16        Q.    My name is Doug Hanna and I

17   represent the defendants in this case, which I

18   will collectively refer to as the Board.  And

19   it's a lawsuit that was filed by you in the

20   Eastern District of North Carolina.  It was a

21   lawsuit that's entitled Complaint for Declaratory

22   and Injunctive Relief.

Page 7

1               Are you familiar with the lawsuit

2     that I'm talking about?

3          A.   Yes, sir, I am.

4          Q.   Okay.  And you're here today on

5     behalf of 360 Virtual Drone Services LLC?

6          A.   Yes, sir.

7          Q.   And just for the record, do you have

8     a copy of the Complaint in front of you?

9          A.   Yes, I do.

10         Q.   Okay.  Great.  And I'm going to

11    share my screen with you if I can figure this

12    out.

13         A.   Great.  Thank you.

14              (Whereupon, Exhibit 1, Re-Notice of

15       Rule 30(b)(6) Deposition of Plaintiff 360

16       Virtual Drone Services LLC, was marked for

17       identification.)

18         Q.   And if that worked, do you see a

19    document called "Re-notice of Rule 30(b)(6)

20    Deposition"?

21         A.   I do, yes, sir.

22         Q.   And we're here today to take the

Page 8

1    corporate deposition of Virtual Drone Services

2    LLC.

3              Have you seen this Notice of

4    Deposition before?

5         A.    Yes, sir.  I have it right here.

6         Q.    Okay.  And on that notice, you'll

7    see where I have asked "Plaintiff 360 Virtual

8    Drone Services LLC to designate one or more

9    officers, members, managing agents, or other

10   persons to testify on its behalf on each of

11   the" -- on each of the 13 topics listed in this

12   Deposition Notice.

13             Are you the person designated?

14        A.    Yes, sir, I am the only person.

15        Q.    Okay.  All right.  And are you the

16   100 percent owner of 360 Virtual Drone Services?

17        A.    Yes, sir, I am.

18        Q.    And that is a limited liability

19   company formed in North Carolina?

20        A.    Yes, sir, it is.

21        Q.    And you're the single managing

22   member of that LLC?

Page 9

1          A.    Yes, sir.

2          Q.    All right.  And you started that

3    company, I believe you formed it on or about

4    October 16, 2017?

5          A.    Yes, sir, that sounds about right.

6          Q.    And just for the judge, just to go

7    through a little bit of a timeline here, but you

8    operated and provided services under that LLC for

9    a couple of years before you received a letter

10   from the North Carolina Board of Examiners for

11   Engineers and Surveyors, correct?

12         A.    Yes, sir.

13         Q.    And then just going through the

14   timeline, it looks like you received a letter

15   dated December 19, 2018 notifying you of an

16   investigation, correct?

17         A.    Yes, sir.

18         Q.    And that you provided -- we'll look

19   through the documents here shortly -- but you

20   provided an E-mail response in January to the

21   Board?

22         A.    Yes, sir.

Page 10

```
 1          Q.    And you were interviewed by the
 2     investigator in February of 2019?
 3          A.    William Casey, yes, sir.
 4          Q.    And in June of 2019, you received a
 5     letter from the Board that you attached as an
 6     exhibit to the Complaint, correct?
 7          A.    Yes, sir.
 8          Q.    All right.  So I'm going to share my
 9     screen and show you a copy of the Complaint.
10               Do you see that on the screen?
11          A.    Yes, sir, I do.
12          Q.    And is that the same Complaint that
13     you have in front of you?
14          A.    Yes, it is.
15               (Whereupon, Exhibit 2, Complaint for
16          Declaratory and Injunctive Relief, was marked
17          for identification.)
18          Q.    And if I move down to Page 6 of your
19     Complaint, you have a section at the bottom,
20     "Regulation of Land Surveying in North Carolina."
21               Do you see that?
22          A.    Yes, sir, I do.
```

Page 11

1          Q.    And based on that, you're familiar

2      the, with the Act that's identified as 89C?

3          A.    I'm familiar with, yes, as far as it

4      being on this paper.  I don't have the ins and

5      outs of all of that.

6          Q.    Understood.

7                And your Complaint -- this is your

8      Complaint, right?

9          A.    Okay.  Yes, ma'am -- yes, sir.  I'm

10     sorry.

11         Q.    And your Complaint quotes from the

12     Act and I think in specifically on Paragraph 40

13     which is on Page 8, do you see where your

14     Complaint talks about the "practice of land

15     surveying" and how the Act defines the practice

16     of land surveying?

17         A.    What number does that start on,

18     Mr. Doug?  40?  Right there?

19         Q.    Yes, sir.

20         A.    Yes, sir, I do.  Thank you.

21         Q.    Okay.  And one of the items that is

22     listed here in your Complaint when you look at

Page 12

1     Page 9 --

2              A.    Okay.

3              Q.    -- so it's Paragraph 40,

4     Subparagraph 5, and the definition as you've

5     indicated here from the statute, the definition

6     of land surveying includes, "determining the

7     configuration or contour of the earth's surface

8     or the position of fixed objects on the earth's

9     surface by measuring lines and angles and

10    applying the principles of mathematics or

11    photogrammetry."

12              Do you see that?

13             A.    Yes, sir.

14             Q.    Okay.  And your company, 360 Virtual

15    Drone Services, prior to receiving any type of

16    letter from the Board, had you ever provided any

17    services in the field of photogrammetry?

18             A.    No, not for paying customers.  I

19    tried to pitch it to customers for a future

20    service, but nobody bought into it.

21             Q.    Did you -- do you know what -- what

22    is photogrammetry?

Page 13

1            A.    Photogrammetry is being able to make

2       orthomaps of the earth by having multiple

3       pictures stitched together to create one large

4       picture or map.  That's the way I understand it.

5            Q.    Okay.  And do you have any education

6       in the field of photogrammetry?

7            A.    No, just a couple of online courses

8       that I took.

9            Q.    Do you have any experience?  Did you

10      work for any company before you started 360

11      Virtual Drone in the field of photogrammetry?

12           A.    No, sir.

13           Q.    And do you have any certificates or

14      any formal training in photogrammetry?

15           A.    Nothing like -- I have a Udemy

16      course I think I completed online, but it's just

17      an informational course, nothing that certifies

18      anyone.

19           Q.    So the -- a copy of the Notice of

20      Deposition in this case is marked as Exhibit 1.

21                And do you have a paper copy of that

22         in front of you, Mr. Jones?

Page 14

1          A.    What is that again?  What's the name

2     of it?

3          Q.    The Re-Notice of the Rule 30(b)(6)

4     Deposition.

5          A.    Got it right here, yes, sir.

6          Q.    And then Exhibit 2 is a copy of the

7     Complaint.

8                Do you have a copy of that in front

9     of you?

10         A.    Yes.

11         Q.    And Exhibit 3 that I have marked is

12    a copy of your deposition transcript.

13               Do you have a copy of your

14    deposition, your individual deposition transcript

15    in front of you?

16         A.    I don't have a hard copy, but I do

17    have it online available to look at.

18               (Whereupon, Exhibit 3, Deposition of

19         Michael Jones, was marked for

20         identification.)

21         Q.    Okay.  And then Exhibit 4 is a set

22    of documents that we produced, the North Carolina

Page 15

1     Board produced.  And I'm going to share my screen

2     with you and show you those documents.

3                    (Whereupon, Exhibit 4, North

4          Carolina Board of Examiners for Engineers and

5          Surveyors Investigative Report Bates NCBELS

6          000001 - NCBELS 000076, was marked for

7          identification.)

8          A.    Okay.  Thank you.

9                    MR. HANNA:  And it's, for the

10         record, it's a group of documents marked

11         NCBELS 1 through 76.

12         A.    Okay.

13         Q.    If I scroll down to Page 4, Page 4

14    looks like an E-mail from you to Mr. Casey dated

15    January 2, 2019.

16                    Do you see that E-mail?

17         A.    Yes, sir, I do.

18         Q.    All right.  And in that E-mail, you

19    indicate that "First I would like to apologize

20    for any violation on behalf, for I'm aware that

21    we are not licensed surveyors/engineers, nor are

22    we allowed to offer any services in that field

Page 16

1    claiming such."

2              Do you see that?

3         A.    Yes, sir.

4         Q.    Okay.  And when you wrote that, did

5    you have a general idea of what a surveyor does?

6         A.    A general idea, yes, sir.

7         Q.    And you were indicating that those

8    were not the kind of services you wanted to or

9    you were performing?

10        A.    No, not the services I was

11   performing, yes, sir.

12        Q.    Okay.  And I'm going to show you

13   another exhibit.  I may come back to that one

14   but --

15        A.    Okay.

16        Q.    -- I'm going to show you a document

17   which is marked as Exhibit 9.  And it's

18   Plaintiffs No. 20.

19              (Whereupon, Exhibit 9, E-mail Bates

20        Plaintiffs000020, was marked for

21        identification.)

22        Q.    And do you see that on your screen?

Page 17

1          A.    Yes, I do.

2          Q.    Okay.  And that, do you recognize

3     that E-mail?

4          A.    I absolutely do.  It's to Paul

5     Aitken from Drone University.

6          Q.    Can you tell me a little bit about

7     the E-mail, who the recipient was, and what the

8     purpose of the E-mail?

9          A.    Sure.  Paul Aitken is one of the I

10    believe owners of Drone U, maybe a partnership

11    with a guy named Rob, and they teach courses on

12    multiple services that drones offer, including

13    mapping.  So I had been following their podcast.

14    They had had prior stories on this subject.

15          So when this letter arrived, I

16    decided to send this letter to Paul Aitken in

17    hope for some support or guidance maybe on, you

18    know, what I should do or just to let them know

19    that this was happening to multiple people with

20    the drone companies in North Carolina.

21          Q.    All right.  And so the letter you're

22    referring to is the December letter from the

Page 18

1    Board just letting you know there was an

2    investigation?

3            A.    Yes.  Yes, sir.  Sorry.

4            Q.    That's all right.

5                  And in the letter to Mr. -- well, in

6    the letter to Paul, I don't know what his last

7    name is?

8            A.    Yeah, Aitken.

9            Q.    Aitken.  You indicate to Paul, in

10   the third sentence, you say, "And before we

11   begin, I am not an idiot, I am well aware I cant

12   [sic] offer services such as surveying without

13   license."

14                 Do you see that?

15           A.    I'm trying to -- where was that?

16   Second paragraph?

17           Q.    I'm sorry.  First paragraph, third

18   sentence.

19           A.    Okay.  Let me see.

20                 Yes, I see that.

21           Q.    What did you mean by "I'm not an

22   idiot, I'm well aware I cant [sic] offer services

1     such as surveying without license"?

2          A.     I had assumed Paul probably gets a

3     lot of notifications of people who are breaking

4     the law and offering surveying without license.

5     I was letting him know I'm not one of those guys.

6     I was aware of the line in the sand as far as

7     being able to make maps or do measurements or

8     anything and turn into a county or Board and try

9     to, you know, legitimately get this passed as a

10    project.

11         Q.     And what services were you referring

12    to, in your mind, when this --

13         A.     There was mapping --

14         Q.     Hold on.  Hold on.  You've got to

15    let me -- the court reporter won't be able to

16    take down what we say if we talk over each other.

17         A.     Okay.

18         Q.     So you need to do the best you can

19    to let me finish my question, pause, and I will

20    let you finish your answer.  I'll pause and then

21    I'll ask the next question.  But if we have a

22    normal conversation and we talk over each other,

1      she won't be able to get that down.  Okay?

2              A.    Yes, sir.

3              Q.    So when you wrote this in January of

4      2019, what services were you referring to that

5      you could not do as a, without -- you know, what

6      kind of surveying services were you referring to

7      that you couldn't do without a license?

8              A.    I was referring to the services that

9      you guys were claiming were surveying services.

10     I was referring to making maps, orthomosaic maps

11     for progression projects for construction sites

12     or developers.

13             Q.    And so you're referring, you were

14     indicating to Mr. -- or to Paul, that you're

15     aware that you can't offer services such as maps

16     or orthomosaic maps without a license?

17             A.    I was letting them know that I knew

18     you couldn't do that, create the maps and turn

19     them in for official documents to courts to build

20     any projects or roads or anything like that.

21             Q.    All right.  And you mentioned a few

22     minutes ago in your testimony that you understood

Page 21

1    the line in the sand.

2              What is the line in the sand?

3         A.    Me turning in -- me making

4    orthomosaic maps or measurements.  Just for an

5    example, turning it into Steve Keen and telling

6    him this is official, all measurements are

7    straight, they're accurate.  We can turn them

8    into the courts and any licensed surveyor would

9    take this map and they can go forward with it

10   officially, which I can't do.  So that's what I

11   was letting him know.

12        Q.    So if I understand your testimony,

13   it was your understanding that making maps or

14   orthomosaic maps was, in fact, surveying?

15        A.    No.  Just the part about turning

16   them into the official courts with lines, you

17   know, to do with projects or roads or what have

18   you.

19        Q.    Correct.  So, what, in your mind,

20   what turned that orthomosaic map into surveying

21   was whether it was used for an official purpose?

22        A.    Yes.

Page 22

```
 1           Q.    And when a client hires you, do you

 2      inquire what the purpose is and how they are

 3      going to be using the product?

 4           A.    No, because I never got that far --

 5           Q.    Okay.

 6           A.    -- with clients.

 7           Q.    All right.  And so how were you --

 8      how did, prior to being notified by the Board,

 9      how did you make sure the orthomosaic map that

10      you created for Mr. Keen, how were you -- how did

11      you ensure that it was not used for any official

12      purpose?

13           A.    Okay.  So one, just for the record,

14      he did not ask for this map nor did he order or

15      ask for it.  This was a sales pitch of a service

16      that I wanted to go forward with.  Steve was

17      having me do multiple video products.  So while I

18      was at his house one day, I presented this map to

19      him and said, look, these are things I can do

20      with my drone.  It's not for measurements, but if

21      you want to keep an eye on the progression of

22      your project, I can do this if you'd like.  And
```

Page 23

1    he had no interest in it.  So he's like, that's

2    cool, let's get back to my video and that was it.

3        Q.    So Mr. Keen did not hire you to

4    produce an orthomosaic map in PDF form?

5        A.    No, sir, he had no clue about it.

6    It was just a sales pitch that I was trying to

7    let him know these are other services that I can

8    possibly perform for you and they may be of need

9    to you.

10       Q.    And had Mr. Keen actually hired you

11   to provide a PDF orthomosaic map, how would you

12   have made sure that it wasn't used for some

13   official purpose?

14       A.    By telling him exactly what I did

15   when I pitched it to him, that this is not a map

16   you can make any kind of measurements off of, you

17   can't turn it into the Board.  It's not accurate

18   for measurements.  You can't build anything off

19   of it, and you can't use it in your development,

20   in this development that you're creating.

21             And I had a written void or, excuse

22   me, a written notice on my website and if I

Page 24

1    delivered that to Steve, it also had that on it

2    as well.

3         Q.   So if you would have created an

4    orthomosaic map for a client, you would have

5    informed the client that you can't use this for

6    measurements?

7         A.   I would inform the client this map

8    is not official, so to speak, but you can't use

9    this with surveyors.  You can't turn this into a

10   surveyor and you say this is perfect, I could use

11   this, no need to hire a surveyor.

12        Q.   All right.  Let me switch gears on

13   you a little bit --

14        A.   Okay.

15        Q.   -- and ask you about the services

16   you actually did provide --

17        A.   Okay.

18        Q.   -- operating under 360 Virtual Drone

19   Services beginning in 2017.

20             And as I indicated before, I believe

21   you were incorporated in late 2017; is that

22   right?

Page 25

1      A.    That's correct, yes, sir.

2      Q.    All right.  And so would you have

3 started providing services about that time, which

4 I believe was -- yeah, you were -- the

5 corporation was formed on October 16, 2017.

6      Does that sound right?

7      A.    Yes, sir.

8      Q.    All right.  And when would you have

9 started providing services under the umbrella of

10 360 Virtual Drone --

11      A.    Maybe a little before that, before I

12 saw it was going to turn into a prominent

13 business.  Like as I had mentioned in the other

14 deposition, I was coming from regular photography

15 and then kind of transitioned into the air and

16 the stuff with the droning.

17      Q.    I'm going to show you what's marked

18 as Exhibit No. 5.

19      (Whereupon, Exhibit 5, Plaintiff 360

20     Virtual Drone Services LLC's Responses and

21     Objections to Defendant's First Set of

22     Interrogatories, was marked for

Page 26

1          identification.)

2              A.    Okay.

3              Q.    And Exhibit 5 is a copy of Plaintiff

4      360 Virtual Drone Services LLC's Responses and

5      Objections to Defendant's First Set of

6      Interrogatories.

7                    Do you see that?

8              A.    Yes, sir, I do.

9              Q.    And so essentially, on behalf of the

10     Defendants, we served a list of questions on the

11     company, and it looks like at the very end, you

12     signed on behalf of the company declaring "under

13     penalty of perjury that the answers to the above

14     interrogatories, 1 through 10, are true and

15     correct to the best of" your "information,

16     knowledge, and belief."

17                   Do you see that?

18             A.    Yes, sir.

19             Q.    Okay.  And I'm going to show you

20     your response to No. 2.

21                   Do you see Interrogatory No. 2 on

22     this screen?

Page 27

1          A.     Yes, I do.

2          Q.     Okay.  And it says:  "Identify and

3    describe in detail all services provided by 360

4    Virtual Drone Services to customers in 2017,

5    2018, 2019, 2020, and 2021."

6                 Do you see that?

7          A.     Yes, sir.

8          Q.     All right.  And what -- can you read

9    your response for the record?

10         A.     Yes, sir.  You ready?

11         Q.     I'm ready.

12         A.     Okay.  "Between 2017 and 2021, 360

13   Virtual Drone Services LLC has provided a range

14   of drone photography-related services, including

15   videography and photography for commercial and

16   real-estate marketing and weddings.  360 Virtual

17   Drone Services LLC has captured visual and

18   thermal images for use in orthomosaic and thermal

19   maps.  360 Virtual Drone Services LLC also

20   provided a completed orthomosaic map before

21   Defendants issued a cease-and-desist letter."

22                 Is that good?

Page 28

1          Q.     It is good.  Thank you.

2                 So if I break that down, you

3     provided videography services to clients?

4          A.     Yes, sir.

5          Q.     And you provided photography

6     services for clients?

7          A.     Yes, sir.  Yes, sir.

8          Q.     And you provided, you provided

9     one -- or you completed one orthomosaic map

10    before you received that June letter, which I

11    think you called "Cease and Desist Letter,"

12    right?

13         A.     I think so.  I'm not sure if that's

14    accurate, but, yes.

15         Q.     Do you know what I'm talking about,

16    so you received a letter from the Board in

17    December of 2018 talking about a -- notifying you

18    of an investigation, right?

19         A.     Yes, sir.

20         Q.     And then there was an investigation

21    conducted and you cooperated with the

22    investigation, right?

Page 29

1          A.    Yes, sir.

2          Q.    And then there was a letter you

3    received in June, and that's what -- that's the

4    letter June of 2019 that you call a cease and

5    desist letter?

6          A.    Yes, sir.  Or the decision, I guess,

7    the Board had made.

8          Q.    Okay.  And that -- based on the

9    decision that the Board had made, you indicate

10   that prior to that June of 2019 letter, you had

11   completed one orthomosaic map for Mr. Keen?

12         A.    I completed one orthomosaic map to

13   present to Mr. Keen for a possible purchase in

14   the future.

15         Q.    So this was like a marketing ploy

16   for you?

17         A.    Yeah.  I don't want it to be

18   misunderstood that Mr. Keen bought this and this

19   was something he paid for and I delivered this

20   orthomosaic map to him.

21              This is just me trying to get him to

22   understand this is some services I may be able to

Page 30

1      offer if you need it and he was not interested.

2              Matter of fact, he didn't even

3      remember -- when I was talked to him, he said you

4      didn't make me a map, and I had to remind him

5      what it was.  And he was like, oh.

6          Q.    All right.  Let me drop down to --

7      actually, let me switch exhibits.

8          A.    Okay.

9          Q.    So the next exhibit I'm going to

10     show you is Exhibit 7.

11              (Whereupon, Exhibit 7, Plaintiff 360

12          Virtual Drone Services LLC's Responses and

13          Objections to Defendant's First Set of

14          Request For Production of Documents, was

15          marked for identification.)

16          Q.    And Exhibit 7 is Plaintiff 360

17     Virtual Drone Services LLC's Responses and

18     Objections to Defendant's First Set of Request

19     For Production of Documents.

20              Do you see that?

21          A.    Yes, sir, I do.

22          Q.    And I'm going to drop all the way

Page 31

1    down to 21.

2              And Request No. 21 I -- we ask you

3    to "Produce a copy of all company files on

4    Dropbox, including all work product created by

5    360 Virtual Drone Services as referenced in the

6    testimony of Michael Jones at Page 35 of his

7    deposition."

8              Do you see that?

9         A.    Yes, sir.

10        Q.    All right.  And just for the record,

11   it was my understanding that when you did work

12   for 360 Virtual Drone that you used Dropbox to

13   communicate with clients?

14        A.    To deliver the products to clients.

15        Q.    Okay.  And did you ever use any

16   other service other than Dropbox to deliver

17   products to clients?

18        A.    Possibly if the file was small

19   enough.  It might have been done under direct

20   E-mail.  But usually my products are so large you

21   have to put them on a Dropbox link.

22        Q.    Okay.  So if it's -- again, I'm just

Page 32

1    trying to get the Court to understand, that if it

2    was like a small, like a photo, you might send it

3    via E-mail, but most of the time you would use

4    Dropbox and provide the images, videos, or

5    whatever services you had provided to the client

6    via Dropbox?

7         A.    Yes, sir, through a shared link that

8    they could access.

9         Q.    Okay.  And the documents when you

10   looked at the file that you produced in response

11   to RFP 21, you provided a real estate video on

12   104 Blue Crest.

13             Do you remember that project?

14        A.    Yes, sir.

15        Q.    And tell me about that.  What was

16   the purpose of that real estate video?

17        A.    Marketing video for a real estate

18   firm here in North Carolina.  They use me for all

19   their videography services for their house to

20   make real estate tours.

21        Q.    And then you also produced a file or

22   set of files on 105 Brian Pool Road which appears

Page 33

1     to be another real estate video file?

2          A.    Yes, sir.

3          Q.    And at least one of those two also

4     had some regular images of what I would call

5     photographs and not videos?

6          A.    In the video?

7          Q.    No.  In the information you

8     produced, it looks like you produced some videos

9     and some photographs?

10         A.    Yes, sir.  That real estate agent

11    also has aerial photos with all of her video

12    packages -- aerial stills.  Yes, sir.

13         Q.    And then the third -- I guess I

14    would call client file -- is a wedding that you

15    call the "Price Wedding."

16              Do you remember providing that

17    information?

18         A.    Yes, sir.

19         Q.    All right.  Were there other files

20    that you -- that you provided to clients on

21    Dropbox that you no longer had or deleted?

22         A.    So when I deliver these to clients,

Page 34

1    the link is normally deleted within 90 days.

2    They have to download the file in 90 days, and

3    then I delete it for space purposes and storage.

4        Q.    Understood.  Okay.

5             So let me move up.  So there were

6    other deliverables to clients between 2017 and

7    2019, but they would have been deleted by then?

8        A.    Yes, sir.

9        Q.    All right.  And then do you see

10   Request No. 10?

11       A.    Yes.

12       Q.    And then the request ask you to,

13   "Produce an exemplar, including all electronic

14   data for the 'aerial or orthomosaic maps'

15   provided by Plaintiff to its clients as

16   referenced in Paragraph 72 of the Complaint."

17            And in response you indicate that

18   you couldn't find any, right?

19       A.    Yes, sir.

20       Q.    And you further indicated that, "A

21   PDF of the orthomosaic map provided by 360

22   Virtual Drone Services LLC to client Steve Keen,

Page 35

1    however, is available at NCBELS000072."

2              Do you see that?

3         A.    Yes, sir.

4         Q.    All right.  And just so I understand

5    your answer here --

6         A.    Okay.

7         Q.    -- No. 1 is you can't -- you don't

8    have any final products or PDFs of orthomosaic

9    maps that you previously produced?

10        A.    Correct.

11        Q.    Okay.  And your recollection is you

12   would have only produced one of them for

13   Mr. Keen, and that was for marketing purposes?

14        A.    Yes, sir.

15        Q.    And that other than the orthomosaic

16   map you turned into a PDF for Mr. Keen, you

17   didn't produce any other orthomosaic maps prior

18   to receiving any type of, what you call, "cease

19   and desist letter" for the Board?

20        A.    I did not create any maps for

21   anyone.  I created them for myself practicing

22   doing surveying or learning how to do it.  But no

Page 36

1    one ever saw them or I delivered them.

2          Q.    Right.

3                And the NCBELS000072 document, that

4    was essentially a photocopy of the PDF that you

5    provided to Mr. Keen that you provided to the

6    Board investigator, right?

7          A.    I'm not sure if it was a photocopy

8    or attachment out of an E-mail.  I'm not positive

9    on what that was.

10         Q.    Well, let's take a look at that.

11         A.    Okay.

12         Q.    Do you see that on your screen right

13   now?

14         A.    Yes, sir.

15         Q.    So it's NCBELS000072, which is part

16   of Exhibit 4.

17         A.    Yes.

18         Q.    Can you explain to me -- well, first

19   of all, to me this looks like just a photo --

20   just a copy of the image that you may have

21   provided to him in PDF form?

22         A.    No, I don't think it is.  I don't

Page 37

1    think it's a copy.  This is a print from

2    DroneDeploy.  They have an option for exporting

3    files, how you would like to export them, what

4    file extension you would like to use.  When you

5    choose PDF, they give you a PDF form.  This is

6    it.  And I just hit "print."  It is printed off.

7              That's why it has "Powered By

8    DroneDeploy" at the bottom.

9         Q.   I see what you're saying.  What

10   you've done is you've just printed a copy of the

11   PDF image that you sent, but you didn't -- you no

12   longer have the PDF file is what I guess is the

13   point?

14        A.   Yes, sir.  To explain further,

15   maybe, help you understand a little bit better.

16   I was a -- I had a trial membership with these

17   guys.  They are very expensive.  I had a trial

18   membership with them.  And then once you, you

19   know, are done with your 7-day trial all of these

20   things you've done are unavailable to you unless

21   you continue your monthly subscription, which I

22   wasn't able to do.

Page 38

1              So that's one reason that I don't

2      have the actual map and just pictures.  I don't

3      have access to their dashboard anymore.

4              Q.    All right.  And when you provided

5      this to the Board investigator, did you tell him

6      that this was a copy of the orthomosaic map that

7      you had previously produced?

8              A.    I'm not sure what terms I used as

9      far as "copy."  I probably told him this is a

10     picture of the map.  I'm not sure about the copy

11     thing, like how -- why are we determining whether

12     it's a copy or me just printed it.  It's still

13     the picture.

14             Q.    When I say "copy" or "print" I mean

15     the same thing.

16             A.    Okay.  Okay.

17             Q.    Essentially this was just a picture,

18     if you feel better with that word --

19             A.    Yeah.

20             Q.    -- a picture of the map that you

21     previously produced?

22             A.    Yes, sir.

Page 39

1              Q.    And you actually specifically told

2      him it's a picture of the orthomosaic map that

3      you previously created?

4              A.    How I explained it to him was, yes,

5      this is 4 or 500 pictures stitched together of

6      your whole entire property.  And we can do this

7      weekly if you want, but he wasn't interested.

8              Q.    Did -- well, I'm actually talking

9      now about the communications that you would have

10     had with the Board investigator.

11             A.    With the Board, okay.

12             Q.    This is a document that's marked

13     NCBELS 000072.  This is actually part of the

14     investigation that was conducted right before you

15     received the June 2019 letter.

16             A.    Yes, sir.

17             Q.    All right.  And in that

18     investigation, you had communicated to the Board

19     that you have -- that you offer orthomosaic maps,

20     you offer to do that to clients?

21             A.    I wanted to, yes.  I was offering,

22     just nobody was interested.

Page 40

1          Q.    All right.  And so -- and then you

2     were giving him an example of what an orthomosaic

3     map would look like that your company would be

4     able to create?

5          A.    Correct.

6          Q.    All right.  And did you explain to

7     him that you, prior to the investigation in early

8     2019, that you had not been hired by any client

9     to produce an orthomosaic map?

10         A.    I'm sure we had discussed that.

11    Yes.  I can't recall the conversation exactly.

12    But I don't know why I wouldn't have expressed to

13    him I don't have clients that order those.  This

14    is a hopeful service I can get into.

15         Q.    All right.  And did you explain to

16    him that the one orthomosaic map that you had

17    created was actually in PDF form?

18         A.    I'm quite certain that I did.

19         Q.    Okay.  Did you provide -- other than

20    the videography services that we talked about

21    earlier, or the photography services that we

22    talked about earlier, did you provide any other

Page 41

1     services for clients between, you know, the date

2     you started in October of 2017 through the date

3     you received that letter from the Board in June

4     of 2019?

5          A.     Just photography, videography.  And

6     that's pretty much my business.  And aerial

7     photography, if you want to separate that.

8          Q.     And aerial photography you're

9     talking about --

10          A.     With the drone.

11          Q.     -- essentially video that you're

12     talking using your drone?

13          A.     Or still pictures.

14          Q.     Okay.  And prior to June of 2019,

15     had you ever been hired to provide any measurable

16     maps to clients?

17          A.     No, sir.

18          Q.     And prior to June of 2019, had you

19     ever been asked to provide maps with location

20     data?

21          A.     No, sir.

22          Q.     And prior to June of 2019, had you

Page 42

1      ever been asked to provide maps with elevation

2      data?

3              A.     No, sir.

4              Q.     And prior to June of 2019, had you

5      ever been asked to provide maps with volume data?

6              A.     No, sir.

7              Q.     And so when you received the, what

8      you call a cease and desist letter in June of

9      2019, how did you change your business, if you

10     changed your business at all?

11             A.     So I left the meeting with the

12     understanding that I could not draw lines on any

13     real estate photos that I was giving to the

14     clients, like property boundary lines; I could

15     not deliver clients any maps, whether they were

16     measurable in PDF form, I was pretty much under

17     the understanding I could not make any maps

18     regardless of anything.  So I quit offering that.

19     And that was -- and you know, that service as far

20     as taking pictures together and mapping has to do

21     with a lot of other service like parking lot

22     pavement inspections, roof inspections, I had to

Page 43

1    turn all of those possible jobs down that came to

2    me because that technology is used to create

3    those things as well.

4         Q.   So based on the -- just so I

5    understand -- based on the June 2019 letter that

6    you received from the Board that you identify as

7    a cease and desist letter, you no longer would

8    provide any type of marketing maps with property

9    boundary lines?

10        A.   Yes, sir.

11        Q.   Okay.  And that was something you

12   did prior to -- was that something you did prior

13   to receiving that letter in June of 2019?

14        A.   Yes, sir, it was.

15        Q.   Okay.  And then other than that, did

16   you stop doing any service that you had

17   previously provided a client?

18        A.   With that one, the lines -- like I

19   had a lot of real estate agents that would hire

20   me to take aerial photos and then in that package

21   they would also, can you put the property around

22   this empty parcel, the property lines, you know,

Page 44

1     and they would give me a map that they had from

2     Google and I would just, kind of, you know, in

3     Photoshop application would draw the lines.  I

4     had to send E-mails and notification and texts to

5     all my clients I can no longer do that.  I could

6     take the pictures, but I couldn't draw any lines.

7          Q.     So other than not providing pictures

8     with lines for marketing purposes, did you stop

9     doing anything else that you had previously done

10    prior to June of 2019?

11         A.     I had stopped trying to market any

12    kind of maps because I just quit making them

13    altogether.  I wasn't delivering those -- I mean,

14    I had no clientele to get the maps, but that was

15    something I was hoping to get into.  I just put a

16    halt to all of that.

17         Q.     I guess so we're clear, you were

18    hired and you had provided marketing maps to

19    clients where you would draw the property

20    boundaries, right?

21         A.     Not marketing maps.  Aerial photos.

22         Q.     Aerial photos with -- sorry.  Aerial

Page 45

1    photos with approximate property boundaries for

2    marketing purposes?

3         A.    Yes, sir.

4         Q.    Okay.  But other than that service,

5    there was no other service that you previously

6    provided that you had to stop providing, right?

7         A.    I don't think so.  I think that was

8    it.

9         Q.    And then as far as the orthomosaic

10   PDF map, that was the only map that you had tried

11   to do but you only did that for marketing

12   purposes, you weren't hired to do that?

13        A.    Exactly.  And also too, can I say

14   one thing about -- as far as the mapping and

15   stopping everything -- so I've had to turn down a

16   lot of jobs, I guess you can say, I quit offering

17   anything that has to do with mapping because I

18   was told I couldn't collect the data.  Remember

19   that part where companies were hiring me to

20   collect the data, take the pictures.  I would

21   deliver all the pictures to them then they would

22   produce a map.  And I was told by William that

Page 46

1    you cannot even collect the data for a company

2    who's making the map.

3                 So that I had to quit offering

4    altogether.  Someone called me and said, all you

5    got to do is take the pictures, send the manilas,

6    you know, we are doing the map.  I had to again

7    tell them I can't perform that service.

8         Q.    Who hired you to do that?

9         A.    I'm a member of a couple of -- like,

10   Droners, DroneBase they send me jobs daily that I

11   have to turn down.

12        Q.    And you're saying you turned down

13   jobs where you would just take pictures and

14   provide pictures?

15        A.    If they wanted to make a map out of

16   it.  Because there is a certain -- in the

17   instructions they have to tell you, you have to

18   use DroneDeploy, they tell you to overlap,

19   instructions how to make the map.  I'm just

20   collecting the pictures and putting the SD card

21   in the computer, uploading it to their site.

22   They create a map because they own the stitching

Page 47

1    application.  I would just be collecting the

2    data, which are pictures, sending it to them.

3    They create the map.

4                But I was told by William even

5    though I wasn't doing any processing of the map,

6    I couldn't collect the pictures at all.

7                So if a job came to me and they were

8    like, we need beauty shots and also an

9    orthomosaic picture or map, I had to turn it

10   down.  And still am today.

11               Q.    Just so we're clear, what you're

12   talking about is flying your drone and taking

13   pictures and providing those pictures?

14               A.    Yes, but what I'm talking about

15   turning down is the orthomosaic maps which they

16   are asking me to do.  They are asking me to take

17   pictures, but they are in a separate like, No. 1

18   instruction, we need beauty shots of the front of

19   the building.  No. 2, we need an orthomosaic map

20   over top of the warehouse.  And then they give me

21   a picture of the map and they draw the line over

22   the warehouse where they need an orthomosaic map.

Page 48

1                    So I'm not doing a map, but by

2          William's words, I can't even collect those

3          pictures for that company.

4                    Is that clear?

5          Q.    It is.  I mean, have you seen that

6          written down where you -- from anybody from the

7          Board that you're not allowed to take pictures

8          and provide clients with aerial photos?

9          A.    Actually, technically, it is.  It's

10         the one paragraph that I can't offer any location

11         services which they have to have that picture in

12         order to make the map.  So yes, it does say I

13         can't collect pictures with location data.

14         Q.    Just so I'm clear, so since June of

15         2019, you no longer -- let me make sure I've got

16         this right.

17         A.    Okay.

18         Q.    You no longer provide aerial images

19         for marketing purposes where you would

20         approximate rough boundaries of the property?

21         A.    No.  So I no longer am providing

22         pictures that is told to me when I'm getting the

Page 49

1    job, we're going to take these pictures, Michael,

2    and we're going to create a map with them.  If

3    they have that in their instruction, I'm saying I

4    can't do it.

5        Q.   No.  I hear you.  But let me back

6    up.

7             So the first thing you talked about

8    was aerial photos where you would approximate

9    rough boundaries for real estate marketing

10   purposes.  And you're no longer doing that?

11       A.   No, I can't.  No.  I don't draw the

12   lines on the pictures.  All of my clients know

13   that I can't do that.

14       Q.   Okay.  And as I understand, you've

15   said that since you received the cease and desist

16   letter, you've been asked to provide photographs,

17   aerial photographs to other people who would then

18   use them to produce an orthomosaic map?

19       A.   Yes, sir.

20       Q.   Okay.  And you -- and those jobs,

21   those are new jobs since June of 2019 that you

22   have been unable to do?

Page 50

1          A.     Yes, sir.

2          Q.     Okay.  Are there any other jobs that

3     you're unable to do?

4          A.     Not within my realm of what I want

5     to.  No.  That's it.

6          Q.     And you've never been asked to

7     produce a 3D model?

8          A.     No.

9          Q.     And you've never produced a 3D

10    model?

11         A.     Just for practicing and learning how

12    to do it for myself.

13         Q.     Have you ever produced a 3D model to

14    a client or a third party?

15         A.     No, because it's very hard and I

16    didn't get far enough in the learning process.

17         Q.     All right.  Let me -- we've been

18    going about quite an hour.  Let me take a

19    five-minute break and I don't think I have that

20    much longer.

21         A.     Okay.  Thank you.

22         Q.     Thanks.

Page 51

1                    (Recess taken.)

2                    THE COURT REPORTER:  Back on the

3        record.

4    BY MR. HANNA:

5        Q.    Mr. Jones, I wanted to turn back to

6    Exhibit 2, which is a copy of the Complaint.

7        A.    Okay.

8        Q.    I put that on my -- I can share my

9    screen with you.

10       A.    Great.  Thank you.

11       Q.    And so you indicate here on

12   Paragraph 72, you said:  "Before the Board issued

13   its June 13, 2019 letter, Plaintiffs offered and

14   provided drone services such as aerial

15   orthomosaic maps, aerial images containing

16   location information, and aerial images of land

17   that include lines indicating the rough position

18   of property lines."

19                    Do you see that?

20       A.    Yes, sir.

21       Q.    Okay.  And as far as providing

22   services such as aerial orthomosaic maps, you

Page 52

1    actually never did that prior to June 13, 2019?

2         A.    Correct.  Just hoping, hoping to do.

3         Q.    And as far as aerial images

4    containing location of information, are those

5    just -- are you talking about aerial -- you're

6    talking about just photographs that you took

7    using your drone that you provided to real estate

8    clients and other clients?

9         A.    Yes, sir.

10        Q.    Okay.  And just so we're -- and so

11   it's not anything unusual, but we're talking

12   about using your drone to fly a piece of property

13   and take video and take aerial images on top of

14   the video and provide that to the client?

15        A.    Yes, sir.

16        Q.    Okay.  And as I understand it, you

17   continued to provide aerial images to clients

18   after you got the June 13, 2019 letter, correct?

19        A.    Yes, sir.

20        Q.    And you provided, continued to

21   provide aerial videography to clients?

22        A.    Yes, sir.

Page 53

1          Q.    Okay.  And you no longer provided

2     aerial images of land that include lines

3     indicating the rough position of property lines?

4          A.    Yes, sir, I quit that.

5          Q.    Okay.  And do you understand that

6     the Board's position is that you're allowed to do

7     that if it's for marketing purposes only?

8          A.    No, that's not what I got from Mr.

9     William Casey.

10          Q.    Well, I understand that.  But you're

11     talking about a conversation that you claim to

12     have with Mr. Casey during the investigation,

13     right?

14          A.    Yes, sir, absolutely had.  And I can

15     remember all of it.

16          Q.    But since this lawsuit has

17     started -- so that conversation that you had with

18     Mr. Casey was in early 2019, right?

19          A.    Yes, sir.

20          Q.    And you filed this lawsuit in March

21     of 2021?

22          A.    Yes, sir, I think that is correct.

Page 54

1          Q.   And since the filing of the lawsuit,

2     do you now understand that the Board takes the

3     position that you can, in fact, provide aerial

4     images of land that include lines indicating the

5     rough position of property lines as long as it's

6     being used for marketing purposes only?

7          A.   I did not know that, but that's

8     great.

9          Q.   Okay.  And as far as providing a PDF

10    of an orthomosaic map, that's something that you

11    never -- you were never hired to do, but you did,

12    in fact, provide a PDF to one potential client,

13    correct?

14         A.   Yes, sir, Steve Keen.

15         Q.   And do you know if the Board would

16    allow you to actually provide a PDF of an

17    orthomosaic map to a paying client as long as it

18    didn't have measurable information?

19         A.   I was not aware of that, not the

20    impression I was under.

21         Q.   Okay.  But those are two things that

22    you want to do going forward, right?

Page 55

1          A.    Two of the things I want to do, yes,

2     sir.

3          Q.    And the other thing is you want to

4     be able to provide aerial images to other third

5     parties for them to use in, I guess, creating

6     orthomosaic maps or using DroneDeploy in some

7     other way?

8          A.    Yes, that's another thing I'd like

9     to do.

10         Q.    Okay.  Why don't those companies

11    just do it themselves?

12         A.    Honestly, I think it's a group of

13    young entrepreneurs and they have locked down as

14    far as like an internet feed to drones nationwide

15    so they can charge the clients thousands of

16    dollars and pay a drone client 70 bucks to go fly

17    it.

18         Q.    And that's something that you've

19    been asked to do since you received this June 13,

20    2019 letter?

21         A.    Yes, sir.  These job boards I have,

22    they basically just send jobs constantly to you

Page 56

1     and you have the option to accept or decline, so.

2          Q.    And when was the first time that you

3     declined providing aerial images?

4          A.    That's hard to say.  I would have no

5     idea, I mean.

6          Q.    Like within the last 12 months?

7     Last 18 months?

8          A.    These things come weekly, every day.

9     I mean, they've never stopped.  So as far as me

10    being able to tell you, like, the first one I got

11    after that notice, I'm not sure.  They come

12    frequently.

13         Q.    And so what I hear you saying, just

14    so that I'm clear, you're complaining that you

15    are not able to provide PDF orthomosaic maps to

16    clients, right?

17         A.    That's one of the complaints, yes.

18         Q.    I'm just trying to break it down for

19    the Court.

20         A.    That's fine.

21         Q.    You're complaining that you're not

22    allowed to provide aerial images of land that

Page 57

1    include lines indicating the rough position of

2    property lines for real estate marketing

3    purposes, right?

4            A.    Yes, sir.

5            Q.    And that you're complaining that

6    you're not allowed -- since the Board issued its

7    June 13, 2019 letter, you have not been allowed

8    to provide aerial images to other third-party

9    Droners?

10           A.    Yes, for map production.

11           Q.    All right.  Anything else?

12           A.    I would -- I mean, I would like to

13   have the option to give these clients access to

14   DroneDeploy's dashboard to use the tools they

15   have to measure and do volume metrics like

16   construction sites.  I think there's like 48 or

17   47 or 48 other states that have no problem with

18   this.  I would like to do what these other people

19   are doing in other states.

20               I'm not surveying.  I'm not claiming

21   it's surveying, but I don't understand why I

22   can't give the client these tools.  They are made

Page 58

1    for that and they are being offered nationwide.

2    It's just North Carolina is telling me you can't

3    do it.  And I have trouble understanding why.

4    And I want to be able to do that.

5         Q.   I'm walking through your Complaint

6    and I just want to make sure I understand where

7    in your Complaint you were asking about this.

8              So in Paragraph 72, we've covered --

9    I mean, there's nothing else identified in

10   Paragraph 72 that you're claiming injury, right,

11   other than what we've just talked about?

12        A.   I'm sorry.  I'm not understanding

13   that question now.

14        Q.   Yeah.  In Paragraph 72, this is

15   under a heading called "Injury to Plaintiffs,"

16   right?

17        A.   Okay.

18        Q.   Do you understand that?

19        A.   Yes.

20        Q.   Okay.  And you're saying to the

21   Court since the June 13, 2019 letter has been

22   issued, you've been injured in the following

Page 59

1    ways, right?

2            A.    Yes.

3            Q.    And one of the things you've been

4    injured in and you're no longer able to provide

5    PDF aerial orthomosaic maps?

6            A.    That's one of the things, yes, sir.

7            Q.    Even though you never actually

8    provided it, you just did it one time for

9    marketing purposes, right?

10           A.    Yes, sir.

11           Q.    Okay.  And that you're now going

12   forward, you're not able to provide aerial images

13   containing location information to third-party

14   Droners using your, using your drone and camera?

15           A.    Yes, sir.

16           Q.    Those are the same aerial images

17   that you currently take and provide to paying

18   clients for real estate purposes and other

19   purposes, right?

20           A.    Yes, sir.

21           Q.    Okay.  And so just to make sure,

22   when we say aerial images, you're talking about

Page 60

1    aerial photographs that you took for real estate

2    clients before the letter and you've continued to

3    take for real estate clients since you received

4    the letter?

5          A.    Yes, sir.

6          Q.    And that also this idea of you're

7    claiming injury that you are no longer able to

8    provide aerial images of land that include lines

9    indicating the rough position of property lines

10    for real estate marketing purposes?

11          A.    Yes.

12          Q.    All right.  And anything else, any

13    other way you've been injured?

14          A.    As far as, I mean, like I mentioned

15    the maps.  I have not been able to, that part

16    about the location data and the aerial, that

17    keeps me from being able to make a map.  I would

18    like to be able to do that.

19          Q.    All right.  So let's -- let me break

20    it down this way.

21          A.    Okay.

22          Q.    In Paragraph 72, there's nothing

Page 61

1    else, right?

2               I'm sorry.  Did you get that

3    question?

4         A.   Yeah, I'm sorry.  I was just reading

5    over it.  Sorry about that.

6               When you say there's nothing else, I

7    guess that's the part I'm not understanding.

8         Q.   Well, in Paragraph 72, you have

9    aerial orthomosaic maps, and you're talking about

10   the PDF map that you made, right?

11        A.   Well, I'm talking about the ability

12   to make any orthomosaic map there, actually.

13        Q.   All right.  Prior to, prior to June

14   of 2019, you had never provided any client with

15   an orthomosaic map, right?

16        A.   No.

17        Q.   Okay.  And prior to June of --

18   June 13, 2019, you had never been asked by any

19   Droners to provide aerial images for use in this

20   DroneDeploy software?

21             MR. GEDGE:  Object;

22        mischaracterizing prior testimony.

Page 62

1               But you can answer, if you can.

2          A.    What was that question again?  Since

3     receiving the Board, plaintiffs have had --

4          Q.    Prior to June of 2019, you had never

5     been asked by a client to provide an orthomosaic

6     map, correct?

7          A.    Oh, no.  Yes, sir.  I'm sorry.  No,

8     I have not.

9          Q.    And prior to June of 2019, you have

10    never been asked by a third-party Droners to

11    provide aerial images, correct?

12               MR. GEDGE:  Objection;

13        mischaracterizing prior testimony.

14               MR. HANNA:  You can object to the

15        form.

16               MR. GEDGE:  Objection to form.

17               MR. HANNA:  I don't -- I don't like

18        your speaking objection at all.

19    BY MR. HANNA:

20         Q.    Do you understand my question,

21    Mr. Jones?

22         A.    Can you ask it one more time,

Page 63

1    please?

2              Q.    Yeah.

3                    You said, you testified that prior

4    to June of 2019, you had never been asked to

5    provide an aerial orthomosaic map by a client,

6    right?

7              A.    Yes, we've got that one, so, no.

8    The next question.

9              Q.    And prior to June of 2019, you had

10   provided clients with aerial images for marketing

11   purposes or real estate purposes, right?

12             A.    Yes.

13             Q.    And prior to June of 2019, you had

14   provided videos to real estate clients, aerial

15   videos, correct?

16             A.    Yes, yes.

17             Q.    And after June of 2019, you

18   continued to provide aerial images to real estate

19   clients, right?

20             A.    Yes.

21             Q.    And after June of 2019, you

22   provided, continued to provide aerial videography

Page 64

1      to real estate clients, correct?

2           A.    Yes.

3           Q.    All right.  And then we talked about

4      aerial images containing location information.

5      You said -- I understood that prior to June of

6      2019, you had never been asked by a third-party

7      droner to provide that kind of information for

8      use in DroneDeploy, correct?

9           A.    Okay.  So, no, because they wouldn't

10     have asked that.  I guess that's why that's

11     confusing me.  No, they wouldn't have asked that.

12     If they were hiring me for pictures, they would

13     just say I want aerial pictures.  They wouldn't

14     go -- it would be like you saying I want a new

15     car and also want gas and oil in it.  It was

16     just -- I just assume that when they call me to

17     ask for the aerial pictures, I'm not putting

18     locations.

19                 Now, to be factual, all of the

20     pictures taken with any modern camera does have

21     location information in it.  The question is kind

22     of bending.

Page 65

1           Q.    Again, and I'm just going off your

2    testimony, which is why your lawyer objected, but

3    your testimony was that since June of 2019, you

4    have turned down jobs where you were asked by

5    other droners to provide aerial images?

6           A.    Yes, since June '19, I've turned

7    down all jobs that want orthomosaic pictures and

8    they let me know we're going to produce a map

9    with this.  I turned those down.

10          Q.    So what's really important for the

11   Court to understand is prior to June of 2019, had

12   you taken a paying client where you provided

13   aerial images to a third-party droner for use in

14   this DroneDeploy software?

15          A.    Yes, prior to June 13th, that's like

16   the Wilmington mall, the thermal jobs, all of

17   those were me providing the pictures to that

18   company.  They were doing the map or producing

19   the map, which we discussed multiple times in

20   this case.

21          Q.    All right.  Well, let's go back over

22   that because --

Page 66

1          A.     Okay.

2          Q.     -- so what you're saying is before

3    June of 2019, you had been asked to fly a site

4    and take pictures?

5          A.     Yeah, like Harbor Freight.  Is this

6    not all ringing a bell?  Harbor Freight,

7    Wilmington, all of that.  I wasn't making the

8    maps, but I was hired to take the pictures for

9    the map.  Then the Board told me you can't even

10   do that.  So from that point, I quit doing --

11         Q.     Hold on, hold on.  And you were

12   hired to take aerial images by a client in

13   Wilmington, right?

14         A.     By Upland Data from Chicago.

15         Q.     Okay.

16         A.     In Wilmington, yes.

17         Q.     And you took aerial images and you

18   provided it that to that client?

19         A.     Yes, sir.

20         Q.     Do you have a copy of that?  Do you

21   have that information?

22         A.     I'm not sure if it's in the Droners'

Page 67

1      E-mails.  I know they send you Droners' E-mails

2      from Droners.

3           Q.    Well, I'm just asking for the -- you

4      know, you have a paying client prior to June of

5      2019 where you took aerial images, right?

6           A.    Yes, yes.

7           Q.    And you, do you have those aerial

8      images?

9           A.    No.

10          Q.    Okay.

11          A.    They were delivered.

12          Q.    Hold on, hold on.  What you're

13     saying is the aerial images are nothing different

14     than what you're providing your real estate

15     clients, same photos, same images?

16          A.    No.

17          Q.    No what?

18          A.    No, they are not the same images.

19          Q.    And why not?

20          A.    Because they are not orthomosaic

21     maps.  I'm having such a time understanding why

22     you're not understanding this.

Page 68

1               So pictures taken like -- the real

2      estate agents call me.  They are just pictures.

3      I choose the framing of the house or I put

4      whatever is in the frame.

5               Orthomosaic maps are me collecting

6      data to make a map.  It's flown by an automated

7      mission by the drone.  The drone is taking

8      pictures straight down every two seconds whatever

9      direction they give me to plot the map.  They are

10     nothing like the real estate pictures.  They are

11     pictures, yes, but they are not in any form like

12     those at all.

13          Q.   Okay.  And other than the fact that

14     they are being taken straight down and they are

15     taken every two seconds, is there anything

16     different about those images than the images from

17     a data perspective that you provided your real

18     estate clients?

19          A.   No.

20          Q.   And so it's -- and so if you

21     provided me -- and you don't have an exemplar to

22     provide the Court of what you're talking about?

Page 69

1          A.    No, sir.

2          Q.    Okay.  But what you're saying is

3    from a data perspective, the images that you take

4    every two seconds straight down, for this

5    Wilmington mall client, it has the same data that

6    you're providing your real estate clients?

7          A.    Yes, all the photos have the same

8    data in it.  Yes, sir.

9          Q.    Okay.  And so if a client calls you

10   like the Wilmington mall client and says we need

11   you to take aerial images, you're no longer doing

12   that?

13         A.    Aerial images -- I'm making a map.

14   I would know if it's for a map by the way they

15   ask me to take the pictures.  If I know that,

16   then I tell them I can't do it.

17               I can send you plenty of examples of

18   E-mails where I turned down those jobs.

19         Q.    Yeah.  That would be great.  If you

20   would provide those, I think I asked for those in

21   discovery.  So --

22               (Cross-talking.)

Page 70

1           A.     They probably --

2                  (Whereupon, a request for Request

3           for E-mails, was made.)

4      BY MR. HANNA:

5           Q.     So if you get one that would be

6      great.

7                  Is there anything else in Paragraph

8      72 that we haven't talked about?

9           A.     No.

10          Q.     And other than not providing aerial

11     images to third parties for use in preparing an

12     orthomosaic map, is there anything that you're

13     not able -- anything else that you're not able to

14     do since you received this June 2019 letter?

15          A.     Well, I can't deal with 3D models.

16     I can't --

17          Q.     Did you ever build a 3D model before

18     June of 2019?

19          A.     I have built several, yes.

20          Q.     For a client?

21          A.     Not for a client.

22          Q.     Is there anything that you were

Page 71

1    doing prior to June 2019 other than what we

2    talked about in Paragraph 72 that you're no

3    longer able to do?

4          A.    No.

5          Q.    Okay.  So the lawsuit, as I

6    understand it, your First Amendment lawsuit,

7    you're claiming that the -- you're claiming that

8    the Board is keeping you from doing three things

9    as I understand it.

10              They are keeping you from -- and I'm

11   looking at -- well, let me back up.  Let me

12   strike that.  Let me back up.

13              Do you see your Cause of Action on

14   Page 19?

15         A.    Yes.

16         Q.    Okay.  And this is -- you're filing

17   or making a claim under the First Amendment,

18   right?

19         A.    Yes.

20         Q.    Okay.  And in Paragraph 93, you say

21   "Plaintiff," meaning you and your company --

22   "want to create, process, and communicate

Page 72

1      information -- for example, aerial images, 3D

2      digital models, and data about land and

3      structures.  These services consist entirely of

4      speech protected by the First Amendment."

5                  Do you see that?

6            A.    Yes, sir.

7            Q.    Okay.  And, again, 3D digital models

8      is something you never did prior to receiving

9      this June 2019 letter, right?

10           A.    Correct.

11           Q.    And aerial images is something that

12     you did prior to receiving the letter and for

13     real estate clients and other clients you've

14     continued to provide aerial images, correct?

15           A.    Correct.

16           Q.    But for clients who you think are

17     going to use it to produce orthomosaic mapping

18     under DroneDeploy you stopped doing it?

19           A.    Yes, sir.  Or any other program.

20           Q.    Okay.  Am I -- do I have that?  Am I

21     being fair to you on that?

22           A.    Yes, I think that's correct.

Page 73

1           Q.    Okay.   And the aerial images that

2    you no longer do for these people you think might

3    be using it for DroneDeploy are the same aerial

4    images that you provide from a data perspective

5    to real estate clients, correct?

6           A.    Somewhat, yes.

7           Q.    Okay.   And I mean they are photos,

8    aerial, they are photos using your drone?

9           A.    Yes.

10          Q.    Okay.   And then the last thing you

11   have in Paragraph 93 is "data about land and

12   structures."   What are you talking about there?

13          A.    As far as the native data in the

14   picture, so height, volume, distance, square

15   footage, area, et cetera, et cetera.

16          Q.    Again, we're be back to aerial

17   images.

18               It's the data that you have in the

19   aerial images is what you're talking about?

20          A.    Yes, sir.

21          Q.    Okay.   And the data in the aerial

22   images whether you take it for real estate client

Page 74

1    or whether you take it straight down every two

2    seconds for a client you think might be using it

3    for mapping is the same data?

4            A.    Yes.

5            Q.    Okay.  All right.

6            A.    And can I clarify one thing?

7            Q.    Sure.

8            A.    There's no thinking of me knowing or

9    thinking it.  I know for a fact that they are

10   going to use it for the map.  There's no

11   situations where like I'm wondering if they are

12   going to make a map.  I know for a fact if they

13   call me that they are going to make a map.

14           Q.    Right.  But you're not making the

15   map, you're just taking the digital images,

16   right?

17           A.    Right.  I'm just clarifying there's

18   no speculation when they call whether I know if

19   they are going to do a map or not.  I know for a

20   fact they are going to make a map.

21           Q.    Just to clarify, again, for the

22   Court prior to June of 2019 you never made an

Page 75

1    aerial map for a client?

2           A.    No, sir.

3           Q.    Okay.  And Paragraph 94, it says

4    "Creating, processing, and disseminating images

5    on land and structures is fully protected speech

6    under the First Amendment."

7                 Do you see that?

8           A.    Yes, sir.

9           Q.    And, again, what we're talking about

10   is the images that you're taking these

11   photographs?

12          A.    Yes, sir.

13          Q.    Okay.  And then Paragraph 95 talks

14   about 3D models, which is not something you've

15   done before, correct?

16          A.    Haven't done before, but I would

17   like to.

18          Q.    Well, there's a lot of things you'd

19   like to do, but I'm just focused right now on

20   stuff you did prior to June of 2019.

21                That's not something you ever did?

22          A.    No, correct.  Never.

Page 76

1          Q.    And Paragraph 97 [sic], you have

2     "Creating, processing, and disseminating data

3     about land and structures (including data about

4     distances, coordinates, elevations and volumes)

5     is fully protected speech under the First

6     Amendment."

7               What are you talking about there?

8          A.    I don't -- I mean, I'm not a lawyer.

9     I don't know how to tell you what it means as far

10    as the first speech amendment.  That's what it's

11    talking about.

12         Q.    Let's break down the nonlawyer part.

13    You say "creating, processing, and disseminating

14    data about land and structures (including data

15    about distances, coordinates, elevations and

16    volumes)."

17              What are you talking about there?

18         A.    All of the information in the

19    pictures.  The metadata which tells everything

20    you've listed as far as the approximate

21    boundaries, the height, elevation.

22         Q.    Again, the aerial photos that you

Page 77

1    provide to real estate clients is an example?

2         A.    They have metadata in them, yes --

3         Q.    Okay.

4         A.    -- but not for making maps.

5         Q.    And the aerial photos that you're

6    taking for these people who are going to use them

7    to create mapping, it's those photos that you're

8    talking about, those aerial images?

9         A.    Yes.

10        Q.    And from a data -- just so we're

11   clear, I want to make sure we got this

12   100 percent --

13        A.    Sure.

14        Q.    Just so we're clear, the data in the

15   aerial images for these droners or these folks

16   that are going to create mapping, is the same

17   data in the aerial image that you take and

18   provide to your real estate clients?

19        A.    Yes.  Every picture has that

20   metadata and this mapping software using that

21   metadata in every picture.

22        Q.    And other than Mr. -- other than

Page 78

1    your contention that the investigator told you

2    that you couldn't provide these pictures with

3    metadata, do you have any other evidence or

4    information that the Board has said you can't

5    provide these images or these pictures to

6    clients?

7              A.    As far as saying I can't deliver any

8    location data in the pictures, I would take that

9    as them saying -- that's what that says.

10             Q.    And where are you reading from?

11             A.    As far as -- I'm not sure where it

12   was, but the part that says about collecting the

13   metadata in the pictures, like I have to have

14   that in order to do the map.  If I have to strip

15   that out, then I can't do any maps.

16             Q.    Well, again, I'm not talking about

17   maps.  I'm talking about the pictures, the

18   images, right?

19             A.    Uh-huh.

20             Q.    You can point to anything where the

21   Board has said you're not allowed to take images,

22   take pictures and provide them to clients?

Page 79

1          A.    No, that was with the personal

2     meeting in the library with Mr. Casey.

3          Q.    Mr. -- with Will Casey?

4          A.    With William.  Sorry.

5          Q.    Okay.  All right.  And then 97 is

6     the "Creating and disseminating information about

7     the approximate boundaries of property" for

8     marketing purpose?

9          A.    Yes, sir.

10          Q.    Okay.  And then 98 you mention a

11     couple of general statutes here that prohibit you

12     from "creating, processing, and disseminating

13     images of land and structures."

14               Do you see that?

15          A.    Yes, sir.

16          Q.    And, again, what you're talking

17     about is you feel like you're not able to take

18     these images, these photos, and provide them to a

19     paying client, right?

20          A.    Yes, sir.

21          Q.    Okay.  And it's these images or

22     photos that you contend are speech?

Page 80

1          A.    Yes.  Information.

2          Q.    Right.  But you're specifically

3    calling it "speech," right, in your lawsuit?

4                MR. GEDGE:  Object to form.

5          A.    I mean, I think so.  I'm not an

6    attorney, but that's what I see it as.

7          Q.    Okay.  And then Paragraph 99 says

8    that these statutes are prohibiting plaintiffs,

9    your company, "from creating, processing and

10   disseminating 3D digital models of land and

11   structures."

12               Do you see that?

13         A.    Yes, sir.

14         Q.    And, again, the 3D digital models is

15   not something you ever did prior to receiving the

16   June 2019 letter, correct?

17         A.    Correct.

18         Q.    Okay.  And then Paragraph 100 says

19   these statutes "...prohibit Plaintiffs,"

20   including your company, "from creating,

21   processing, and disseminating data about land and

22   structures (including data about distances,

Page 81

1    coordinates, elevations and volumes)."

2              And again, that is the images that

3    you're talking about, the aerial images that

4    you're taking?

5         A.    Yes, sir.

6         Q.    Anything else other than the aerial

7    photos?

8         A.    No, sir.

9         Q.    Paragraph 101, these statutes are

10   prohibiting you and your company from "creating

11   and disseminating information about the

12   approximate boundaries of property" -- for

13   marketing purposes.

14             Again, that's the marketing boundary

15   issue.  Anything else other than that in

16   Paragraph 101?

17        A.    No, sir.

18        Q.    Okay.  So -- and it looks like --

19   can you think of anything else that you're

20   complaining about that you're not able to do as a

21   result of the Board's letter in June of 2019?

22        A.    I think we've covered everything.

Page 82

```
 1            Q.    Great.

 2                  And are you currently operating 360

 3     Virtual Drone Services?

 4            A.    Yes, sir.

 5            Q.    And what kind of work are you doing?

 6            A.    Real estate, weddings, business

 7     commercials for their marketing companies,

 8     et cetera, et cetera, and event videography.

 9            Q.    Let me show you what's been marked

10     as Exhibit 6.

11                  (Whereupon, Exhibit 6, Plaintiff 360

12          Virtual Drone Services LLC's Responses and

13          Objections to Defendant's First Set of

14          Request For Admissions, was marked for

15          identification.)

16            A.    Okay.

17            Q.    And Exhibit 6 is just a copy of

18     Plaintiff 360 Virtual Drone Services LLC's

19     Responses and Objections to Defendant's First Set

20     of Request For Admissions.

21                  Have you seen this document before?

22            A.    Yes, sir.
```

Page 83

1        Q.   Okay.  And so these are essentially

2   questions or items that we asked you to admit or

3   deny, and I take it you had a hand in responding

4   to this on behalf of company?

5        A.   Yes, sir.

6        Q.   Okay.  And I'm going to show you

7   what's been marked as Exhibit 8, and ask if you

8   can identify this document for me.

9              (Whereupon, Exhibit 8, Letter dated

10      2/8/2019, was marked for identification.)

11        A.   Of course.  That is a letter to

12   William Casey from me, 2/8/2019.

13        Q.   Do you see and the bottom where it

14   has "Plaintiffs000014"?

15        A.   Yes, I do.

16        Q.   Okay.  And it looks like Plaintiffs

17   14, 15, 16, 17, 18, 19 are essentially copies of

18   the E-mail correspondence between you and

19   Mr. Casey?

20        A.   Yes.

21        Q.   Okay.  All right.  Let me show you

22   what's been marked as Exhibit No. 10.

Page 84

1                    (Whereupon, Exhibit 10, Certificate

2          of Completion, was marked for

3          identification.)

4          Q.    I'll represent to you that they

5     were -- so you provided some images of

6     Certificate of Completion.

7          A.    Okay.

8          Q.    Unfortunately, I don't have a better

9     copy, but this says "This is to certify that

10    Michael Jones successfully completed 4 hours of

11    Drones: How to tell aerial stories online course

12    on Aug. 17, 2017."

13                    Do you see that?

14         A.    Yes, sir.

15         Q.    Okay.  And what is this Certificate

16    of Completion that you provided us?

17         A.    Exactly what the title is.  It's

18    just a course on how to tell stories with aerial

19    photography and videography from Udemy.  That's

20    an online course.  They have multiple courses.

21         Q.    There is a second certificate that

22    you provided us.  And, in fact, it's the only

Page 85

1    other certificate you provided us.

2              Can you tell me about the second

3    one?

4         A.    Same thing.  This is a course of

5    6 hours of how to take a stunning aerial

6    photography using drones.

7         Q.    Have you taken any other drone

8    courses where you received a Certificate of

9    Completion?

10        A.    I think I have taken several Udemy

11   courses about drones that I've completed and

12   probably got certificates for.

13        Q.    Okay.  And what else -- because you

14   didn't produce those in discovery.  What other

15   courses do you think you took where you got a

16   Certificate of Completion?

17        A.    I'm not sure of the name.  It's been

18   so long.  I don't know the titles of the courses.

19   It had something to do with drones I'm sure.

20   Probably took some mapping courses.  Trying to

21   learn about that.  But I couldn't tell you how

22   many courses I had.

Page 86

1          Q.    And what's the mapping course that

2    you would have taken?

3          A.    I'm not sure of the title.  I mean,

4    they all have titles to the courses --

5          Q.    What did you -- what did you learn

6    in the mapping course?

7          A.    Mainly stuff I already knew.  You

8    want me to go into that?

9          Q.    Can you be a little more specific?

10   Do you remember anything that you learned from

11   the mapping course?

12         A.    Yeah.  They explained different, you

13   know, how to collect the data correctly; what you

14   can do with ground control points; what you

15   couldn't do ground control point; how accurate

16   you could make the map, if you needed to make the

17   map accurate.  And there were several things

18   about equipment I don't have, so I just finished

19   the course out.

20         Q.    Meaning, you don't have the

21   equipment to actually do the job?

22         A.    Like they got into heavy surveying

Page 87

1   stuff where they were putting ground control

2   points and videos and stuff like that which I

3   don't have and could never afford, so...

4          Q.    And what equipment do you have?

5          A.    A drone -- I mean I have several

6   drones -- and various camera and video equipment.

7          Q.    Prior to June of 2019 did you have

8   any different equipment?

9          A.    No, sir.

10         Q.    All right.  I don't have anything

11  further.

12                Thank you.

13                MR. GEDGE:  Why don't we take five

14       to chat here.  We might have a question or

15       two.

16                THE COURT REPORTER:  Off the record.

17                (Recess taken.)

18                MR. GEDGE:  We don't have any

19       questions.

20                (Time Noted:  11:43 a.m. EST)

21

22

Page 88

1          CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2

3                    I, Amanda Gorrono, the officer
             before whom the foregoing deposition was
4            taken, do hereby certify that the foregoing
             transcript is a true and correct record of
5            the testimony given; that said testimony was
             taken by me stenographically and thereafter
6            reduced to typewriting under my direction;
             and that I am neither counsel for, related
7            to, nor employed by any of the parties to
             this case and have no interest, financial or
8            otherwise, in its outcome.
                     IN WITNESS WHEREOF, I have hereunto
9            set my hand this 22nd day of February, 2022.

10

11

12

13

14   _____

15   AMANDA GORRONO, CLR

16   CLR NO:  052005 - 01

17

18   Notary Public in and for the State of New York

19   County of Suffolk

20   My Commission No.  01G06041701

21   Expires:  01/07/2023

22