

**Page 1**

```
                    1
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                   WESTERN DIVISION
                CASE NO. 5:21-CV-0137-FL
 3
 4
 5   360 VIRTUAL DRONE SERVICES    )
     LLC AND MICHAEL JONES,        )
 6             Plaintiffs,         )
                                   )
 7   v                             )
     ANDREW L. RITTER, IN HIS      )
 8   OFFICIAL CAPACITY AS EXECUTIVE)
     DIRECTOR OF THE NORTH CAROLINA)
 9   BOARD OF EXAMINERS FOR        )
     ENGINEERS AND SURVEYORS; AND  )
10   JOHN M. LOGSDON, JONATHAN S.  )
     CARR, DENNIS K. HOYLE, RICHARD)
11   M. BENTON, CARL M. ELLINGTON, )
     JR., CEDRIC D. FAIRBANKS,     )
12   BRENDA L. MOORE, CAROL        )
     SALLOUN, AND ANDREW G.        )
13   ZOUTWELLE, IN THEIR OFFICIAL  )
     CAPACITIES AS MEMBERS OF THE  )
14   NORTH CAROLINA BOARD OF       )
     EXAMINERS FOR ENGINEERS AND   )
15   SURVEYORS,                    )
               Defendants.         )
16
17              DEPOSITION OF MICHAEL JONES
18
19   This matter coming on for deposition on July 21, 2021, at Graebe,
20   Hanna & Sullivan, Raleigh, North Carolina, before Victoria L.
21   Pittman, BA, FAPR, RDR, CRI, CVR-CM-M, Court Reporter and Notary
22   Public, the following proceedings were had, to wit:
23
24   Reporter:  Victoria L. Pittman, Managing Reporter
               BA, FAPR, RDR, CRI, CVR-CM-M, RCP, NCJT
25
```

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

**Page 2**

```
                    2
 1                   APPEARANCES
 2   For the Plaintiffs:
 3          Samuel B. Gedge
 4          INSTITUTE FOR JUSTICE
 5          901 North Glebe Road
 6          Arlington, Virginia 22203
 7
 8   For the Defendants:
 9          Douglas W. Hanna
10          GRAEBE HANNA & SULLIVAN
11          4350 Lassiter at North Hills Ave., Suite 375
12          Raleigh, North Carolina 27609
13
14
15
16
17   Present:    John M. Logsdon
18
19
20
21
22
23
24
25
```

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

**Page 3**

```
                    3
 1                 C O N T E N T S
 2   THE WITNESS                          PAGE
 3   MICHAEL JONES
 4          Examination by Mr. Hanna        4
 5          Examination by Mr. Gedge      175
 6          Examination by Mr. Hanna      178
 7
 8
 9                   EXHIBITS
10   NUMBER  DESCRIPTION               MARKED
11   1       Complaint for Declaratory and    46
             Injunctive Relief
12   2       Exhibit 1 to the Complaint       46
     3       Rule 26 Initial Disclosures      37
13   4       Letter from NC Board of Examiners for  37
             Engineers and Surveyors, 12/19/18
14   5       NCGS Chapter 89C                102
     6       Investigative Report             20
15   7       DroneDeploy Post Processing Guide  159
     8       DroneDeploy Making Great Maps E-book  167
16
17   **Reporter's Note:  This transcript may contain quoted material
18      If so, such material is reproduced as read or spoken?**
19
20
21
22
23
24
25
```

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

**Page 4**

```
                    4
 1          Wednesday, July 21, 2021 (10:06 a.m.)
 2          (Pursuant to the Federal Rules of Civil
 3           Procedure:)
 4                   * * * * *
 5                  MICHAEL JONES,
 6   having been identified and affirmed by the Notary, was examined
 7   and testified as follows on EXAMINATION
 8   BY MR. HANNA:
 9       Q.  Mr. Jones, good morning.
10       A.  Good morning.  How are you, sir?
11       Q.  Good.  I'm Doug Hanna.  I represent the Board of
12   Engineers -- actually, the Board of Examiners for Engineers
13   and Surveyors and all of the individual defendants that have
14   been named in the lawsuit in their official capacity.
15       A.  Okay.
16       Q.  I just wanted to introduce myself.
17           Could you, for the record, state your full name.
18       A.  Yes.  Michael Rudolph Jones.
19       Q.  Mr. Jones, also, if you could state your address
20       A.  4971 Wayne Memorial Drive, Goldsboro, North
21   Carolina 27534.
22       Q.  Mr. Jones, where did you grow up?
23       A.  Wilson, North Carolina.
24       Q.  And could you tell the jury about your educational
25   background.
```

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

5

1    A.   Education -- I went through high school, dropped

2  out in tenth grade, went to get my GED.  That's pretty much

3  it.

4    Q.   In what year would you have received your GED?

5    A.   '92 I think it would be.

6    Q.   And had you not dropped out, what graduation year

7  would you have been?

8    A.   Oh, I'm sorry.  I thought that's what you were

9  asking.  I think '92 would have been the graduation year.

10    Q.   Okay.  Sorry about that.

11    A.   No problem.

12    Q.   And did you get your GED before '92 or after '92?

13    A.   So I dropped out in tenth grade and went right to

14  the community college and got it, like, that next upcoming

15  week.

16    Q.   Okay.

17       So 1990?

18    A.   Probably around that.  Sorry.  Not easy on those

19  dates.

20    Q.   No worries.

21       I'm just going to try to get a little bit of

22  understanding of your background as well.

23    A.   Sure.

24    Q.   So in 1990, you were, you know, 16 years old,

25  about, I would say; right?

6

1    A.   16, yes.

2    Q.   And did you start taking classes at the community

3  college?

4    A.   I went and just got the GED there and then I went

5  to work.

6    Q.   Okay.

7       And what did you do?

8    A.   Grocery stores.

9    Q.   And if you could, just a broad overview of what

10  was your work experience like in the '90s and then the first

11  decade of the 2000s?

12    A.   In the '90s, I -- of course, 16, I hit the ground,

13  wanted to work 40 hours a week, grocery stores, one from the

14  next, whoever needed stock boys, bag boys.

15       And then I learned the trade of welding in about

16  '95 maybe -- '94ish, '95, at Murphy Truck Body, they were a

17  national company in Wilson, and I went to work there,

18  welded, and left there, went to Evans Metal Fabrication,

19  which I have stayed off and on through the years doing the

20  same thing -- welder, layout fitter.  And then I got into

21  network support, computers, IT, and went to BB&T, Branch

22  Banking & Trust, worked there as a network support

23  specialist for seven years.

24    Q.   All right.  Let me stop you there.

25    A.   Sure.

7

1    Q.   So you're transitioning from employment in the

2  welding field to IT?

3    A.   Yes, sir.

4    Q.   What year did you do that?

5    A.   About '99/2000, that's when I got my first A+

6  certification, CompTIA A+ certification.

7    Q.   So you would have been in your late twenties?

8    A.   Early twenties -- no 23, age 23.  I just know it

9  because my father passed when I was 23; so I was already

10  welding then, and I -- after he passed is when I got into

11  the IT network field.  So it had to be in 2000 -- he passed

12  October 2000.

13    Q.   How old are you right now?

14    A.   44.

15    Q.   All right.

16       And so then you went to work for BB&T, did you

17  say?

18    A.   Yes.

19    Q.   And what year was that?

20    A.   2000, maybe, -3ish.

21    Q.   What did you do for BB&T?

22    A.   Network support specialist.  So we did all of

23  their IT internal support for all of the branches, IT

24  centers -- anything on the map.

25    Q.   So explain that to me because I'm -- I don't know

8

1  much about IT.

2    A.   So we -- I -- the department I dealt with, we did

3  not deal with any clients outside; we only dealt with

4  BB&T -- the internal clients at BB&T.  So if there was a

5  loan officer in Mississippi who needed support with their

6  mouse or their network wasn't supporting -- wasn't

7  connecting to the servers, they called us.  We were the

8  first line; so we either resolved the issue on the phone or

9  we dispatched a technician or sent a client server engineer

10    Q.   All right.

11       And then how long did you work for BB&T?

12    A.   Seven years.  Actually worked there -- they

13  offshored the help desk to India for a couple years  I left

14  during that time and did some just contract network stuff

15  through a couple different companies.  When they returned

16  back to the States, I was called by my supervisor and asked

17  did I want to return, so I did.

18    Q.   Okay.

19       So you were employed full-time beginning in '03?

20    A.   I think so, around '03.

21    Q.   Okay.

22       And, again, the dates -- the specifics aren't

23  critical by any stretch --

24    A.   Sure.

25    Q.   -- but just approximately 2003.

Case 5:21-cv-00137-FL   Document 39-3   Filed 03/28/22   Page 2 of 50

**9**

1             How long did you work full-time?

2      A. So I worked full-time until about 2007, I think,

3 is when they offshored. And I think they offshored for

4 about two years; so around 2010 maybe, somewhere around the

5 area, is when I was called back by BB&T. And then I went

6 back to work for them and worked, I'm not sure, maybe

7 another year or two, something like that.

8      Q. And then what did you do after BB&T?

9      A. Then went back to welding.

10      Q. And was that just a matter of welding paid more or

11 did you --

12      A. Oh, no. Actually, in 2013, I actually got under

13 some trouble with the law. And BB&T, due to the FDIC

14 regulations, had to release me.

15      Q. So you were -- when you say "released," you were

16 terminated by BB&T?

17      A. Yes.

18      Q. Okay.

19             What was the reason for the termination?

20      A. I sold a prescription pill bottle to a guy without

21 a prescription, one of my prescriptions.

22      Q. And other than that incident, do you have any

23 other -- have you been involved in any other type of charges

24 from law enforcement?

25      A. No. Just speeding tickets with cars, but ...

**10**

1 yeah, that's it.

2      Q. Have you been involved in any other lawsuits other

3 than the lawsuit that was filed in your name and on behalf

4 of your company's name?

5      A. No, sir.

6      Q. So tell me about -- so what happened in 2013? Who

7 invest -- how did you get caught or turned in on this issue?

8      A. So I had sold to a hairdresser in Wilson who had a

9 business, and he bought the whole bottle, and then they set

10 up an audio/video recording of him buying it from me. And

11 then they did the arrest after that, I guess.

12      Q. All right.

13             And so he was like an undercover informant,

14 basically?

15      A. I don't think he was undercover. He just -- I

16 think what I heard, he got pulled, like, driving from the

17 house or something, and I guess they got them to tell. I'm

18 not sure. I was never told exactly what happened.

19      Q. When you say "they," who is "they"?

20      A. Police officers.

21      Q. From what --

22      A. Wilson County.

23             (Stenographer clarification.)

24             (Discussion off the record.)

25      Q. What was the prescription that you sold the

**11**

1 hairdresser?

2      A. Oxycodone.

3      Q. And this was a prescription that had been

4 prescribed to you legally?

5      A. Yes.

6      Q. Okay.

7             So I take it, then, you were charged by the local

8 district attorney in Wilson County?

9      A. Yes.

10      Q. And was it a felony?

11      A. Yes.

12      Q. And how was that felony charge resolved?

13      A. It was resolved -- I hired an attorney in Wilson

14 and they got the charge dropped to a delivery and sale of a

15 narcotic, which was still a felony, but it was a couple

16 charges below. And then I was released with two years'

17 supervised probation.

18      Q. And do you remember what class felony you pled

19 guilty to? Do you remember? There's a chart -- A, B, C, D?

20      A. I'm not sure. I wouldn't be able to tell you. It

21 wouldn't be honest.

22      Q. Fair enough.

23             You just know that the felony charge that you pled

24 to, that put you in a lower punishment bracket; is that

25 right?

**12**

1      A. It was out of the mandatory bracket because what I

2 was in was a mandatory, and it dropped one below that but

3 I'm not sure the letters.

4      Q. Okay.

5             And then you -- as a punishment, you -- obviously

6 you got a conviction, felony conviction; correct?

7      A. Yes.

8      Q. And then you were two years supervised probation

9      A. Yes, sir.

10      Q. And then as a result, unfortunately, I guess, then

11 you were terminated from your job at BB&T?

12      A. Yes, sir.

13      Q. And then you went back into the welding field?

14      A. Yes, sir.

15      Q. Okay.

16             And how long did you work in welding?

17      A. Probably another two years, maybe, until I got

18 back on my feet.

19      Q. And then what did you do next?

20      A. And then I started my own photography company that

21 turned into photography with drones.

22      Q. Now, the photography company, what year would you

23 have started that?

24      A. 2016.

25      Q. And was that something you were doing -- well, let

**13**

```
 1   me back up here.
 2           The documents that we produced to you in this
 3   case, there is some information about the incorporation of
 4   360 Virtual Drone Services LLC with the State of
 5   North Carolina.
 6           And the documents that I'm looking at show that
 7   that company was incorporated by you in October of 2017.
 8           Does that sound right?
 9   A.   Yes.
10   Q.   Okay.
11           And so when you say "photography company," is that
12   just a business you were operating under your name?
13   A.   So first I started doing photography, started
14   doing, you know, small clients, family portraits, friends --
15   stuff like that.  Then I realized I wanted to -- you know,
16   hey, I want to make this into a business; so that's when I
17   spoke to another friend of mine who invested in the drone
18   equipment, and then I kind of moved from that to the aerial.
19           So yes, the drone business, 2017 would be the
20   date, you know, but I did photography in 2016 kind of
21   leading up to that as a hobby turned, you know, business.
22   Q.   All right.
23           Let me spend a few minutes transitioning and just
24   talk about the timeline of events.
25   A.   Absolutely.
```

**14**

```
 1   Q.   So you indicate in 2016 -- is that when you
 2   started getting interested in photography?
 3   A.   Yes.
 4   Q.   And you called it a hobby.  Was that a hobby
 5   initially?
 6   A.   Yes.
 7   Q.   And what equipment were you using in 2016?
 8   A.   One Nikon D35 camera, I think, 3500.
 9   Q.   Any other equipment?
10   A.   That was it for me.  A couple flashes and lights
11   you know.
12   Q.   And how did the hobby of photography turn into a
13   side business?
14   A.   So a friend of mine noticed I was doing
15   photography, she was a real estate agent, and she asked did
16   I have a drone.  I told her no.  She wanted to invest in my
17   company by purchasing the drone if I would return the work
18   and the pay through real estate work for her doing the
19   drone -- you know, using the drone.
20           And so we did that, and I started doing, you know,
21   real estate photography and things like that.
22   Q.   When was that?  When did your friend -- well, who
23   is your friend?
24   A.   Lisa.  Oh, you need her last name too?
25   Q.   Yes.
```

**15**

```
 1   A.   Lisa -- what was her last name?  You'll have to
 2   give me a second on her last name.  I can't think of it.
 3   Q.   Do you remember what company she worked with?
 4   A.   No, because she was starting real estates as well.
 5   I can't believe I'm drawing a blank on her name.  Sorry.
 6   Q.   Well, when you -- if it comes, jumps into your
 7   head, let me know.
 8   A.   Yeah.  I'll think of it in a minute.
 9   Q.   And so Lisa comes to you and says, "I want you
10   to -- I want to partner with you"?
11   A.   Not those exact words.  She asked did I do drone
12   photography.  I told her no.  She said, "Have you ever
13   thought about it?"
14           I said, "I can't afford them.  You know, not in my
15   bank right now."
16           So she said, "Well, how about if I purchase the
17   drone?  You can do your real estate work with it and then
18   you can pay back the money for the drone by doing real
19   estate work for me."
20           So that was the agreement we had.  She bought a
21   drone for me, wrote me a check, I bought a drone, and it
22   started there.
23   Q.   Okay.
24           When did she buy the drone?
25   A.   It was around the 2017ish mark, in between '16 and
```

**16**

```
 1   '17, that transition from regular photography to 360 Virtual
 2   Drone Services.  I'm not sure of the month.
 3   Q.   So if 360 Virtual is incorporated in October,
 4   would you say that was three, six, nine months earlier?
 5   A.   I'd hate to give you a definite time  I'm really
 6   not sure.
 7   Q.   Would you still have -- did you buy the drone?
 8   A.   I bought the drone, yes.
 9   Q.   Do you still have the records related to the
10   purchase of the drone?
11   A.   I'm sure I do.  It came through, actually, on
12   eBay; so I would say I can probably obtain it but I'm not
13   positive.
14   Q.   And so do you have e-mails between you and Lisa?
15   Or text messages?
16   A.   No.
17   Q.   And just so the record is clear, prior to Lisa
18   buying the drone for you, there had been no photography
19   business conducted by you?
20   A.   Regular photography; no drone photography.  Like I
21   said, I was doing friends who wanted family portraits and,
22   you know, graduation pictures -- stuff like that, but I
23   hadn't -- I didn't have a drone at that time; so I only did
24   that.
25           So that's when it was more or less kind of a
```

**17**

1  hobby, you know, 50 bucks here for a shoot, 60 bucks here
2  for a shoot.  And then it just kind of progressed from
3  there.
4       Q.  All right.  So let me back up.
5          You buy a camera in -- sometime in 2016, and you
6  get interested in the hobby of photography; correct?
7       A.  Yes.
8       Q.  And at some point, it develops into more of a
9  hobby by people saying, "I'll give you 50 bucks if you shoot
10  this event"?
11      A.  Sure.  Yes.
12      Q.  All right.
13         When was that?  When would be the first time you
14  had received money in exchange for doing a photography
15  shoot?
16      A.  I couldn't tell you the actual date.
17      Q.  Okay.
18         Was it in 2016 or 2017?
19      A.  2016, probably.
20      Q.  And how many times would you have been paid to
21  shoot photographs at an event before the drone -- before
22  buying a drone?
23      A.  I wouldn't have any way of telling you, here,
24  without seeing any records or anything.
25      Q.  Okay.

**18**

1         More than 10?
2      A.  Maybe 10, a few more than 10 maybe.
3      Q.  And are we talking about the total of, making,
4  like, you know, 500 bucks or something -- or did it -- was
5  it more than that as far as --
6      A.  Oh, it was less than that starting out, yeah.
7      Q.  Okay.  All right.
8         So it really was just doing side deals with
9  friends, like, "I'll do this for $50" or "do this for $75,"
10  whatever?
11      A.  Sure.  Because I was beginning the hobby; so I
12  wasn't feeling, you know, I was that good to do it.  So then
13  the work -- just started turning out more work.
14      Q.  And how did you meet Lisa?
15      A.  She -- I was in a band and the drummer who I had
16  hired had dated her briefly, and that's how she even knew of
17  me.
18      Q.  So did you meet her out, like, at an event where
19  you were playing?
20      A.  To be honest, I never met her during the entire
21  time; everything was communicated through my drummer, like
22  when we would do the events.  He was like, "Hey, the Lisa
23  girl wants to invest in your company," you know or "buy you
24  a drone" or ...
25         So we -- I got the check and purchased the drone

**19**

1  before I met Lisa.
2      Q.  Did you get the check and purchase the drone
3  before you ever spoke to her on the phone?
4      A.  Yes.
5      Q.  And how much was the check?
6      A.  1200.
7      Q.  All right.
8         And so sometime in 2017?  Is that fair?
9      A.  For what?
10      Q.  You bought the drone?
11      A.  Either late 2016 or '17 -- early '17.
12      Q.  And so what kind of drone was it?
13      A.  A DJI Phantom 4.
14      Q.  And so now you have this -- did you say $1200
15  drone?
16      A.  Oh, the drone was actually 900, and I think I
17  bought a camera lens with the remaining for the -- for the
18  regular camera.
19      Q.  So you have the drone and the camera lens, and now
20  what do you do with it?
21      A.  So then I start learning how to work with the
22  drone, you know, taking pictures and incorporating them, who
23  my customers could be -- things like that.
24      Q.  How do you do that?  How do you go about learning
25  how to do that?

**20**

1      A.  Internet.
2      Q.  Where on the internet?
3      A.  YouTube, Google.
4      Q.  Take me back to 2017.  Before you incorporated 360
5  Virtual Drone Services, what are you -- what are you
6  googling, what are you looking at on YouTube?
7         What type of videos?
8      A.  So I'm looking up things -- you know, businesses
9  to start with drones, industries who, you know, are using
10  drones, future of drones -- things like that.  Obviously,
11  real estate was the number one service, you know, for drone
12  people.
13         So then I just started my education.  I mean, I
14  had to get, of course, certified with the Part 107 license
15  to fly.  So all of that, I googled for months, studying all
16  the FAA regulations, the rules, what you've got to have to
17  fly, when you can and cannot fly.
18         So there were courses on Udemy, that's another
19  site I went to, and the drone -- it's called Drone U, the
20  letter U, I guess, for "university."  That's an online site
21  that also does drone education.
22      Q.  I'm going to mark this document as Exhibit 6.
23         (Exhibit 6 marked.)
24      Q.  I've handed you what has been marked as Exhibit 6.
25  And for the record, it is also identified by Bates numbers

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

21

1    NCBELS 1 through 79.

2         Have you seen those documents before?

3    A.   Of course, this is a huge packet of paper, but

4    yes, a lot of these documents do look familiar.

5    Q.   I'll tell you that these are the documents we

6    produced to your lawyer --

7    A.   Okay.

8    Q.   -- in what's called the initial disclosures.

9    A.   Gotcha.

10   Q.   So there's no trick question here, I was just

11   curious if you'd seen them.

12        And the last document in that packet, 79, is a

13   copy of some sort of certification involving the FAA.

14   A.   Okay.

15   Q.   And it's something that actually we printed off in

16   our office.

17        Do you recognize that document?  Have you seen a

18   document like that before?

19   A.   I'm familiar with all the information on it.  I'm

20   not sure if I've seen this document.  But, I mean, the

21   information is all familiar.

22   Q.   And the information, is that you, Michael Rudolph

23   Jones?

24   A.   Yes, sir.

25   Q.   And your address?

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

22

1    A.   Yes, sir.

2    Q.   And then it says you were -- received a

3    certificate as a remote pilot on January 18, 2017.

4    A.   Yes, sir.

5    Q.   Okay.

6         And that's what you were referring to a few

7    minutes ago when you talked about you researched the FAA

8    rules and ...

9         What did you have to do in order to get the

10   certificate?

11   A.   You have to take an exam at the airport or testing

12   facility.  By the way, it's referred to as a Part 107, if

13   you need that.

14   Q.   And besides taking the exam at the airport, do you

15   take any classes?

16   A.   No classes.

17   Q.   Okay.

18   A.   I mean, online boot camps, I studied, you know,

19   through those but ...

20   Q.   And so does this refresh your memory about when

21   you would have purchased a drone?

22        Or would you -- do you know if you used somebody

23   else's drone to get certified?

24   A.   No, I didn't use anybody else's drone to get

25   certified because you don't have to have a drone to get

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

23

1    certified, technically.

2    Q.   Okay.

3    A.   But as far as refreshing -- 1/18/2017 -- I mean,

4    that sounds in the field of the time that I was

5    transitioning from 2016, you know, hobby photography, to

6    this time.  That was my first one because you have to get

7    them reissued every two years; so this would have been my

8    first.

9    Q.   And so other than taking or getting this

10   certificate, did you take any other classes before you

11   incorporated 360 Virtual Drone Services in October?

12   A.   I'm just looking at the date.

13        Yes.  There's a North Carolina one that they

14   supersede the FAA on, and North Carolina State said you have

15   to have a North Carolina drone -- I guess they're calling it

16   a certificate, because it's completely null in the FAA, but

17   they say you have to have it.  It was $25.  The test wasn't

18   hard; so I took it and got that.

19   Q.   Did you take any classes before you took that

20   test?

21   A.   No.  Just study.

22   Q.   So prior to incorporating 360 Virtual Drone

23   Services LLC in October of 2017, did you take any classes?

24   A.   No.  Besides the online -- you know, if you want

25   to -- as far as the definition of classes, I never went to a

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

24

1    class and attended anyone, like, teaching me things --

2    Q.   Correct.

3    A.   -- but I did watch many a training video, you

4    know, before the test.

5    Q.   So other than watching YouTube videos, did you

6    enroll in any classes?

7    A.   Not if it wasn't online.  I mean, there could have

8    been an online boot camp, if you want to call that

9    enrolling, that I may have signed up for to take their

10   quiz/exam, you know, practice test.  But I couldn't tell you

11   what they were.  I think I may have took -- taken one at

12   Udemy as well.

13   Q.   Have you taken any classes in photography?

14   A.   Just online stuff.

15   Q.   Again, I'm not talking about YouTube videos, but

16   other than watching a YouTube video or doing a google

17   search, have you taken any classes -- any instruction,

18   formal instruction?

19   A.   No.  I have not taken any classes from any

20   photographers.

21   Q.   No formal instruction from photographers?

22   A.   No, not on hand, not person to person.

23   Q.   Have you taken any classes or had any formal

24   instruction involving the use of drones?

25   A.   No.

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

25

1     Q.    All right.

2        And then, again, going back to the timeline, you

3  incorporated 360 Virtual Drones on or about October 16th,

4  2017.

5        Does that sound right?

6        And let me refer you to documents 14 and 15 of

7  Exhibit 6.

8     A.    4/13/2018?  Is that the date you just gave?

9     Q.    So if you look at Exhibit 14, this was a

10  printout -- again, this was done, I think, by the

11  investigator for the board of examiners and they printed out

12  something on your company that indicates that it was formed

13  on 10/16/2017.

14     A.    Okay.  I see the date formed.

15     Q.    Does that sound right?

16     A.    If that's what the paper says, I'm assuming that's

17  right.  Yes, sir.

18     Q.    Okay.

19        I think what this is indicating is that's what the

20  Secretary of State's office is reporting.

21     A.    Yes, sir.  On their website.

22     Q.    And that sounds to you like about the month and

23  date that you would have incorporated 360 Virtual Drone

24  Services LLC?

25     A.    Yes, sir.

26

1     Q.    And you are the registered agent; correct?

2     A.    Yes, sir.

3     Q.    And you are the -- are you the sole owner?

4     A.    Yes.

5     Q.    So you're the only manager?

6     A.    Yes, sir.

7     Q.    And you're the only member?

8     A.    Yes, sir.

9     Q.    And prior to incorporating this, had you done any

10  business, drone business?

11     A.    With the drone?  I mean, it started out probably

12  the same way that photography did, you know, a couple people

13  were hiring me here and there, "Hey, you've got a drone, you

14  know, would you come take pictures of, like, our house?"

15        So yeah, just light hobby work.  But when I saw it

16  was getting to the point it was turning into a business,

17  then that's what I registered.

18     Q.    So you get the drone in late 2016?

19     A.    I think it was around that time, yes.

20     Q.    You were mentioning someone by the name of Lisa.

21     A.    Lisa, yes.

22     Q.    So what did you -- when did you first speak to her

23  or meet her?

24     A.    Datewise, I could not tell you.

25     Q.    How long after purchasing the drone did you first

27

1  meet her or first speak with her?

2     A.    Maybe a month or two.

3     Q.    Tell me what you spoke about.

4     A.    I just expressed my gratitude for what she had

5  done.  She was telling me that she wanted to invest in a

6  hard worker, somebody who was going to go make something.  I

7  told her I would, and that, you know, I would pay her back.

8        So she said, "Okay, let's go."

9        I think she actually went and got her real estate

10  license around that time to start working, and I was doing

11  this; so we were just kind of like patting each other on the

12  back and, you know, let's go build something.

13     Q.    Okay.

14        And when was that?

15     A.    I'm not sure.  I mean, a couple months after the

16  check, whatever date we talked; but I'm not sure when that

17  was.

18     Q.    Do you know if it was before or after you received

19  your FAA certification?

20     A.    It was before I received that, my FAA

21  certification.

22     Q.    All right.

23        And so you meet her -- or do you meet her?  Or do

24  you talk to her on the phone?

25     A.    I think we may have met for lunch or something.

28

1  I'm not positive of the first meet we had.  We may have

2  spoken on the phone, you know, briefly prior to that.  I may

3  have called and told her thank you or something.

4     Q.    Did her boyfriend meet with you as well?

5     A.    No, she didn't have -- they just kind of had a

6  brief relationship so she had no boyfriend.  It was just me

7  and Lisa.

8     Q.    Okay.  All right.

9        And so when did you first do any work for Lisa?

10     A.    The odd thing is I've never done any work for

11  Lisa.  She never allowed me to pay her back.  She never

12  allowed me to return the work.  She just -- after a while,

13  when I tried and kept asking her, "Are you going to let me

14  do any work for you to return this?" she just said, "You

15  know, you're good.  Don't worry about it."  And that was it.

16        Morris is her last name.  I'm sorry.

17     Q.    Lisa Morris?

18     A.    Morris.

19     Q.    When's the last time you spoke to her or saw her?

20     A.    Maybe a couple of months ago.  She called me when

21  this case came out and just wanted to know what was going

22  on.

23     Q.    Did you ever pay her the $1200 back?

24     A.    No.

25     Q.    And you never did any work for her?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

29

1     A.     No.

2     Q.     All right.

3            So you have this drone and you have a camera lens;

4  correct?

5     A.     Yes, sir.

6     Q.     You have -- now, in January of 2017, you have some

7  sort of FAA certificate?

8     A.     Yes, sir.

9     Q.     All right.

10           You've not taken any classes, enrolled in any

11  classes involving photography; correct?

12    A.     No, sir.

13    Q.     Not enrolled in any classes involving the use of

14  drones; correct?

15    A.     No, sir.

16    Q.     You've received no formal instruction regarding

17  photography; correct?

18    A.     No, sir.

19    Q.     No formal instruction regarding the use of drones;

20  correct?

21    A.     No, sir.

22    Q.     And then what do you do next?

23    A.     Then I just started building my business finding

24  out how -- you know, what industries are cooking with the

25  drones, what are they being used most for, what it looks

30

1  like it's going to turn into, you know, the best industry to

2  go with in the drones.

3            And then I go start, you know, pushing my work

4  doing real estate jobs.  I hired on to the Droners.io

5  website, they're kind of like a job -- a contractual job

6  finder, I guess you could say.  They just find jobs for

7  drones and then you sign up under their website and you can

8  bid on the job.  So I did some jobs through that.

9            There was also another site called DroneBase.com

10  that I also did some jobs for.  They were kind of the same

11  thing, very low-hanging fruit, but just to get into the

12  industry and stuff in my portfolio; so I did those jobs.

13    Q.     Did you do your first job before or after you

14  incorporated 360 Virtual Drone?

15    A.     Before.

16    Q.     And what was your first job?

17    A.     I did a job for a real estate agent in Apex.  It

18  was just a real estate marketing video and photos.

19    Q.     So you're going to -- I need to go back to the

20  drone that you bought.

21           So you buy a drone for $900 and you buy a camera

22  lens.  Does that camera lens allow you to take video and

23  take still pictures?

24    A.     Yes.

25    Q.     Okay.

31

1            So you're flying your drone.  Are you doing that

2  manually in Apex?

3     A.     Yes.

4     Q.     And you're flying the drone -- manually, meaning

5  you control the drone?

6     A.     Yes.

7     Q.     It's not being controlled by a computer program?

8     A.     No.

9     Q.     And you fly the drone in Apex and you take video?

10    A.     Yes, sir.

11    Q.     And you're -- as I understand it, you're flying a

12  piece of property that this real estate agent is trying to

13  sell?

14    A.     Yes.

15    Q.     And was the real estate agent there when you were

16  flying the drone?

17    A.     Yes.

18    Q.     And so how much were you paid for that?

19    A.     I'm sorry.  I'm trying to remember.

20           I want to say how it went was I did a couple of

21  jobs for this same real estate agent and, in return, he

22  bought my first editing computer which was around $600.  It

23  was kind of a trade-off, pay for the computer for me doing

24  the jobs, him helping me.

25    Q.     When did you buy the editing computer?

32

1     A.     I don't know what the date is.

2     Q.     Did you do that before or after you incorporated

3  360 Virtual Drones?

4     A.     Before.

5     Q.     So walk me through the -- or walk the jury through

6  the job in Apex, where you go out there, you bring your

7  drone out there, the drone has a camera.

8            Is the camera part of the drone?

9     A.     Yes, sir.

10    Q.     Okay.

11           And can you explain to the jury how you went about

12  taking the video and creating this project.

13    A.     So I first check the airspace location to make

14  sure it wasn't any kind of airspace that was locked down

15  or -- you know, from flying.

16           Everything was clear so we then go out to the job.

17  He meets me out there.  We -- I get the drone out, we check

18  everything out around -- make sure there's no towers, power

19  lines, and then we launch the drone.  He stands behind me,

20  kind of guides me on what angle he wants, you know, which

21  way he wants to feature the property from, we fly that, we

22  take the pictures in the same manner, we get finished, we

23  come back down, land it.  I pack up, I go home, deliver --

24  after I edit the video, I then deliver it to him via Dropbox

25  link.



**33**

1    Q.   So do the -- when you put the drone in the air, is

2    who the drone taking pictures every few seconds --

3    A.   Uh-huh.

4    Q.   -- or is it taking pictures when you manually take

5    the pictures?

6    A.   All manual.

7    Q.   Okay.

8    And so you get home, and in order -- and you

9    essentially now have a camera with data in it; right?

10   A.   Sure.  Yes.

11   Q.   And what was your deliverable to this real estate

12   agent?

13   A.   I can't remember the number exactly, maybe 20 to

14   30 photos, still aerial photos, and then the video was

15   probably under 3 minutes of just orbiting flights, straight

16   pass-bys of the property, which also had details and

17   information that I added in the postproduction that he

18   supplied me with.

19   Q.   And so this was the work product that he hired you

20   to do?

21   A.   Yes.

22   Q.   And this work product, you did this a couple of

23   times for him in exchange for him buying an editing

24   computer?

25   A.   I think that's how it went.

**34**

1    Q.   Okay.

2    Who is the real estate agent?

3    A.   I figured you were going to ask me.  Do you mind

4    if I look at my phone?

5    Q.   Sure.

6    MR. HANNA:  Why don't we go off the record

7    (Discussion off the record.)

8    Q.   We're back on the record.

9    What was the name of the real estate agent that

10   you worked for in 2017?

11   A.   In Apex?

12   Q.   Yes.

13   A.   Billy Mills.

14   Q.   And if you could explain to the jury, when you get

15   back home, how exactly do you process the data that you

16   called the work product, the 20 to 30 still photos and the

17   3-minute video, how do you do that?

18   A.   So that's on an SD card which is in the drone.

19   All the data is recorded onto the SD card.  I then load the

20   SD card into my computer, upload the photos and video.

21   Photos get taken into an editing program for still

22   photography; videos get loaded into a program called Final

23   Cut Pro, which is a film editing program.  And that's where

24   I edit the video into short clips, 10- or 12-second clips,

25   multiple clips, to create kind of a highlight reel of the

**35**

1    property.

2    Q.   And then you -- do you e-mail him this work

3    product?

4    A.   It was either Dropbox link or I may have given him

5    a thumb drive.  It's been so long ago, I can't remember

6    exactly how we did the deliverable.  But that's the two

7    primary ways I deliver products anyway.

8    Q.   Either Dropbox or a thumb drive?

9    A.   Mostly Dropbox, but the occasional person wants a

10   thumb drive.

11   Q.   Do you still have the same Dropbox account?

12   A.   Yes.

13   Q.   And so after you -- I take it you do a couple of

14   projects for Mr. Mills?

15   A.   Yes.

16   Q.   And then you -- why did you need the editing

17   computer if you already were using certain software?

18   A.   Because -- okay.  So the editing software which is

19   on the Apple, it's called Final Cut Pro, you have to have

20   pretty substantial hardware set up to run that program

21   fluently, and I just didn't have a computer -- I had a

22   computer, but I didn't have an editing machine, you know,

23   with the RAM memory and the space to actually use.

24   So he was just discussing wanting, you know,

25   writing on the screen that popped up and told details So I

**36**

1    just expressed to him, "Hey, I'm saving up for a computer

2    that will allow me to do that," and that's when he kind of

3    offered, like, "Hey, you know, I'll get that for you if you

4    want to trade out this work for it and then that's how I'll

5    pay you." So ...

6    Q.   So when you did the first work product of 20 to 30

7    photos, you're just uploading photos, going through, making

8    sure that you're picking 20 or 30 that are the best photos,

9    I take it?

10   A.   Yes.

11   Q.   And then the 3-minute video is something you

12   just -- did you have to edit that at all?

13   A.   Yes.

14   Q.   Okay.

15   And so other than editing it, you're just sending

16   him information; you're not drawing lines or pictures or

17   putting words on anything on it?

18   A.   Not on this one -- yes, I am doing words of the

19   details that I mentioned earlier that he supplied me with

20   Okay.

21   A.   It's like the acreage.  You know, it's close to

22   401, you know, proximity, it's close to -- you know, details

23   like that, just kind of traditional real estate stuff.

24   Q.   And so -- but you're providing him with photos and

25   video?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

37

1    A.   Photos and videos for this, yeah.

2    Q.   And do you still do that today?  Do you still

3  provide customers photos and videos?

4    A.   Yes.

5    Q.   And then as I understand the timeline, between --

6  your lawsuit alleges that "Between 2017 and 2019, Michael

7  offered drone photography services through a single-member

8  LLC, 360 Virtual Drone Services LLC, to clients."

9         Is that true?  Did you offer drone photography

10  services between 2017 and 2019 to clients?

11    A.   Yes.

12    Q.   And then in December of 2018, you received a

13  letter from the Board of Examiners for Engineers and

14  Surveyors; correct?

15    A.   Yes.

16         (Exhibit 3 marked.)

17    Q.   Mr. Jones, I'm going to hand you what's been

18  marked as Exhibit 3.

19         Exhibit 3 is a document that was produced by your

20  lawyer in this lawsuit, and it's just called "Plaintiff's

21  Rule 26 Initial Disclosures."

22         Have you seen that before?

23    A.   Yes, I think so.

24         (Exhibit 4 marked.)

25    Q.   And then related to your initial disclosures is

38

1  Exhibit 4.

2         And Exhibit 4 is a copy of the documents that you

3  produced in this lawsuit during the initial disclosures.

4    A.   I'm sorry.  Could you repeat that?

5    Q.   Sure.

6         So Exhibit 4 is related to Exhibit 3.  It's a copy

7  of the documents that were produced by you during the

8  initial disclosure phase.

9    A.   Okay.

10    Q.   And those documents are -- they're marked

11  Plaintiffs' 1 through 13.

12    A.   Okay.

13    Q.   Have you seen those documents before?

14    A.   Yes.

15    Q.   And the board investigation letter that we

16  mentioned a few minutes ago that was received by you in

17  December of 2018, that is the first document in that

18  Exhibit 4, right, Plaintiffs' 01?

19    A.   Yes, sir.

20    Q.   And then in response to that, did you send the

21  board an e-mail on January 2, 2019?

22    A.   I think I did.  I'm not sure the date, but I

23  definitely replied through e-mail.

24    Q.   And did you produce -- strike that.

25         How did you create the set of documents

39

1  that were produced during your initial disclosures?

2    A.   Which documents are you referring to?  I'm sorry.

3    Q.   Exhibit Number 4.

4    A.   So this packet?

5    Q.   Yes.

6    A.   So all of this?

7    Q.   Correct.

8         MR. GEDGE:  I'll just object to the extent it

9  requires disclosing attorney-client communication or work

10  product.

11         MR. HANNA:  Fair enough.

12         MR. GEDGE:  To the extent you can answer ...

13    Q.   Yeah, because I don't want to get into -- to make

14  the record clear, I don't want to get into anything you've

15  talked to your lawyer about or any advice you received or

16  assistance about, "Hey, this is how you answer these

17  questions."

18         But I do want to -- if you go back to Exhibit 3,

19  Exhibit 3 is a copy of the initial disclosures that were

20  served on your behalf and also on behalf of your company.

21    A.   Okay.

22    Q.   And the lawsuit that was filed, you filed a

23  lawsuit on behalf of your company and on behalf of yourself

24  individually; correct?

25    A.   Yes, sir.

40

1    Q.   Okay.

2         And then the initial disclosures, question

3  number 1 is a question that says:  "Individuals likely to

4  have discoverable information that plaintiffs may use to

5  support their claims."

6         Do you see that?

7    A.   Yes, I see that.

8    Q.   Okay.

9         And so you've made a claim in this case -- a First

10  Amendment freedom of speech claim; correct?

11    A.   Yes, sir.

12    Q.   Okay.

13         And you've identified certain individuals that you

14  believe may have discoverable information that you will use

15  to support your claims; correct?

16    A.   Can you repeat that.  I'm not quite sure --

17    Q.   You have identified some individuals here --

18    A.   Okay.  The listed ones in bold?

19    Q.   Yes.

20    A.   Okay.

21    Q.   And those are the individuals that you believe to

22  have discoverable information that plaintiffs may use to

23  support their claims?

24    A.   I'm not sure about these names, maybe just because

25  I'm unfamiliar with it or it's been a while.

41

1    Q.    Well, let me help you out.

2    A.    Sure.

3    Q.    So the first name on the list is you, right, the

4  plaintiff?

5    A.    Right.

6    Q.    And you're the owner of the company?

7    A.    Yes, sir.

8    Q.    100 percent owner; correct?

9    A.    Yes, sir.

10    Q.    The second group of names are the defendants in

11  the lawsuit --

12    A.    Okay.

13    Q.    -- that were all named in their official capacity?

14    A.    Okay.  Thank you.

15    Q.    Yes, sir.

16        And then the third name on the list -- who is

17  Chris Alexander?

18    A.    I'm not -- Chris Alexander, I don't know.

19    Q.    Okay.

20        Are there any other witnesses, sitting here today,

21  that you think you would use to support your claims?  And,

22  again, I don't want to get into anything you talked to your

23  lawyer about about strategy, but just -- you understand the

24  case; right?

25    A.    I understand the case, yes.

42

1    Q.    You read the complaint before it was filed;

2  correct?

3    A.    Yes, sir.

4    Q.    It's your lawsuit; correct?

5    A.    Yes, sir.

6    Q.    It's not your lawyer's lawsuit; right?

7    A.    No, sir.

8    Q.    All right.

9        And can you think of any other witnesses that

10  you're going to use to support your claims other than these

11  people you've identified?

12    A.    I'm not aware of any, no.

13    Q.    Okay.

14        And then question number 2, do you see that one,

15  where it says" Documents, electronically -- documents,

16  electronically stored information, and tangible things in a

17  plaintiffs' possession, custody, or control that plaintiffs

18  may use to support their claims"?

19    A.    I suppose we do have documents that back up our

20  claims, yes.

21    Q.    Okay.

22        And you've produced those?

23    A.    I produced what you have here in this packet, yes.

24    Q.    Right.

25        You produced 13 documents?

43

1    A.    Okay.

2    Q.    13 pages; correct?

3    A.    Yes.

4    Q.    All right.

5        And this is something where you're producing

6  information that you may use, not that you will use, but

7  that you may use to support your claims.

8        Do you understand that?

9    A.    Yes.

10    Q.    All right.

11        And are you aware of any other documents that you

12  have in your possession or electronically stored information

13  or tangible things that you may use to support your claims?

14    A.    I'm not sure about that.

15    Q.    What does that mean, "not sure"?

16    A.    I have documents at the house  I'm not sure what

17  is going to be applicable to the case that we may use.  So

18  to be honest answering you, I'm not sure if those documents

19  are going to be used.  I mean, I keep records of everything

20  So yes, I have documents; whether they're used in this, I'm

21  not sure; I've not been told.

22    Q.    Okay.

23        And sitting here, what documents are you thinking

24  of?

25    A.    Records of certifications or job timelines,

44

1  conversations with clients ...

2    Q.    Let me flip back to the timeline.

3    A.    Okay.

4    Q.    So there was a -- do you recall giving an

5  interview to the board investigator on about February 7,

6  2019?

7    A.    If that was that meeting at the library in

8  Goldsboro, yes.

9    Q.    Okay.

10        Let me turn your attention back to Exhibit 6, this

11  packet.

12    A.    Okay.

13    Q.    If you look at -- if you turn to document

14  number 9, NCBELS 9 of Exhibit 6.

15    A.    Yes, sir.

16    Q.    Okay.

17        And there is a three-page document that appears to

18  have been generated by the board investigator that states

19  "Report of Interview with Michael Jones on February 7,

20  2019."

21        Do you see that?

22    A.    Yes, sir.

23    Q.    Okay.

24        And have you seen this document before?

25    A.    Yes, sir.



**Page 45**

1    Q.   Do you recall giving an interview to --

2    A.   William.

3    Q.   -- yeah, Mr. Casey --

4    A.   Yes, I do.

5    Q.   -- on February 7?

6    A.   I do.

7    Q.   And then earlier I'd asked you about an e-mail.

8  If you flip back a few pages, there appears to be an e-mail

9  from you to Mr. Casey dated January 2, 2019.

10      And that's on document number 4.

11    A.   4?  Right here?  Yes, I do see that.

12    Q.   Okay.

13      And do you recall sending him an e-mail on the 2nd

14  of January?

15    A.   I do.

16          (Exhibit 2 marked.)

17    Q.   Okay.

18      And then it looks like there was -- after the

19  interview, Exhibit 2, Deposition Exhibit 2, which is also

20  identified as Exhibit 1 to your complaint, is that the

21  letter that you received from the Board of Examiners for

22  Engineers and Surveyors in June of 2019?

23    A.   Yes.  This was, like, the second letter after the

24  meeting.

25    Q.   Okay.

**Page 46**

1          MR. GEDGE:  Do you have a copy of that?

2          MR. HANNA:  Oh, I'm sorry.  Yeah.

3          MR. GEDGE:  Could we take a break when you

4  get to a natural stopping point?

5          MR. HANNA:  Yeah, let me just get a couple of

6  housekeeping and we'll take a break.

7          (Exhibit 1 marked.)

8    Q.   Mr. Jones, I keep referring to the lawsuit.  I'm

9  going to hand you what's been marked as Exhibit 1.

10      Do you recognize that lawsuit that was filed?

11    A.   Yes.

12    Q.   And then going back to the timeline real briefly,

13  you received the letter in June of 2019, and based on that

14  letter, you stopped performing certain services; correct?

15    A.   Yes.  Yes, sir.

16    Q.   And then the next thing I have on my timeline is

17  March of 2021 when you filed the lawsuit.

18      So not quite two years later, you're filing a

19  First Amendment lawsuit; correct?

20    A.   Yes, sir.

21          MR. HANNA:  Let's take a break.

22          (Recess taken, 11:01 to 11:18 a.m.)

23    Q.   Back on the record.

24      I think I had handed you Exhibit 1, the complaint.

25    A.   This?

**Page 47**

1    Q.   Yes.  And if you could turn to paragraph 77.

2      In paragraph 77 -- first of all, let me move up

3  little earlier.

4      Do you see the top of the page it says "Injury to

5  Plaintiffs"?

6    A.   Yes, sir.

7    Q.   Okay.

8      And then paragraph 72 says:  "Before the Board

9  issued its June 13, 2019, letter, plaintiffs offered and

10  provided drone services such as aerial orthomosaic maps,

11  aerial images containing location information, and aerial

12  images of land that include lines indicating the rough

13  position of property lines."

14      Do you see that?

15    A.   Yes, sir.

16    Q.   All right.

17      And is that true, what was alleged in

18  paragraph 72?

19    A.   Yes.

20    Q.   All right.

21      And then paragraph 73 is basically saying, "Hey,

22  following the board's June 13 letter, we no longer offer

23  aerial orthomosaic maps"; correct?

24    A.   Yes.

25    Q.   "We no longer offer aerial images containing

**Page 48**

1  location information"; correct?

2    A.   Yes.

3    Q.   And "We no longer offer aerial images of land that

4  includes lines indicating the rough position of property

5  lines."

6    A.   Yes.

7    Q.   And when you say you no longer offer this, it's

8  your company; right?  360 Virtual Services -- 360 Virtual

9  Drone Services?

10    A.   Yes, sir, which is me.

11    Q.   Right.

12      You don't yourself individually offer any services

13  in your name; correct?

14    A.   No.

15    Q.   And you don't transact any business, drone

16  business or photography business under your name?

17    A.   No.

18    Q.   And then if I drop down to 76 -- and we talked

19  about this earlier, but you still use your drone to -- for

20  certain projects; right?

21    A.   Yes, I still do.

22    Q.   You're still hired to perform a work product in

23  the form of images or video, something of that sort;

24  correct?

25    A.   Yes, sir.

**49**

1 Q. And then paragraph 77, as I read it, is sort of
2 the heart of the lawsuit, and it says to the Court that your
3 company -- when you say "plaintiffs," you mean your company;
4 right?  360 Virtual Drone Services?
5 A. Plaintiffs, me and the company, 360 Virtual Drone
6 Services.
7 Q. But you through your company; correct?
8 A. Yes, sir.
9 Q. That you wish "to offer and provide drone services
10 that include the following" -- and I'm going to say
11 number 1, "capturing aerial images on behalf of paying
12 clients and using orthomosaic software to stitch those
13 aerial images together to form orthomosaic maps."
14 A. Yes.
15 Q. That's what you want to be able to do?
16 A. Yes, sir.
17 Q. And you're not doing that because of the June 13,
18 2019, letter; correct?
19 A. Because of the warning letter, yes, sir.
20 Q. Okay.
21 And then number 2, you want to create "marketing
22 images of land on behalf of paying clients andrawing those
23 images lines indicating the approximate position of property
24 boundaries."
25 A. Yes, sir.

**50**

1 Q. Number 3, going to 77 -- paragraph 77.c, the third
2 item is "capturing aerial images of land and structures
3 (along with location data, coordinates, elevation data, and
4 volume data) and making those images and that data available
5 to bank paying clients"; correct?
6 A. Yes, sir.
7 Q. That's what you want to do but you can't do that
8 based on June 13, 2019, letter?
9 A. Yes, sir.
10 Q. And then number 4, "capturing aerial images of --
11 and data about land and structures; processing those images
12 and data to create 3D digital models of land structures and
13 making those 3D digital models availableto paying clients."
14 That's what you want to do; correct?
15 A. Yes, sir.
16 Q. Okay.
17 Is there anything else that you're complaining
18 about that you're not able to do because of the board's
19 June 13 letter?
20 A. Yes.  There's other stuff.
21 Q. Okay.
22 What else?
23 A. Parking lot paving inspections, which involves
24 stitching; cemetery plot availability for cemeteries that
25 also involves stitching pictures of the orthomosaic map  If

**51**

1 I haven't said roof inspections yet.  Agriculture, farm,
2 there's software to keep the health of the crops.  That's
3 also included in the orthomosaic.
4 So by -- according to the letter, I can't do any
5 of that.  So those are also things in addition to what's
6 listed that I would like to be able to do.
7 Q. And the items or the projects that you mentioned
8 seem to fall under item 1, which is capturing aerial images
9 on behalf of paying clients and using orthomosaic software
10 to stitch those aerial images together to form orthomosaic
11 maps.
12 A. Yes.  And orthomosaic maps would be the definition
13 of the end product of that.
14 Q. All right.
15 A. I just want to make sure everyone knew that those
16 extra items I mentioned also, you know, were developed from
17 the orthomosaic map.
18 Q. As I understand, your testimony is if you're able
19 to do this, to use this, use your drone in connection with
20 certain software to take images, stitch the images together
21 and create orthomosaic maps, then you can do the type of
22 projects that you just mentioned a few minutes ago; correct?
23 A. Yes, sir.
24 Q. All right.
25 And so other than the four items there listed

**52**

1 under paragraph 77, are you complaining about anything else
2 that you're not able to do as a result of action taken by my
3 client, the Board of Examiners for Engineers and Surveyors?
4 A. So, yes, there is another one that I don't think
5 is covered under the orthomosaic which requires stitching of
6 the pictures, but it doesn't produce an orthomosaic map; it
7 produces a navigable 360 image that is on a picture where
8 they can move with the cursor or mouse on their device and
9 move the picture around.  Those are created by stitching
10 pictures together, but it's not considered an orthomosaic
11 map.  I would also like to do that.
12 Q. Have you ever done that?
13 A. Yes.
14 Q. And who did you do that for?
15 A. National Land Realty.
16 Q. Do you have an example of that work product?  Do
17 you still have that work product?
18 A. Yes, I do have some examples of that.
19 Q. Anything else?
20 A. I think that is it.
21 Q. And so just as I'm clear -- and the reason why I'm
22 asking this is in paragraph 77, these four items are
23 identified by you and your company as plaintiffs in the
24 lawsuit, and then when you get into the First Amendment
25 claim starting on page 19 of the lawsuit, you see those

53

1  paragraph 77 items being repeated -- they're sort of broken
2  down one by one.
3       And so I was just curious if there were any more
4  examples of drone services that you want to provide that
5  you're not being able to provide.
6       And you've identified an example of creating a 360
7  image. Anything else other than the 360 image?
8       A.   Okay. So I'm going to answer that by saying no,
9  but the possibilities are endless to what these things could
10  do.
11       So in a week from now, there may be another option
12  that I'd like to do with drones that they've come up with.
13  But as of right this second, I would say no, I can't think
14  of any other services that I would like to offer.
15       Q.   And the reason why I ask this is because the Court
16  at some point -- the judge, Judge Flanagan, is going to try
17  to understand the facts, what you're complaining about.
18       A.   Okay.
19       Q.   And so the idea that, you know, the possibilities
20  are endless, that's not something that we're able to judge.
21  We need to judge what it is that you're not able to do that
22  you say you've done before or that you want to do.
23       Do you understand?
24       A.   Yes.
25       Q.   Okay.

54

1       A.   So yes, my answer would be that is it, what I have
2  listed.
3       Q.   Okay.
4       And just so you understand, one of the purposes of
5  this deposition is for me to discover what your lawsuit is
6  about; so I'm just trying to make sure I understand --
7       A.   Sure.
8       Q.   -- what's in your lawsuit. Okay?
9       A.   Yes, sir.
10       Q.   If you look at paragraph 77.d, 77.d talks about
11  capturing aerial images of and data about land and
12  structures, processing those images and data to create 3D
13  digital models of land and structures, and making those 3D
14  digital models available to paying clients.
15       Do you see that?
16       A.   Yes, I do see that.
17       Q.   And does this 360 image that you're talking about,
18  is that covered under paragraph 77.d?
19       A.   No. It doesn't.
20       Q.   All right.
21       I want to switch gears and ask you a little bit
22  about the December letter that you received from the board.
23  And when I say "board," do you understand I'm talking about
24  my client, the Board of Examiners for Engineers and
25  Surveyors?

55

1       A.   Yes, sir.
2       Q.   Okay.
3       So the board sent you a letter dated December 19,
4  2018. And in the letter -- and that's the first document of
5  Exhibit 4.
6       In that letter, they say: "Based upon a review of
7  the firm's website (carolinadronehome.com) by the surveying
8  committee of the board and an advertisement on the
9  Droners.io website, it is alleged that the firm may be
10  practicing or offering to practice land surveying."
11       Do you see that?
12       A.   I do see that.
13       Q.   All right.
14       Is that your website, carolinadronehome.com?
15       A.   That is my website.
16       Q.   Okay.
17       Is that still your website today?
18       A.   Yes, sir.
19       Q.   And you indicated earlier, I think, in the
20  deposition, that you did advertise on Droners.io website;
21  correct?
22       A.   Yes, sir.
23       Q.   And then the board's letter goes on to say: "The
24  services include, but are not limited to, quote, 'surveying
25  & mapping,' unquote, and providing orthomosaic maps of

56

1  construction sites."
2       Do you see that?
3       A.   I do see that.
4       Q.   All right.
5       And in fact, on that Droners.io website, you were
6  advertising the services of, quote, "surveying & mapping,"
7  close quote; correct?
8       A.   Yes.
9       Q.   And then on that website, were you advertising
10  providing orthomosaic maps?
11       A.   Yes.
12       Q.   Now, I mentioned earlier -- and I'm going to force
13  you to switch to Exhibit 6 here, but I mentioned earlier the
14  e-mail that you sent, which is document 4, I think.
15       A.   Okay.
16       Q.   So how did you get ahold of Mr. Casey?
17       A.   Mr. Casey, William Casey, okay, he sent the -- he
18  contacted me through the e-mail, the initial letter. I
19  contacted him back. I'm not sure if we talked on the phone
20  or in this e-mail, somewhere, we arranged a meeting at the
21  library in the city of Goldsboro. We made that date. We
22  both met person-to-person. We had a, I guess, maybe an hour
23  meeting and that was it.
24       Q.   All right.
25       Let me ask you about your e-mail.

57

1    A.   Okay.

2    Q.   And it looks like there's one, two, three, four,

3  five -- are these just -- is this just sort of a formatting

4  error?

5    A.   Yeah.  That looks weird.  I'm not sure what

6  happened there.

7    Q.   All right.

8         And then you -- do you see, next to number 2, it

9  was "we"?

10    A.   Yes.

11    Q.   All right.

12         And then it says:  "We added this to the company's

13  website.  And to any of the videos that offer any services

14  for construction industry.  Also any videos that have

15  property lines added to them in post video production, we

16  also addressed those videos as well stating that the lines

17  are for visual purposes ONLY and are NOT accurate nor do

18  they represent any city or county documentation for that

19  property."

20         Do you see that?

21    A.   Yes.

22    Q.   All right.

23         So what are you talking about there?

24    A.   So the part, number 2 where I say we've added this

25  to the company website and any videos of service to

58

1  construction was my disclaimer to state that I wasn't a

2  surveyor and that this was being offered for visual

3  representation only and no valid measurements could be used

4  and turned in to any kind of official office.

5    Q.   And how do you do that?  How do you add property

6  lines in post video production?

7    A.   In video?  Is that all -- you want to know about

8  video?

9         Videos use what the post -- it's an editing

10  program, Final Cut Pro  There's many; that's the one I use.

11  There's a plug-in on that that you can track items in the

12  video.

13    Q.   But how do you do it?  How do you know where to

14  put -- add property lines?

15    A.   When I do it, I use the GIS county map that the

16  Realtor -- when I go with the Realtor or whoever is hiring

17  me, most of the time they already have the map with the

18  lines already drawn on it and that they have been using to

19  advertise.  Then they come to me because they want an

20  updated version; so then I just basically replicate what

21  they've given me.  But it's with updated pictures.  So I'll

22  update the picture -- take the picture in real time, then I

23  take it into Photoshop or, if it's video, it's Final Cut

24  Pro, and then by looking at the lines from GIS, I add the

25  lines to that from the GIS map.

59

1    Q.   So you're somehow interfacing with the GIS map to

2  get lines?

3    A.   "Interfacing" as in just using it as a visual

4  reference.  Like, if this was the map, then I would just

5  look at this and copy this line from this onto my picture or

6  video.

7    Q.   How do you do that?

8    A.   Through the software Final Cut Pro.  So I would go

9  in, you open the plug-in up, you drag it on top of the video

10  footage.  You take your mouse and you draw a line pointing

11  around the property to each point, and then you hit track.

12  It tracks every scene, every frame, all the way down.  So

13  the lines -- if the picture's moving, it tracks with the

14  lines, and then that's it once I, you know, render the file

15  out; it is all in one file then.

16    Q.   All right.

17         And just so I understand, because it is a little

18  confusing to me --

19    A.   Sorry.

20    Q.   -- you have a map, a GIS map with lines on it that

21  the Realtor -- or the client gives you.

22    A.   To be clear, it may not be a GIS map, but it's

23  some kind of a map that they have, most likely from Google

24  Earth or something like that, that they've given me and

25  said, "I need you to take a picture of this property and --

60

1  for an advertisement, and here's the lines on it."

2    Q.   Okay.

3         And so you have a map and you're not exactly sure

4  where it comes from?

5    A.   No.

6    Q.   And it has -- there's a map of a property with

7  lines on it?

8    A.   Yes, sir.

9    Q.   And then you go ahead and you take pictures and

10  video of the site?

11    A.   Yes, sir.

12    Q.   And are you doing this manually or are you doing

13  this through some sort of computer program?

14    A.   Manually.

15    Q.   All right.

16         And then you upload the data on your computer from

17  the drone?

18    A.   Yes, sir.

19    Q.   And then you're able to access the picture of the

20  site or pictures of the site, and at some point, you use

21  software to actually draw the lines yourself?

22    A.   Yes.

23    Q.   And essentially what you're doing, if I understand

24  it, is you're using this picture that was given to you by a

25  client with lines on it and you're just trying to replicate

**Page 61**

1  that yourself using the software?

2      A.   Yes.

3      Q.   And you're doing that manually yourself?

4      A.   Yes.

5      Q.   Okay.

6           And then you -- on top of putting the lines on

7  this finished work product, you were putting in this

8  disclaimer?

9      A.   Yes.  I was, but they told me that it didn't

10  matter; so ...

11      Q.   In your disclaimer, you say "These maps do have a

12  relative accuracy of 1 to 3 inches."

13           How are you able to make that claim?

14      A.   That's the claim from the software, Pix4D and

15  DroneDeploy, that creates the orthomosaic maps from the data

16  that I collect.

17      Q.   And then you go on to tell the client:  "This

18  means the measurable points on the map are within 1 to 3

19  inches accurate to a ground measurement."

20      A.   Yes.

21      Q.   Where do you get that information?

22      A.   As far as the information, I could replicate it.

23      Q.   I mean, how are you able to make that

24  representation to the client?

25      A.   I could measure on the ground with a tape measure

**Page 62**

1  and then actually replicate that with the picture of the

2  orthomosaic map and then confirm through the tape and the

3  picture.  They have a tool in the DroneDeploy and Pix4D that

4  you can draw, to click here, to click here, to get that

5  measurement.  So that's provided in the software.

6           So using that, that maps what I would replicate on

7  the ground with a tape measure.

8      Q.   Did you ever do that?  Did you ever double-check

9  to see -- when you used DroneDeploy and you inserted your

10  points to get distance, did you ever go onto the ground and

11  measure to see if that was accurate?

12      A.   Yes.

13      Q.   Okay.

14           And what was -- what were your results?

15      A.   It was dead on.

16      Q.   What is DroneDeploy?

17      A.   DroneDeploy is a company who offers mapping

18  software, among other things.  They have other things, but

19  that is their claim to fame, so to speak.

20      Q.   When did you first start using the mapping

21  software offered by DroneDeploy?

22      A.   I would guess 2017 at some point.

23      Q.   And did you do this -- did you subscribe to buy a

24  license or how did you -- did you have to buy the software?

25  How did you go about doing this?

**Page 63**

1      A.   So different software companies offer different

2  packages as far as the availability of it.  DroneDeploy at

3  the time offered a "free up to a certain point of data" that

4  you could enter that would create the map.  So I just used

5  the free version.  And I think for a month, maybe, I

6  subscribed.

7      Q.   So when you were creating orthomosaic maps, were

8  you doing that using the free service?

9      A.   Yes.

10      Q.   Do you still use DroneDeploy today?

11      A.   No.

12      Q.   Did you stop using DroneDeploy in June of 2019?

13      A.   Yes.

14      Q.   Did you ever subscribe to any paid service through

15  DroneDeploy?

16      A.   Yes.

17      Q.   And how long?  Is that that one month?

18      A.   Yes.  Like a month or two.  It wasn't long at all

19  because it's very expensive and there was no work and

20  turnaround for it; so ...

21      Q.   Okay.

22           So do you know if you ever did any -- did you ever

23  create any work product for a client using the paid

24  subscription?

25      A.   I would not be being honest if I tried to answer

**Page 64**

1  that.  I would guess maybe I did once, but it would be hard

2  to tell with in that timeline I actually produced the

3  orthomosaic map and if my subscription was valid at that

4  point.

5      Q.   Going back to that e-mail on the second page,

6  which would be I think page 5 --

7      A.   Okay.

8      Q.   -- if you see under number 2, it says:  "We also

9  address the Droners.io website profile."

10           Do you see that?

11      A.   Yes, sir.

12      Q.   And then you wrote to the board, quote:  "On this

13  website, there are categories that you are opted to select

14  from.  The title of one I had added to my, quote, 'area of

15  expertise,' unquote, was, quote, 'mapping and surveying,'"

16  unquote.

17           Do you see that?

18      A.   Yes, sir.

19      Q.   And so you were advertising expertise in mapping

20  and surveying on Droners.io website; correct?

21      A.   No, I wouldn't say correct.

22      Q.   Okay.

23           On the Droners.io website, you -- you had a

24  profile for your company, 360 Virtual Drone Services;

25  correct?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

65

1   A.   Yes, sir.

2   Q.   And did you pay for that?

3   A.   No.  That works off of, I guess you could call, a

4 commission basis.

5   Q.   And so you advertised on Droners.io website,

6 advertised drone services; correct?

7   A.   They have a profile page and yes, I filled out a

8 profile page.

9   Q.   And under the profile page, there's a part of that

10 that says "area of expertise"; correct?

11   A.   Not sure it's stated just like that, but yes, it

12 gives you options to choose your selected services.

13   Q.   All right.

14       You wrote in this e-mail:  "The title of one I had

15 added to my, quote, 'area of expertise,'" unquote.

16       Do you know why you were putting that in

17 quotations?

18   A.   Just because I generally didn't know how it was

19 listed on Droners; so "areas of expertise" was just a title

20 I picked out, I guess.

21   Q.   Okay.

22       And what is that meant to explain to the board?

23   A.   Okay.  What are you asking, "what's meant to

24 explain"?

25   Q.   Yeah.  Why did you use the words "area of

66

1 expertise" to explain --

2   A.   So on Droners.io, they have a spot where you can

3 select your services of what you want to participate in in

4 offering your clients, okay.

5       So I'm not sure if they have the words "area of

6 expertise" on the site.  It may have "specialties."  It may

7 have "areas you would like to participate."

8       So as far as the writing, I'm not positive on

9 that; it's just an option on the site where you can choose.

10 And they already have them prefilled-in boxes; so you don't

11 get to write out, you have to choose the options they

12 already have.

13   Q.   And your -- one of the options that you chose to

14 advertise on Droners.iowebsite was "mapping and surveying?"

15   A.   Yes, sir.

16   Q.   Okay.

17       And that's what the board saw and sent you the

18 letter in December; correct?

19   A.   I'm not positive.  Maybe.

20   Q.   Okay.

21       Well, go back to Exhibit 4, the letter in

22 December.

23   A.   Okay.

24   Q.   And when I read the letter, it says -- they've

25 referenced specifically the Droners.io website in the second

67

1 paragraph; correct?

2   A.   Yes.

3   Q.   And it goes on to say the services that were

4 advertised by you "include, but are not limited to,

5 surveying and mapping."

6       Do you see that?

7   A.   Yes, sir.

8   Q.   Okay.

9       And then you provided them a link to your profile

10 in this e-mail; correct?

11   A.   Yes, sir.

12   Q.   Do you still advertise there?

13   A.   No, sir.  My account is not active there.

14   Q.   And then you have a few questions that you want to

15 ask the board; right -- in your e-mail?

16   A.   Yes.

17   Q.   And then you write:  "So we of course offer

18 orthrectified mapping," and then you put in parens,

19 (orthomosaic map) (measurable maps)."

20       What are you talking about there?

21   A.   So I guess you're asking for the definition of

22 orthomosaic map?  Is that what you're looking for?

23   Q.   I'm trying to understand -- you said "So we of

24 course offer" and then you use the term "orthrectified

25 mapping."

68

1       What is that?

2   A.   That is the process of the mapping puting -- put

3 together in an orthomosaic map; so that's multiple pictures

4 being used to create one picture.

5   Q.   And you say these are measurable maps; correct?

6   A.   Yes.

7   Q.   And this one picture that is processed by the

8 software, you said they do that with"RTK and Ground Control

9 Points."

10   A.   Uh-huh.

11   Q.   What is RTK?

12   A.   RTK and Ground Control Points are GPS modules you

13 use in capturing when you're making orthomosaic maps or in

14 surveying, I guess.  I don't know what they're -- they're a

15 module you have to buy.  They're very expensive.  Those are

16 used to establish certain ground control points on the

17 ground so when you're doing your map, you can make sure the

18 cloud points are accurate to those ground control points.

19   Q.   All right.

20       So when you say:  "So we of course offer

21 orthrectified mapping (orthomosaic maps) (measurable maps),"

22 did you mean to have a period there before you start with

23 "with RTK"?

24   A.   Maybe.

25   Q.   Okay.

Michael Jones — 7/21/21
360 Virtual Drone, et al. v Ritter, et al

Michael Jones — 7/21/21

Michael Jones — 7/21/21

July 21, 2021
5:21-CV-0137-FL

**69**

1 "With RTK," was that the beginning of another
2 sentence or was that part of the first sentence?
3     A. I'm not sure.
4     Q. You say: "With RTK and Ground Control Points we
5 have the ability to offer global accurate maps and relative
6 accurate maps."
7     Do you see that?
8     A. Yes, sir.
9     Q. All right.
10     And so are you telling the board that you're
11 creating orthomosaic maps with RTK and control points?
12     A. No, I'm not telling the board that.
13     Q. Okay. All right.
14     Did you -- were you doing that? Were you creating
15 orthomosaic maps with RTK and ground control points?
16     A. No.
17     Q. All right.
18     What is this sentence that says -- or this
19 information that says: "With RTK and Ground Control Points
20 we have the ability" -- are you saying what you could do --
21     A. Yes.
22     Q. -- or what you have done?
23     A. I'm saying what the technology is capable of.
24     Q. All right.
25     And did you ever do that?

**70**

1     A. No. I couldn't. Those -- the equipment for that
2 is so expensive, I alone could not ever afford that.
3     Q. Okay.
4     And then you say: "We do however have to work
5 with a licensed surveyor to sign off on and work with us
6 capturing this data and with processing."
7     What did you mean by that?
8     A. I mean, so far as a drone company, you cannot
9 go out and collect this data for any kind of construction
10 site or any other client and then turn it in to a state or
11 city or any kind of official department that, you know,
12 turns in any land surveying or lines or anything for the
13 county. So you have to have a licensed surveyor to sign off
14 on it, and I was interested in working with surveyors who
15 were implementing drones into their company.
16     Q. Did you have any success?
17     A. No, sir.
18     Q. All right.
19     Then you -- at the bottom, it talks about "we
20 offer to the construction industry" -- or "What we offer to
21 the construction industry is generally used for the
22 following purposes."
23     Do you see there where it says: "Monitoring" --
24     A. Yes.
25     Q. -- "the site/property, flying it every week or

**71**

1 biweekly"?
2     A. Yes, sir.
3     Q. And do you do that by video?
4     A. It would depend. You could do it by video or
5 pictures really. But I think in this case, most people were
6 looking to orthomosaic map.
7     Q. Why is that? Why are they looking for orthomosaic
8 map instead of pictures and a video?
9     A. The orthomosaic map would be way more efficient if
10 you're looking at a site that's, you know, a thousand acres
11 or a construction site that's very large.
12     Q. The next one: "Investors can see the site as it
13 constructs."
14     A. Yes.
15     Q. Do you see that?
16     Was that by video?
17     A. That is also by orthomosaic map.
18     Q. Can you do it by video?
19     A. You could, yes, sir.
20     Q. And then you have "quality control."
21     Do you see that?
22     A. Yes, sir.
23     Q. What is that?
24     A. It's a quality control on your -- I'll use
25 construction, for example.

**72**

1     So quality control on the site -- equipment being
2 left out unattended, stockpiles being in the wrong spot, I
3 mean, it could -- uncountable things could be wrong. So
4 managers or site managers use that for quality control.
5     Q. And do you do that by video?
6     A. The clients I was going to was wanting the
7 orthomosaic map but you could accomplish it with video, I
8 suppose. It wouldn't be the most efficient.
9     Q. Safety control monitoring? What is that?
10     A. So safety control would follow kind of under the
11 same thing as quality control. They're just able to see
12 every aspect of their site. The maps, they can zoom all the
13 way in to it from all the -- you know, the full map all the
14 way in to one part to monitor, you know, like I said, parts,
15 equipment ...
16     Q. And is that by video?
17     A. No. All of these are under orthomosaic maps is
18 what these clients wanted. You could accomplish it all by
19 video, but nobody wanted that.
20     Q. All right.
21     And so the items that you have listed here under
22 what you offer, all of these items could be -- you could
23 accomplish the projects by providing video but the clients
24 preferred orthomosaic maps.
25     Is that what I hear you saying?

73

1    A.   I mean, that was never anything that came up.  But

2  just answering you here, I mean, I suppose -- it's a visual

3  concept so they could see it by video.

4         Did clients ever want video?  No.  They always

5  wanted an orthomosaic map.

6    Q.   Is there a difference in price between a video and

7  an orthomosaic map?

8    A.   Yes.

9    Q.   And what's the difference in price?

10    A.   It would be impossible to tell you.  I mean, it's

11  just according to what the client wants, you know, on the

12  screen.  A video could run anywhere to $10,000 or could be a

13  thousand, or -- an orthomosaic map, you know, would be a

14  different fee.  Video production is a whole lot more

15  expensive than an orthomosaic map.  Significantly.

16    Q.   Okay.

17         Video is more expensive than creating an

18  orthomosaic map?

19    A.   Yes.

20    Q.   And why is that?

21    A.   It's more work.

22    Q.   Can you explain that to the Court?

23         What's -- what is the work involved in creating a

24  video of a project to determine quality control or monitor

25  safety or provide investors updates on construction?

74

1    A.   Okay.  What was the question again on top of that?

2    Q.   Yeah.

3         If you could explain to the Court the process for

4  providing a video work product.

5    A.   Okay.  So the video work product, you would go out

6  to the site, you would have to schedule that.  You would

7  collect all the data, which is the content you're capturing

8  for the day.  And then you would have to go back home, you

9  would have to upload all of this data onto your computer.

10  Then you'd have to upload all this data into your post

11  editing software.

12         And then, according to the client's demands and

13  requests, you'd have to create the video to their

14  specifications, which would have text on the screen, arrows

15  on the screen -- they may suggest, you know, me bringing in

16  graphics.  I mean, it's -- anything in post production, I

17  mean, it could go on and on, versus making an orthomosaic

18  map is taking pictures, you know, with a computer program,

19  which is much quicker.

20    Q.   All right.

21         And you use -- or did -- before June of '19, you

22  used the DroneDeploy software; correct?

23    A.   DroneDeploy software, yes.

24    Q.   Okay.

25         And so can you explain that process?  So if I

75

1  hired you to come to my site and I provided you a map that

2  has a map of an aerial photo of the site with some lines

3  drawn on it and I asked you to provide me with an

4  orthomosaic map of my site, how would you go about doing

5  that?

6    A.   Let's use DroneDeploy since that's on the table

7  that we're familiar with.  That's one of the many mapping

8  softwares.

9         So you would load that software onto your device.

10  You would then enter the map site as far as the location

11  visually into the software, that's by using your mouse to

12  click lines.  The software would then generate a map as far

13  as direction of how the drone will fly.

14         You have control of adjusting all of that, which

15  is altitude, how many passes it makes, how much overlap it

16  has, front and back, side to side.  The drone then flies

17  this pattern automated while we're monitoring it.  We have

18  complete control of the drone.  We can stop it at any time

19  or cancel the mission.

20         And then once that map is completed as far as the

21  computer program, the drone would then automatically return

22  home.  It will land.  That software -- or the data off the

23  SD card would then be loaded into DroneDeploy via the

24  internet.  According to how many pictures, they produce the

25  map in a certain amount of time, and then they send it back

76

1  to you via a link on their website.

2    Q.   Anything else?

3    A.   That's about it.

4    Q.   Okay.

5         And so just so we're on the same page, when you

6  looked at paragraph 77 of the complaint, the first item on

7  that that you want to do that you claim you're not able to

8  do because of the letter is you want to be able to capture

9  aerial images on behalf of paying clients and use

10  orthomosaic map software to stitch those aerial images

11  together to perform orthomosaic maps?

12    A.   What page was that on?  I'm so sorry.

13    Q.   So that's Exhibit 1, on the left.

14    A.   Oh, gotcha.  I'm sorry.

15    Q.   And then that's paragraph 77.a.

16    A.   Okay.  And I'm sorry.  Could you repeat the

17  question?

18    Q.   Yes.

19         So in your lawsuit, you identify four services

20  that you want to provide that you claim you can't provide

21  because of the board's letter in June; correct?

22    A.   Yes.

23    Q.   And what you just explained to the Court on how

24  you create an orthomosaic map, that's 77 -- paragraph 77.a,

25  right, where it says "capturing serial images on behalf of

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

77

1 paying clients and using orthomosaic software to stitch
2 those aerial images together to form orthomosaic maps."
3     A.  Yes.
4     Q.  Okay.
5     So let us not drill down on that a little more just so
6 we all understand what you're talking about.
7     You go on-site and you have your drone; correct?
8     A.  Yes.
9     Q.  And the software that you're talking about, the
10 DroneDeploy software, is loaded into your telephone?
11     A.  Yes, sir.  Your iPad.  Whatever device you're
12 using with the drone.
13     Q.  Okay.
14     So some sort of smartphone or iPad device?
15     A.  Yes, sir.
16     Q.  Okay.
17     And what did you use?
18     A.  Either iPad or iPhone.
19     Q.  And then you used the software on your phone to
20 locate the piece of property that we're talking about;
21 right?
22     A.  No.  I wouldn't say that.
23     Q.  Okay.
24     A.  So the software, you can either create the map
25 from home, the prework on the internet on the desktop, or

78

1 you can do it when you got to the job site.  If it was a
2 site that I was flying frequently, I did it at home on the
3 desktop, as far as planning the site.
4     So then when I got to the site, opened to the
5 drone, it would already be planned.  Everything was already
6 planned out on the phone.  So all I had to do was connect
7 the drone, pull that certain map program in, and it would
8 fly.
9     Q.  Okay.
10     And so what we're talking about is using the
11 software to draw lines that would essentially sketch out the
12 flight pattern or flight project for the drone?
13     A.  Yes, sir.
14     Q.  It's the mission that you're programming the drone
15 to fly?
16     A.  Yes, sir.
17     Q.  All right.
18     And lines -- you're essentially drawing lines
19 around the property that you want to survey?
20     A.  The perimeter, yes, sir.
21     Q.  Okay.
22     And it might be the entire perimeter of the
23 property owned by your client or it could be a smaller
24 portion; right?
25     A.  Yeah.  I mean, it could be any -- any job, yes,

79

1 sir.
2     Q.  Okay.
3     And do you do that manually using a mouse?
4     A.  As far as creating the plan, yes, you do it
5 manually with the mouse.
6     Q.  All right.
7     And once that plan is -- the area is drawn, does
8 it give you -- the program itself, does it tell you how much
9 acreage is involved?
10     A.  Yes.
11     Q.  And the mission, so to speak, programs the drone
12 to fly in a pattern like you're mowing your lawn; right?
13     A.  Perfect.  Yes.
14     Q.  Okay.
15     And as the drone flies in that pattern like you're
16 mowing your lawn, it's taking pictures every so often?
17     A.  You set the parameter on how often you want to
18 take the pictures; so yes.
19     Q.  Okay.
20     And so that's sort of another key question, which
21 is:  You have the software, and the work product that you're
22 doing, right, is you yourself are controlling the area that
23 is being -- that the mission is flying; right?
24     A.  Yes, sir.
25     Q.  What else do you control before the drone goes up

80

1 in the air?
2     In other words, what kind of decisions are you
3 making as to what type of mission is being flown and what
4 kind of data is being generated?
5     A.  You always have to check the air space as far as
6 preparing -- any flight you do, you always have to check the
7 air space.  That's only controlled by the FAA.  We have
8 maps -- VFR maps that we go to and different software
9 programs that we check that.
10     So once you've established that the site, the
11 project site that you're working is clear from the FAA, then
12 you -- basically, you have to go and just check, you know,
13 for towers, power lines, all the hazards before you take
14 off, and then you take off from there.
15     Q.  But there are other items on the software that
16 you're selecting -- other boxes you're checking and --
17     A.  Like I mentioned earlier, you do have a
18 customization option to select a parameter of that.  So the
19 flight altitude you can adjust, the overlap front and back
20 of the pictures you can adjust, and the speed I think you
21 can adjust.  And different software programs offer different
22 options that you have access to.
23     Q.  All right.
24     And when is the first time you used DroneDeploy
25 software to create an orthomosaic map?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

81

```
1     A.    I couldn't tell you.
2     Q.    Was it in 2017?
3     A.    It was between 2016 and 2017.
4     Q.    And you stopped doing it in June of 2019?
5     A.    Yes.  If that's -- after the letter came, the
6  second letter claim, I quit after that.
7     Q.    Yeah.
8           And the -- how many orthomosaic maps did you
9  generate for paying clients?
10    A.    I couldn't answer.  I couldn't tell you.
11    Q.    Is it more than five?
12    A.    Yes, more than five.
13    Q.    Less than 100?
14    A.    Absolutely, yes.
15    Q.    Less than 25?
16    A.    Less than 25, yes.
17    Q.    Less than 15?
18    A.    Probably.
19    Q.    All right.
20          Can you narrow it down any more from 5 to 15 or is
21  that --
22    A.    Yeah, that's about the pocket I'm comfortable
23  talking to you in --
24    Q.    That's fair enough.
25    A.    -- because I'm really not sure.
```

82

```
1     Q.    Thank you.
2           What type of training did you receive in
3  generating these orthomosaic maps using this DroneDeploy
4  software?
5     A.    Just all self-education online.  The Drone
6  University is heavy into mapping and creating orthomosaic
7  maps.  So I followed those guys a lot.  And then the rest of
8  the education was just on YouTube, Google.
9     Q.    Did you take classes through DroneDeploy?  Did you
10  receive any type of formal training in how to use
11  DroneDeploy?
12    A.    No, sir.
13    Q.    And you said you were using-- primarily for that
14  year and a half, you were primarily using the free version
15  of DroneDeploy?
16    A.    Yes, sir.
17    Q.    All except for about a month?
18    A.    Yes, about a month or two when I had to pay.
19    Q.    And the -- how did you learn how to use the free
20  version first to select altitude, to select overlap, or
21  determine how many passes or determine the speed of the
22  drone or how to create the property lines or mission lines
23  that were going to be followed?
24          How did you learn how to do all that?
25    A.    Self-education online, YouTube, Google.
```

83

```
1     Q.    And do you understand the importance of selecting
2  the right altitude?
3     A.    Yes.
4     Q.    Okay.
5           And what is that?
6     A.    Basically it's according to the job.
7     Q.    Okay.
8     A.    Are you asking the limits of the FAA?
9     Q.    No, not the limits of the -- but is the altitude
10  important for --
11    A.    Yes.
12    Q.    -- creating a final work product?
13    A.    Yes, it is.  So the altitude, you know-- if it's
14  a very large lot, you know, the altitude may be 400 feet.
15  So it would be according to what the client ordered, how
16  close they wanted it to the ground, how many passes they
17  want to, you know, have the drone go.  It's kind of hard to
18  give it a block answer on that.
19    Q.    All right.
20          Can you give me some ideas or some issues that you
21  were concerned about when you selected altitude or factors
22  that you considered when you selected altitude?
23    A.    So when you can get to the job site, you have to
24  pretty much find the lowest obstacle.  So if it's a tower,
25  that's always the check.  You look around, you find that.
```

84

```
1           The jobs that I was doing for the orthomosaic
2  maps, the majority of them, they had on the order what the
3  altitude was; so they wanted it flown -- and a lot of the
4  times, the jobs or the client hiring for the job, they would
5  already have all of the directions and what to make the
6  altitude, the front lap, back lap -- everything like that in
7  the order sheet, and then I would just adjust accordingly.
8     Q.    Did the client also have the parameter drawn for
9  what they wanted flown for the mission?
10    A.    Yes.
11    Q.    All right.
12          And so as I understand it, you had the software on
13  your phone, the client would provide you the perimeter map
14  that would be flown; correct?
15    A.    Yes.
16    Q.    And the client would provide you the altitude that
17  would be flown; correct?
18    A.    Yes.
19    Q.    And they would provide you with instructions as to
20  how many passes to do?
21    A.    Yes.  Which is determined by the overlap.
22    Q.    And so they would provide you the overlap?
23    A.    Yes.
24    Q.    Did they provide you the speed?
25    A.    No.  Speed is determined by a couple more
```

85

1  equations -- overlap height, and that could vary.
2       Q.    So once you follow the instructions provided by
3  the client on overlap and altitude, then the speed is
4  automatically generated by the program?
5       A.    I believe in DroneDeploy it is.  Like I mentioned
6  earlier, the softwares have differences.  Some have the
7  options to adjust the speed directly.  Some of the speeds
8  are adjusted by parameters -- height, altitude, front
9  overlap, rear overlap.
10      Q.    And so your company, then, is -- you have this
11 free software loaded onto your system; correct?
12      A.    Yes, on one of my devices.
13      Q.    And you are following the instructions of the
14 client on the location to be flown or the mission perimeter
15 to be flown?
16      A.    Yes.
17      Q.    And you are entering that into the software that
18 you have along with the altitude provided by the client;
19 right?
20      A.    Yes, sir.  Into DroneDeploy.
21      Q.    And you're entering the overlap provided by the
22 client; correct?
23      A.    Yes, sir.
24      Q.    And you're entering -- and the speed is generated
25 automatically by the software; right?

86

1       A.    Could be determined according to which software
2  you're using.
3       Q.    And so is there any discretion you havein what I
4  would call the preflight planning for the mission?
5       A.    Discretion?  I'm not really sure what you mean.
6       Q.    Maybe that's not a good word.  It sounds to me
7  like ...
8            Is there any of your own work product that goes
9  into the preflight planning that's not provided to you by
10 the client or generated automatically by the software?
11      A.    Other than the internet access to access the
12 software, but that would be it if I'm understanding the
13 question correctly.
14      Q.    I think so.  So -- I hope.
15           Is there any of your company's work product that
16 goes into the preflight planning that's not provided by your
17 client or generated automatically by the DroneDeploy
18 software?
19      A.    No.
20      Q.    And then once you get to the site, you have this
21 preflight mission loaded and ready to go; right?
22      A.    Most of the time, yes, sir.
23      Q.    And if you don't have it loaded and ready to go,
24 you're working on it with your client at the site --
25      A.    You can draw it out on-site.

87

1       Q.    And they're telling you, "Here is the perimeter I
2  want you to use"; right?
3       A.    Yes.
4       Q.    And "Here are the other instructions that you have
5  to enter into the program."
6       A.    Yes.
7       Q.    And you're just following their instructions.
8            And then what do you do?  Push a button to create
9  the mission?
10      A.    So after the all perimeters and everything are
11 entered, you hit "create flight."  The software
12 automatically goes through and does a number of safety
13 checks, makes sure everything's right.  If everything's not
14 right, the software will not allow you to continue to the
15 take-off point.  It will hold up and tell you what's wrong
16 or what you need to adjust.
17           But if everything is okayand the software checks
18 out, then it's a go, the button turns green and you hit
19 "fly," and the drone takes off and then it flies the
20 automated pattern.
21      Q.    And so what I hear you explaining to the Court is
22 that in order to generate a flight plan, you have to input
23 certain data into the software and you push a button called
24 "create flight"?
25      A.    Yeah.  I mean, as far as the title, it may be

88

1  "create flight," but something along those lines, yes.
2       Q.    And the data that you're inputting is nothing
3  that -- it's data that's either given to you by the client
4  or it's just automatically generated by the software?
5       A.    Correct.
6       Q.    All right.
7            And then you create flight, and then the drone is
8  being controlled by the software?
9       A.    Yes.  It follows the mission that's programmed
10 into the software.
11      Q.    And as I understand it, then, the drone is flying
12 this lawnmower-type pattern, taking pictures, and then it
13 completes its flight?
14      A.    Yes.
15      Q.    And you're on-site with it?
16      A.    Have to be on-site with it.
17      Q.    And then once the drone completes its mission,
18 what happens next?
19      A.    Then it returns back -- back home, it lands
20 automatically.  The software will see you captured all the
21 data.  It will let you know that it was captured
22 successfully or if there were any problems.
23           At that point, close down, pack up, take that
24 information home, as I mentioned, and load it into
25 DroneDeploy application on your desktop.  And, you know, it

**89**

1  could be an hour or two, three, according to how big of a
2  map you have created, and then they send you a notification
3  via e-mail that your map's ready.

4      Q.   All right.

5      And that's my next question, which is:  Explain to
6  the Court how the information or data from the drone isthen
7  loaded to DroneDeploy.

8      A.   So it's on an SD card like I mentioned earlier.
9  So the SD card just comes out of the drone into my computer,
10  you open it as a drive, copy those photosto your drive, and
11  then load that via the internet, DroneDeploy.com on your
12  account, you load that into that map because it already has
13  the map, you know, prefilled out from when you panned it.

14      So once you enter the data, it kind of connects
15  everything, processes the map, and as I mentioned, you have
16  to wait a couple of hours or however big the map is.  At
17  that point, you'll get an e-mail your map is ready and then
18  you have to use their site to go back to it to see it.

19      Q.   So other than manually inserting the SD card into
20  your computer and clicking a few buttons, are you -- is
21  there any work product that's being generated by your
22  company?

23      A.   No.

24      Q.   And once the drone data from the card is loaded
25  into the computer, it's then loaded onto the DroneDeploy

**90**

1  site.

2      And then what do you do?  Push a button that says
3  "orthomosaic map"?

4      A.   So when you go back into the profile, as I
5  mentioned, it will already have your plan that you made --
6  let's just say on Main Street.  So it will have the Main
7  Street job programmed.  It's waiting for you to load the
8  data you acquired.

9      So once you load that data, that software
10  automatically completes it and gives you a message similar
11  to, you know, "Your data is being uploaded.  Your map will
12  be processed shortly."  And then you just wait and you get
13  the e-mail that it's back.

14      And then once you open that up, you go to that map
15  project, click on it, it will open up.  That site has
16  different options that you can use on that map, but you see
17  the map, basically, and have access to it.

18      Q.   All right.

19      And you are -- it takes some time, right, to
20  process this data?

21      A.   Yes.

22      Q.   And the processing is being done by DroneDeploy?

23      A.   By DroneDeploy, yes, sir.

24      Q.   And they send you an e-mail to your company, 360
25  Virtual Drone Services, that your project is ready?

**91**

1      A.   Yes, sir.  Or through their DroneDeploy app, they
2  just send a notification because I have it on my phone.

3      Q.   What does the notification say?

4      A.   Roughly, it just says "Your map's ready" or "Your
5  map's finished processing."

6      Q.   Okay.

7      And then do you have a link or do you actually
8  have an image?

9      A.   If I were to go through the e-mail, there would be
10  a link.  But if I were to open the actual software, it would
11  just be all integrated into that -- you know, that
12  particular app on your phone.

13      Q.   And what do you provide your client?

14      A.   It's according to what they want.  Most of the
15  time, I would deliver a simple PDF of the orthomosaic map.

16      Q.   All right.

17      And so you have a link or you have a -- strike
18  that.  Let me start over.

19      You get an e-mail with a link; correct?

20      A.   Yes.

21      Q.   But if you log in to your account on DroneDeploy,
22  you actually just havewhat?  What do you see at thatpoint?

23      A.   So you open it up to your profile.  You know, it
24  may have "360 Virtual Drones," and then it would have a list
25  to the left of all of the projects you've created and then

**92**

1  you're able to click on each one.  So once you click on the
2  left menu, it opens up on the right, you know, your
3  projects.

4      So let's say we did the one on Main Street.  We
5  click on Main Street.  It opens up, you know, for you to
6  view the map.  And as I mentioned, it has countless tools
7  that you can use for whatever purpose.  What I was using it
8  for was just to create the map.

9      Then I would take that map -- I'm not sure, they
10  may have an option to just export it into a PDF and that's
11  how I got it, so PDF to my computer and then ever what
12  deliverable the client wanted, whether it was on a thumb
13  drive or a Dropbox link or e-mail.  Different clients use
14  different methods.

15      Q.   And so from the point in time when you're hired to
16  provide the client an orthomosaic map, the client is
17  providing you with certain information that you enter into
18  the software, and then the software is automatically
19  generating the remainder of the information necessary to
20  complete the preflight mission; correct?

21      A.   Yes.

22      Q.   And then once you get the drone back in your
23  hands, then you're just taking the data that was generated
24  from that flight and you're loading that data into your
25  computer?

Michael Jones
350 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

93

1  A.  Yes sir.

2  Q.  And then you are load -- you're transferring that

3  data to DroneDeploy software -- DroneDeploy account, I

4  guess.

5  A.  Yes.

6  Q.  And you're not doing -- you're not analyzing

7  anything, you're not changing anything, you're not deleting

8  pictures or changing pictures.  You're just transferring the

9  data; correct?

10  A.  Yes, sir.

11  Q.  And then once you transfer the data, then the

12  DroneDeploy software is processing the data to create this

13  orthomosaic map; correct?

14  A.  Yes, sir.

15  Q.  And then when you get the link back or

16  notification that it's ready, you go onto the site, you

17  click a button, and the map's ready?

18  A.  Pretty much, yes, sir.

19  Q.  And that map is -- you don't analyze it, you don't

20  edit it, you don't do anything to it.  You just take that

21  map and you click another button and turn it into a PDF?

22  A.  Yes.

23  Q.  And that's your deliverable to your client?

24  A.  Most of the time, yes.

25  Q.  And that's what you're saying to the Court that

94

1  you should be able to do that work in order to -- let me

2  read here.

3  You're saying that you want to offer and provide

4  those services where you capture these aerial images on

5  behalf of paying clients and using orthomosaic software to

6  stitch those aerial images together to form orthomosaic

7  maps.

8  A.  Yes, sir.

9  Q.  Okay.

10  And when you're saying "stitching these aerial

11  images together to form orthomosaic maps," it's really

12  simply sending the data to DroneDeploy and hitting a button

13  and they process it for you?

14  A.  Yes, sir.

15  Q.  Okay.

16  And you're saying that your inability to be able

17  to go through that process and provide that orthomosaic map

18  is a violation of your First Amendment freedom of speech?

19  A.  I think so, yes.

20  Q.  Okay.

21  How so?

22  A.  Selling data, information to clients, which is

23  free speech.  I'm not turning any of this work to have

24  anything certified by any land organization, city, county,

25  anything.

95

1  And on top of that, my clients were also aware of

2  that, that this is not what it's being offered for.

3  Q.  And that's the first item in paragraph 77, right,

4  orthomosaic maps?

5  A.  Orthomosaic maps, the first item, "a" that's under

6  77.

7  Q.  And I just want to make sure we're clear for the

8  judge.

9  Is there anything else about the process of how

10  you go about performing that work or those services that we

11  haven't touched on that you think is important?

12  A.  I can't think of anything else, sir.

13  Q.  And when you talk about the other three items

14  under paragraph 77, item 2, "creating marketing images of

15  land on behalf of paying clients and drawing on those images

16  lines indicating the approximate position of property

17  boundaries," is that -- do you do that using DroneDeploy or

18  some other software?

19  A.  So that item specifically, DroneDeploy is not

20  involved because there's no stitching of pictures or any

21  processing of maps.

22  This is just kind of standard photography items

23  that come out of the drone.

24  Q.  And what do you use to draw the lines?

25  A.  In still photos, it would be Adobe Photoshop  In

96

1  videography, it would be Final Cut Pro.

2  Q.  And then the third item is "capturing aerial

3  images of land and structures (along with location data,

4  coordinates, elevation data, and volume data) and making

5  images and that data available to paying clients."

6  What -- is this DroneDeploy?

7  A.  You could use DroneDeploy in that process, but it

8  is not solely just DroneDeploy in that.  I mean, you could

9  use -- yeah, because all photos and any digital thing

10  past -- I mean, since smartphones have began, every camera

11  device that takes pictures, it's going to have metadata in

12  it, which I was told I could not deliver metadata -- I could

13  not deliver a photo with metadata in it.

14  So that, "c," would knock out anything with me

15  delivering to -- I would like to be able to do "c," because

16  that's delivering the picture as it comes out of

17  DroneDeploy -- or, excuse me, not DroneDeploy, out of my

18  drone.  So when I take a picture with my drone and it comes

19  out, it has metadata in it.

20  I was told I could not monetarily sell this item

21  to a client if it's got metadata in it.  I would have to

22  strip the metadata out of the picture, which everybody in

23  the United States is using an item that creates metadata.

24  So "c," that item specifically, I would like to

25  not have to strip all the metadata out of every picture I

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

97

1  give to a client because no photographer does that.
2      Q.   All right.  Let's go about it this way.
3           Number 1, the orthomosaic software creating
4  orthomosaic maps -- we talked about that.
5      A.   Yes, sir.
6      Q.   And that's something you did from paying clients
7  prior to June of 2019; right?
8      A.   Yes, sir.
9      Q.   And then number 2, creating marketing images of
10 land on behalf of paying clients anddrawing on those images
11 lines indicating the approximate position of property
12 boundaries, that's also something that we talked about, and
13 you did that prior to June of 2019; right?
14     A.   Yes.
15     Q.   And you're saying you -- if it was a still photo,
16 you're using Adobe to draw the line that the client wants to
17 draw.  And if you're --and all you're doing is looking at a
18 picture that's provided to you by the client; right?
19     A.   Yes, sir.
20     Q.   And you don't even know where that picture came
21 from?
22     A.   Lots -- I mean, I can tell if it came from GIS or
23 I can tell if it was printed off Google.  But as far as,
24 like, a standard practice, no one client has a standard
25 practice for it.

98

1      Q.   And you're -- if you're doing it on video, you're
2  using some sort of -- what did you say --
3      A.   Final Cut Pro.
4      Q.   Final Cut Pro.
5           All right.  And then that number 3 is "capturing
6  aerial images of land and structures (along with location
7  data, coordinates, elevation data, and volume data) and
8  making those images and that data available to paying
9  clients."
10          Were you doing that prior to June of 2019?
11     A.   Yes, sir.
12     Q.   And is that -- how were you doing that?  Give me
13 an example of one project that you did that.
14     A.   A real estate agent calls me and says, "I want
15 marketing pictures for this house on 100 East Main Street."
16 I go take those pictures from my phone or my
17 camera.  I deliver those to the client.  That's it.
18     Q.   Okay.
19          And so what software are you using?
20     A.   Adobe Photoshop or Adobe Lightroom for the photos.
21     Q.   And so you're -- we're back to -- I think we're
22 back to the beginning, right, where you buy the drone and
23 you buy a camera lens and you use the drone -- you manually
24 control the drone and just take photos?
25     A.   Yes.

99

1      Q.   And you're providing those photos to the client
2  in an -- I guess is it a JPEG?  Is it a -- do you know
3  what --
4      A.   Oftentimes JPEG is the deliverable file extension.
5      Q.   And you use Adobe --
6      A.   -- Lightroom --
7      Q.   -- to just download the data from the camera and
8  then put it on the thumb drive in JPEG?
9      A.   Yeah.  I just move the photo from my SD drive that
10 came out of the camera or drone into my computer and then I
11 edit in Photoshop or Lightroom.  Once I'm finished with it,
12 it's still a JPEG, and I deliver that JPEG to the client.
13     Q.   All right.
14          But you're still doing that, taking pictures and
15 providing it to clients today?
16     A.   Yes.
17     Q.   Okay.
18          And so why is it that you need permission to do
19 that?
20     A.   Because I was told I could not deliver a photo to
21 a client with any metadata in it.
22     Q.   Who told you that?
23     A.   William Casey.
24     Q.   Did you receive anything in writing on that?
25     A.   I'm not sure.  I would have to go back and look to

100

1  be sure.
2      Q.   So even though you were told that you can't
3  deliver photos that may have metadata, you're still
4  delivering photos with metadata?
5      A.   Yeah, you actually -- I mean, it would be hard to
6  not do that, yeah.
7      Q.   Right.
8           But number 3 is something you did before and you
9  still continue to do?
10     A.   Yes.  C.
11     Q.   C, 3 -- it's the third item under 77; right?
12     A.   Yes, sir.
13     Q.   Why do you add in here in parens "along with
14 location data, coordinates, elevation data, and volume
15 data"?
16     A.   So according to what I'm understanding from
17 William, he's telling me the accurate way to do this is I'm
18 a photographer.  A client hires me.  I go in with my iPhone
19 or a digital professional camera or a drone.  I take a
20 picture.  That picture, post 1980 probably, has metadata in
21 it.
22          The correct workflow they told me is I had to take
23 those pictures, then take those pictures to my computer,
24 upload them, strip all of the information and data out of
25 the picture before I could deliver it to the client.

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

101

```
 1      Q.   And where -- again, this is not in writing
 2 anywhere?
 3      A.   I'm not sure.  I would have to go back and look if
 4 they told me that.  But that was discussed at the second
 5 meeting, the meeting where they made their decision
 6 basically.
 7      Q.   All right.
 8           Do you remember talking about the initial
 9 disclosures where you're producing all documents that has
10 evidence that you may use at trial?
11      A.   Yes, I do remember that.
12      Q.   Okay.
13           If you look at the documents you produced, the 13
14 pages, is it in the 13 pages?
15      A.   So here's my difficulty with that, is that these
16 items with the codes, the GS 89C, things like that, I do not
17 know the details of all of those  So I'm not sure if one of
18 those stands for what he said about removing the metadata in
19 it.  It may.
20      Q.   And you're talking about the letter dated June--
21 that cites the general statutes?
22      A.   June 13, 2019.
23      Q.   All right.
24           And you cite some of these general statutes in
25 your complaint, do you not?
```

102

```
 1      A.   Yes.
 2      Q.   And some of these statutes that you're talking
 3 about are from Chapter 89C, Engineering and Land Surveying?
 4      A.   Yes.  GS 89C-24, 55B, 57D.
 5      Q.   All right.
 6           Let me hand you what's been marked as Exhibit 5.
 7           Are these the statutes that you're referring to,
 8 the Chapter 89C?
 9           (Exhibit 5 marked.)
10      A.   Yes, sir.  It does look like it.
11      Q.   And so other than the June letter, is there any
12 other evidence that you can point to in writing where there
13 is some instruction or warning given to you about producing
14 photographs and stripping metadata from photographs?
15      A.   Give me just a second to read it.
16           (Discussion off the record.)
17           (Recess taken, 12:33 to 1:12 p.m.)
18           (Record read.)
19      A.   No, I don't think there is anything in here.
20      Q.   Let me ask you about number 3 under paragraph
21 77 -- or 77.c, as you would refer to it.
22           Are you looking to capture aerial images of land
23 and structures that include location data and provide those
24 to clients?
25      A.   Yes.
```

103

```
 1      Q.   And what does that mean, "location data"?
 2      A.   The metadata in it; so it records the GPS location
 3 inside the picture of where it's taken at -- location where
 4 the photo's taken.
 5      Q.   That's it?
 6      A.   It could have -- okay.  Location data.  It could
 7 also have information about the photo; so whether it's a
 8 JPEG, the file, the size -- typical information of, you
 9 know, any file in a PC.
10      Q.   Okay.
11           And are you looking to take aerial images of land
12 and structures that include coordinates and provide them to
13 paying clients?
14      A.   Yes.
15      Q.   What does that mean, "coordinates"?
16      A.   Coordinates is the same as the location, I would
17 say -- the GPS coordinates.  Also the altitude would tell
18 that in the metadata as well if it's a drone flight.
19      Q.   Why is that?  Why do clients want photos that have
20 location data to include GPS location and coordinates data?
21      A.   So they may not want it specifically, but the
22 software for doing any kind of stitching, the 360 pictures,
23 any stitching is involved, the metadata is what the software
24 uses to stitch those pictures.
25      Q.   So it's the 360 images and the orthomosaic maps
```

104

```
 1 that you're speaking of --
 2      A.   Yes.
 3      Q.   -- when you're talking about location --
 4      A.   Yes.
 5      Q.   -- and coordinates?
 6      A.   Yes, sir.
 7      Q.   How about elevation data?  Same thing?
 8      A.   Yes. Elevation is used for that.
 9      Q.   And so if I take a photo with my drone and it
10 generates a JPEG that I load onto my computer and I e-mail
11 it to my client, that's not going to give them any elevation
12 data?
13      A.   If they know how to find it, it will be -- it will
14 be in the photo.
15      Q.   How so?
16      A.   Just by the nature of IT, it will be in there.  I
17 mean, if -- not a lot of clients know how to get into the
18 information, you know, details of the photo or video; so
19 yes, it is -- you can find it.  It is there.  A client -- I
20 don't know if they would -- every client would traditionally
21 not open the file and find all of the data in it, but it is
22 in there.
23      Q.   But the elevation data you're speaking of has to
24 do with these 360 images or orthomosaic maps?
25      A.   As far as the -- being used to stitch -- as far as
```

105

1  the metadata being used to stitch the photos together, yes,
2  that is what the altitude in the orthomosaic maps or 360
3  photos ...
4      Q.    In other words, to be able to use this data,
5  stitch it together so that the client can use it, right, so
6  that it's in useable form?
7      A.    So they can receive, yeah, the exact product that
8  they wanted.  So if they wanted the orthomosaic map, then
9  that would allow me or the software to stitch it to give
10 them the end product.
11     Q.    But if I say to you, "Listen, I want you to create
12 a product that has elevation data," how would you go about
13 doing that?
14     A.    I'm not -- the question is not quite clear to me.
15     Q.    Yeah.
16           So you specifically identified four things that
17 you want to be able to do.
18     A.    Uh-huh.
19     Q.    You want to be able to capture aerial images of
20 land and structures that include elevation data.
21           Why would a client want elevation data?
22     A.    No, the client may not want elevation data.
23     Q.    Okay.
24     A.    I want to keep from having to using my work time
25 to strip all the data out to give to the client according to

106

1  what Mr. Casey told me.
2      Q.    All right.
3            The --
4      A.    As far as not being able to deliver with the
5  metadata in it.
6      Q.    So you're not looking to provide aerial images of
7  land and on structures with location data?
8      A.    No.  I am looking to do that.
9      Q.    Okay.
10           You are looking -- people do want location data or
11 the ability to generate, right, locations, distances from
12 Point A to Point B; right?
13     A.    They could be using it for that purpose.
14           To answer the question do the clients want that?
15 Some may; some may not.
16           The part that I'm speaking of is I was told that I
17 couldn't deliver the photo to the client with metadata in
18 it.  Therefore, my workflow would have an additional step
19 when I got home; I would have to go and strip all the
20 metadata out in order to deliver to the client under the
21 directions I've been told.
22     Q.    But you're not doing that now.  You're just
23 sending out -- you're taking photos and sending it to the
24 clients?
25     A.    Yes.

107

1      Q.    Okay.
2            What I'm asking you specifically, prior to June of
3  2019, were you ever asked to produce an aerial image with
4  location data?
5      A.    All right.  So asked -- the client never asks me
6  "Can you give me the picture with the location data in it?"
7  The product they wanted, if it was the orthomosaic map,
8  required the metadata to be in the picture to produce the
9  product that they were then ordering; so yes.
10           But to answer the question did they ask, did they
11 say, "I want a picture and here's the information that I
12 want in it," no.
13     Q.    Okay.
14           So outside of creation of an orthomosaic map for a
15 client, did any client ever ask you to take an aerial image
16 of land and structures for the purpose of having location
17 data in there?
18     A.    No.
19     Q.    No?
20           Could you provide that to a client in able form
21 without creating an orthomosaic map?
22     A.    Yes, you actually would, by taking any picture
23 with any current device.
24     Q.    So if you took a picture, if I said, "Hey, I want
25 location data" -- well, first of all, what am I asking for?

108

1  What does that mean to you?
2      A.    You want the metadata in it.  If you're asking for
3  location data, I mean, that's part of the metadata.
4  Metadata is all the data in the photo.  Part of that data is
5  information on the location, the GPS coordinates -- you
6  actually have a north and south and everything.
7      Q.    So when you use the terms "location data" and
8  "coordinates," you're really referring to metadata?
9      A.    The GPS part of the metadata.
10     Q.    And prior to June 2019, no client ever asked you
11 for images with location data; correct?
12     A.    No, sir.
13     Q.    And prior to June of 2019, no client ever asked
14 you for aerial images with coordinates?
15     A.    No.
16     Q.    And prior to June of '19, did any client ever hire
17 you to provide elevation data or do any analysis regarding
18 elevation data?
19     A.    No.
20     Q.    Prior to June of 2019, did any client ever hire
21 you to provide volume data or do an analysis of volume data?
22     A.    No.
23     Q.    All right.
24           So these are all things that are things that you'd
25 like to do in the future but you've never been -- you've

109

1  never done in the past and you're not -- I think that's my
2  question.
4      A.   Okay.
5      Q.   These four items that you have in paragraph 77.c
6  are things that you've never been hired to do, never been
7  asked to perform any of these services, but these are
8  services you want to have the option of performing in the
9  future?
10     A.   Yes.  To make sure I'm clear, let me restate that.
11           So I've never been asked specifically in the way
12 you're asking the question, did the client specifically say,
13 "I want a picture with the metadata."
14           Yes, they did order products that require the
15 metadata to be in the picture.
16           But to answer your question specifically, I was
17 never asked verbally, "Hey, Michael, can you deliver this
18 picture?  And I want elevation data in it, GPS
19 coordinates -- things like that."
20     Q.   Yeah.  That's my question.  My question has
21 nothing to do with metadata because that's -- metadata is
22 not in this paragraph.
23     A.   Okay.
24     Q.   What's in the paragraph that -- your complaint
25 that you filed is you want to be able -- you wish to offer

---

110

1  and provide drone services that include the following:  And
2  you want to be able to capture aerial images of land and
3  structures that include location data, one; coordinates,
4  two; elevation data, three; volume data, four; right?
5      A.   Yes, which could all be compiled under the
6  umbrella of metadata.  That would be the definition of all
7  of the things you just mentioned in the photo.
8      Q.   Okay.
9            But, again, you don't put metadata in here; you
10 don't define metadata as these items in your lawsuit, do
11 you?
12     A.   I'm not if they worded that in that way.
13     Q.   Okay.
14           But, again, the question really is:  Did anybody
15 ever ask you to provide location data specifically?
16     A.   No.
17     Q.   Did anyone ever ask you to provide or hire you to
18 provide coordinates?
19     A.   Again, I feel that's a little -- I feel it's
20 answered in two different sections:  No, they did not ask
21 me -- verbally, pronounce the words "I need location data";
22 but if they said, "I want an orthomosaic map or a 360
23 photo," then they are asking for the data without verbally
24 asking.  They're saying, "I want this product, the 360
25 navigable photo."  That has the metadata of the things you

---

111

1  just mentioned it.
2            So yes, they were asking for that without asking
3  for it specifically, list by list.
4      Q.   All right.
5            And no one has ever asked you -- or has anyone
6  ever hired you to give them elevation data?
7      A.   Not specifically, not verbally asked for that, no.
8      Q.   And no one ever hired you to give them volume
9  data?
10     A.   No.
11     Q.   All right.
12           But, again, going back to the orthomosaic maps
13 that are generated, if you generate an orthomosaic map, you
14 can analyze that and provide location data to a client?
15     A.   So the metadata is in it, yes; I can read it.  I
16 can't do anything to manipulate it.  I can strip it out of
17 the photo.
18     Q.   No, I'm talking about the orthomosaic map.
19     A.   Oh, the orthomosaic map?
20     Q.   Yes.
21     A.   So the orthomosaic maps, each individual photo has
22 the GPS data in it.  I can see that.  I can't do anything
23 with it besides take it out or -- I mean, that's it, I can
24 remove it.
25           Then the process is they use the metadata in the

---

112

1  final map.  The final map does not have any metadata
2  attached to it because it's multiple pictures in one
3  location.
4      Q.   And, again, you're using these terms
5  interchangeably with "metadata," and I'm not talking about
6  metadata.  If you want to talk about it, you can --
7      A.   Yeah.
8      Q.   -- but I'm asking about the word "location data"
9  or "location."
10           If you take -- you, your company -- you can open
11 up the orthomosaic map, can you not, and you can analyze it
12 and perform certain location calculations if you want?
13     A.   Not calculations.  You can look at -- for what the
14 data is.  If it says you're 300 feet and north 38 and 72
15 longitude, that's where it's at and I can't do anything to
16 it.  I can read it, if that's what you're referring to as
17 far as analyzing it.
18     Q.   But you can draw -- you can put in a pin -- a
19 point on the photo or on the orthomosaic map and another pin
20 and you can draw distances showing the location of the
21 building to the perimeter or the building to another object;
22 right?
23     A.   So DroneDeploy -- I'll speak about that one;
24 that's the one that's been kind of famous in the story.
25           DroneDeploy has tools inside their software that

**113**

1  the client can use to do the operations you just
2  mentioned -- measuring, volume data, stuff like that.
3          So to give you an example to make sure you
4  understand everything, if me and Steve over here were -- he
5  had the company, he was the landowner and then we had the
6  project manager, and then I'm the drone pilot, I would go to
7  DroneDeploy, create this map, and I would add these users to
8  this map where they can view it.  Then they would have the
9  options of pulling measurements, volume data.  I can't do
10  anything like that to the picture.
11      Q.   No, but you --
12      A.   Is that good or --
13      Q.   -- could do those measurements?
14      A.   I mean, I could.
15      Q.   Because you're the one that actually has the
16  experience in using DroneDeploy; right?
17      A.   For collecting the data, yes.
18      Q.   Right.
19          It's your license; right?
20      A.   Under my profile, if you want to say that.
21      Q.   When I say "you," your company.
22      A.   Yes.
23      Q.   And your company has the ability to open this up
24  and do distances; right?
25      A.   We do, as anyone else would have.  We don't have

**114**

1  any special club membershipto read that or anything like --
2  anybody with access to this map could do what you're talking
3  about.  So yes, I do, as you do.
4      Q.   I don't have access.
5      A.   Yeah.  I'm just saying if I signed you on a map,
6  if I gave you access to be a user, you could then go in,
7  pull measurements, volume data, anything like that,
8  yourself.
9      Q.   Okay.
10          Did you ever -- on behalf of a client, were you
11  ever asked to do any measurements?
12      A.   No.
13      Q.   Were you ever asked to do any elevation data?
14      A.   No.
15      Q.   Were you ever asked to analyze any data at all?
16      A.   No.
17      Q.   Did you ever explain to the clients how they could
18  perform those functions?
19      A.   No.
20      Q.   So all you're doing is -- what you're saying is
21  you're doing no analysis?
22      A.   No analysis.
23      Q.   You are -- you are providing them a copy of the
24  orthomosaic map; correct?
25      A.   In a PDF form, yes, sir.

**115**

1      Q.   And you're giving them access to the program?
2      A.   No.
3      Q.   Do you give them your log-in information?
4      A.   I don't give them access.  That's just an option
5  of what you can do.  I never had a client or would
6  even be interested in or even would know how to.
7      Q.   All right.
8          So the idea that a client would access the
9  DroneDeploy software to secure certain location data,
10  elevation data, volume data -- that never happened?
11      A.   That never happened.  It's just a possibility of
12  what the software can do.
13      Q.   Okay.
14          If you sent me this PDF, am I able to manipulate
15  the PDF and look at locations and get distances and that
16  sort of something?
17      A.   No, sir.  It's just -- it's -- when it's a PDF
18  form, in that deliverable form, it is nothing more than a
19  picture.  Only thing great about this picture is if it's a
20  thousand acres, you can zoom in to, say, one building.
21  That's the only advantage it has to it.
22      Q.   And then number 4 is capturing -- or 77.d is
23  "capturing aerial images and data about land and
24  structures."
25      A.   Okay.

**116**

1      Q.   "Processing those images and data to create 3D
2  digital models of land and structures and making those 3D
3  digital models available to paying clients."
4          And as I understand it, the DroneDeploy software
5  allows you to create a 3D digital model; correct?
6      A.   That's another option on their package, so to
7  speak.
8      Q.   Did anyone ever hire you to do that?
9      A.   No.
10      Q.   Okay.
11          So, again, that's another example of something
12  that you never did previously, but your reading of the
13  letter and the action taken by the board from your viewpoint
14  is that that's something that you can't do that you would
15  like to do?
16      A.   Yes, sir.
17      Q.   Okay.  All right.
18          Let me ask you about Exhibit Number 6,
19  specifically pages 9 to 11, which is the report of interview
20  with you on February 7.
21          And this "Report of Interview with Michael Jones
22  on February 7," and this is on page 9, the first paragraph
23  says:  "Board Investigator William Casey conducted an
24  interview with Mr. Jones at the Wayne County Public Library
25  in Goldsboro, North Carolina."

1        Is that true?

2    A.   Yes, sir.

3    Q.   "Mr. Jones indicated he has a remote pilot

4 certificate issued by the Federal Aviation Administration."

5        Did you tell him that?

6    A.   Yes, sir.

7    Q.   "He added that pursuant to 14 CFR - Part 107,

8 anyone flying an unmanned aircraft system or drone for

9 commercial purposes must carry that certification."

10       Is that accurate, what you told him?

11   A.   That's accurate, yes, sir.

12   Q.   And it goes on to say:  "Mr. Jones indicated his

13 highest level of education is a high school GED certificate.

14 He added that he obtained a Microsoft certification that

15 allowed him to get into information systems technology.

16 Mr. Jones indicated he worked as a network systems analyst

17 for Branch Banking & Trust for a period of time before

18 leaving the office setting to begin welding.  He indicated a

19 welding coworker brought their drone in to work one day,

20 which got him interested in pursuing a career piloting a

21 drone.  Mr. Jones went on to say that the rest is history."

22       Is that -- all that accurate about your interview?

23   A.   Yes, sir, it is.

24   Q.   All right.

25       And then the next paragraph states that "Mr. Jones

1 stated he operates as 360 Virtual Drone Services LLC and is

2 100 percent owner of the company.  He indicated he started

3 out offering services in the real estate industry, which is,

4 quote, 'low-hanging fruit,' unquote, because it is easy to

5 work but there is no money in it.  Mr. Jones indicated he

6 began taking online mapping courses to help move into

7 different areas of service.  He added that he was able to

8 transition into the construction industry providing

9 orthomosaic or orthorectified maps.  Mr. Jones indicated he

10 markets his services through his website (nedronehome.com),

11 the Droners.io website, his YouTube channel (Jones Knows

12 Drones), and Facebook (360VDrone.)"

13       Is all that accurate?

14   A.   Yes, sir.

15   Q.   And what is an orthrectified map?

16   A.   Orthorectified is a measurable map; so it's

17 actually -- let's see.  So it doesn't have to be clarified

18 to be complete accurate mapping, but it -- the picture is in

19 a scaled map to what you're photographing.

20   Q.   How is it different from orthomosaic?

21   A.   I am actually not sure the difference between the

22 two words.

23   Q.   And have you provided both, orthorectified and

24 orthomosaic to clients?

25   A.   Orthomosaic, like I said, I'm not really sure the

1 difference between orthorectified and orthomosaic.  I would

2 just kind of say they're the same thing.

3    Q.   So when you use these, you used them

4 interchangeably those words, orthomosaic and orthorectified?

5    A.   Yes, sir, I guess.

6    Q.   And orthorectified, you said, allows you to -- it

7 is measurements?  Or what is it?  What did you say?

8    A.   It's, like, scaled to what you're taking.  So

9 everything would be in scale to the size of, say, if you

10 were in a field with a building on it, and this building --

11 everything is in scale to what it actually would be.

12   Q.   And how does it do that?

13   A.   With the metadata.

14   Q.   Of what?

15   A.   The GPS location metadata from the pictures.

16   Q.   So it takes the pictures and it processes them or

17 stitches them together?

18   A.   Yes.

19   Q.   It's the software that does that?

20   A.   It is the software that does that via the

21 metadata.

22   Q.   Okay.

23       And then if you look at the third paragraph -- and

24 I'll just try to simplify for time -- is there anything in

25 there that you would dispute that you told him, or that is

1 an accurate report of your interview?

2    A.   Yes, it is accurate.

3    Q.   And then the fourth paragraph starts with:

4 "Mr. Jones stated he has offered services to professional

5 land surveyors but has not had much luck getting any work

6 from them."

7    A.   Yes.

8    Q.   Is there anything -- if you're reading that fourth

9 paragraph, is there anything in there that is -- misstates

10 what you said or is inaccurate about the interview?

11   A.   Yes.  That's accurate.

12   Q.   All right.

13       The next paragraph starts with:  "Mr. Jones stated

14 one of his current clients is Steve Keen, owner of Adair,

15 LLC, a real estate development group."

16       Do you see that?

17   A.   Yes, sir.

18   Q.   He stated that "Mr. Keen wanted an overall view of

19 the current project he is developing in Wayne County,

20 North Carolina.  Mr. Jones indicated Mr. Keen did not want

21 multiple photos that he would have to tape together or zoom

22 in on individually; however, because he is limited to a

23 400-foot altitude, it was not possible to take a photo of

24 40 acres with one shot.  He indicated for that reason he

25 recommended an orthomosaic map (evidence 4.5) using the

121

1  DroneDeploy application that would like -- that would look
2  like one photo and could be zoomed in on like one photo.
3  Mr. Jones indicated the incremental photos allow Mr. Keeto
4  keep up with the project progression without actually going
5  out on-site.  He added that his (Jones) map even allowed
6  Mr. Keen to confirm that a truck delivering gravel had
7  backed over and broken a section of curb and gutter."
8          Is that paragraph accurate?
9      A.  Yes, sir.
10     Q.  And then the next paragraph starts with:
11 "Mr. Jones stated another function of the DroneDeploy
12 application is the ability to measure area, distance, and
13 volume."
14         Do you see that?
15     A.  Yes, sir.
16     Q.  "He indicated he has never offered that service
17 because the people he works fordo not have a use for it and
18 he is under the impression that you need a license to
19 provide that type of information."
20         Do you see that?
21     A.  Yes, sir.
22     Q.  Is there anything in that paragraph that
23 inaccurately states what you told him?
24     A.  Yes, that's accurate.
25     Q.  And then the next paragraph, starting with

122

1  "Mr. Jones stated his disclaimers" -- is that paragraph
2  accurate?  Or does that paragraph accurately reflect what
3  you told the investigator?
4      A.  Yes, that's accurate.
5      Q.  The next paragraph states that "Mr. Jones stated
6  the Droners.io website provides free memberships.  He
7  indicated Droners.io gets paid a commission on what a member
8  gets paid after completing a project.  Mr. Jones indicated
9  that upon signing up on the Droners.io website there is a
10 checklist whereby you select the types of services you want
11 to offer.  He indicated one of the selections combines
12 mapping and surveying.  He added that when he selected that
13 option he thought that he would only be offering mapping;
14 however, he can see how it would be misconstrued with the
15 word surveying included and has since removed that as an
16 offering on the website."
17         Is that accurate?  Or does that accurately reflect
18 what you told the investigator?
19     A.  That's accurate, yes, sir.
20     Q.  Next paragraph:  "Mr. Jones indicated he considers
21 mapping as the stitching together of multiple photos.  He
22 has reiterated that he is unable to get what some clients
23 want photographed in one shot so he takes multiple shots and
24 stitches them together into a map or one large photo.  He
25 went on to say maybe the term mapping is the wrong word and

123

1  he should just call it a photograph."
2          Does that accurately reflect what you told the
3  investigator?
4      A.  That's accurate, yes.
5      Q.  Next, final paragraph:  "Mr. Jones stated he never
6  has or will produce maps showing property lines or
7  measurements.  He acknowledged that he has taken some real
8  estate videos (evidence 4.6) that include what appears to be
9  property lines.  He indicated his intent with that was to
10 give a general location and shape of the parcel.  Mr. Jones
11 indicated there is never any bearings or distances on any of
12 his maps.  He added that he puts a disclaimer (evidence
13 number 4.7) in the notes of his YouTube videos stating,
14 'Property lines are for a visual guide only and are not
15 accurate to county coordinates.'"
16         Is that accurate?
17     A.  That is accurate.
18     Q.  And then if I flip to page 18, is that a copy of
19 your -- well, what is that document, if you know?
20     A.  That is the right one?
21         It looks like a header I had on my website, maybe,
22 or some website? Business card?
23     Q.  Could be business card?  Is that your business
24 card?
25     A.  Yeah.  I think so, yeah.

124

1      Q.  And does your business card have a "Professional
2  Aerial Data & Media Drone Service Company"?
3      A.  Yes.  That's what's on there.
4      Q.  And then one of the items that you offer is aerial
5  mapping?
6      A.  Yes, sir.
7      Q.  What is your definition of aerial mapping?
8      A.  Stitching of two photos or multiple photos
9  together to create a large photo in one photo.
10     Q.  And you do that, as you indicated -- you do that
11 by taking your drone out to a location and setting up a
12 preflight program using DroneDeploy; correct?
13     A.  Yes, sir.
14     Q.  And that -- and then you have the ability to input
15 certain calculations like speed and altitude and the area
16 that you want to fly in the preflight program?
17     A.  Yes, sir.
18     Q.  And then once all that's selected, you're taking
19 the data that's generated, the photos that are taken, and
20 then you run them through the DroneDeploy processing and
21 they generate this orthomosaic map?
22     A.  Yes, sir.
23     Q.  And it's that orthomosaic map that's generated by
24 DroneDeploy that's then sent back to you that you're calling
25 aerial mapping?

125

1    A.   Yes, sir.

2    Q.   Okay.

3         And then on -- let's see here.  Let me find the

4    page -- page 44, it says:  "We offer video, pictures and

5    orthomosaic maps (measurable maps) of the sites."

6         What do you mean by that?  What is a "measurable

7    map"?

8    A.   So the measurable maps means that it is relevant

9    to the same measurements in real life on-site.

10   Q.   Let me turn to Exhibit 1, which is a copy of the

11   complaint.

12   A.   Okay.

13   Q.   This is a copy of the complaint that you filed on

14   behalf of yourself individually and 360 Virtual Drone

15   Services LLC on March 22, 2021; correct?

16   A.   Yes.

17   Q.   And in the first paragraph, you see the

18   introductions paragraph on page 1?

19   A.   Yes, sir.

20   Q.   It says:  "This is a First Amendment lawsuit to

21   vindicate the rights of plaintiffs 360 Virtual Drone

22   Services LLC and Michael Jones to create useful information

23   (aerial images and related data) and disseminate that

24   information to willing customers."

25        Do you see that?

126

1    A.   Yes, sir.

2    Q.   All right.

3         And what do you mean by "useful information"?

4    A.   Useful information.  Useful information -- that

5    would just be data the clients need or are ordering.

6    Q.   And the next sentence says:  "In 2017, Michael

7    Jones' business, 360 Virtual Drone Services LLC, began

8    harnessing cutting-edge drone technology to capture aerial

9    images and data about land and property - including

10   orthomosaic aerial pictures, thermal maps, and other

11   visualizations of information about land."

12        Do you see that?

13   A.   Yes, sir.

14   Q.   Is that true?

15   A.   Yes, sir.

16   Q.   And did you provide thermal maps?

17   A.   Yes, sir.

18   Q.   And who did you do that for?

19   A.   It was a company out of Chicago but I cannot

20   remember the name, it's been so long ago.

21   Q.   What is a thermal map?

22   A.   A thermal map is taken with a thermal imaging

23   sensor on the drone that actually doesn't take pictures;

24   it's measuring thermal heat.

25   Q.   And is this something that you -- do you need to

127

1    run through software or is that --

2    A.   Same process as far as the mapping software for

3    the thermal mapping of roof inspections that I did, they get

4    ran through.  But in this situation, I only delivered the

5    data to the client and they did all the processing.

6    Q.   In one case -- you mean that you were hired?

7    A.   Yes, sir.

8    Q.   Any were there any other clients that asked for

9    this thermal mapping?

10   A.   No, sir.

11   Q.   So on the thermal mapping, what were you asked to

12   do?

13   A.   To capture the roof of I think four Walmart

14   distribution centers and basically get orthomosaic map --

15   thermal map of the roof.

16   Q.   And so how did you do that for that client?

17   A.   Same exact scenario.  I arrived with the drone and

18   a preprogrammed flight pattern, checked the air space,

19   arrived, took the drone out and flew patterns over the

20   entire roof with, like, an overlay of 70 percent, and then

21   delivered that data to the client.

22        They then took that data, because I'm not sure

23   about how -- DroneDeploy, they did not do thermal imaging;

24   so you had to through Pix4D.  Pix4D, I think they sent it to

25   their -- I had nothing to do with the processing on that

128

1    job.  I just collected the data, deliveredit to the client,

2    and they did the processing with some other company and

3    delivered it to their end client.

4    Q.   So explain to me the data that you're talking

5    about.

6         When you say "deliver the data," what are you --

7    A.   The thermal imaging photos -- well, they're not

8    really photos, but thermal imaging photos that I collected

9    from that drone.

10   Q.   And so they're multiple photos, right, taken?

11   A.   Yes.  In TIFF images.

12   Q.   So you're providing them with the photo images?

13   A.   Yes, sir.

14   Q.   Okay.

15        Anything else that you're doing?

16   A.   In that job, they have -- they actually had a

17   video and photo of thermal.  So they did the orthomosaic

18   map, I collected the data for the orthomosaic map, then I

19   also did the same type pattern manually with the video over

20   the whole entire roof.

21   Q.   Okay.

22   A.   So that was just what I delivered.  I didn't

23   process that data.

24   Q.   And so with that client, you provided them with

25   the thermal imaging photos?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL



**129**

```
1    A.   Photos -- imaging photos and imaging video.
2    Q.   You provided them with a video?
3    A.   Yes, sir.
4    Q.   And did you provide them with a orthomosaic map?
5    A.   No.
6    Q.   Okay.
7         On paragraph 3 on page 2 -- this is Exhibit 1.
8  We're going to be on that for a little while.
9    A.   Page 2?
10   Q.   Page 2, paragraph 3.  In the middle of the
11 paragraph, it says:  "Simply, the projects the board -
12 aerial photos, data, 3D digital models and the like - are
13 speech that is fully protected by the First Amendment."
14        Do you see that?
15   A.   Yes, sir.
16   Q.   Okay.
17        And the aerial photos -- what aerial photos are
18 you talking about that the board is targeting?
19   A.   Okay.  So the ones they're targeting are,
20 according to them -- or William Casey -- was orthomosaic
21 maps would be included, any photo at all with any metadata,
22 I can't deliver for any monetary trade or value, and 360
23 pictures would be included because I was also told that any
24 stitching of any pictures in North Carolina was surveying --
25 practicing promotional surveying.
```

**130**

```
1         Yeah, I guess that's it.  Those are things I was
2  told that I can't do.
3    Q.   And 3D digital models?
4    A.   3D digital models, yes.
5    Q.   And are you using 3D digital models
6  interchangeably with 360 pictures?
7    A.   No.
8    Q.   Okay.
9         3D digital models, as I understand it, so the
10 record is clear, is very similar to orthomosaic maps and how
11 that project is generated?
12   A.   Yes, sir.  Just the flight pattern and the capture
13 process is a little different.
14   Q.   Is the 360 -- 360 picture or 360-degree picture --
15 I don't know how you refer to it -- is that the same process
16 as well?
17   A.   No, sir.
18   Q.   And what is that process?
19   A.   That is just stitching together the pictures in
20 a -- it's in another format, but it's still stitching
21 pictures together.
22   Q.   And what format or what software are you using?
23   A.   That -- it's actually three different software.
24 So it's Photoshop, Adobe Lightroom, and then a program
25 called RICOH, R-I-C-O-H.
```

**131**

```
1    Q.   And you're taking photos, images that are JPEG
2  images?
3    A.   Yes.
4    Q.   And you're taking those and you're running it
5  through some sort of software to create a 360-degree --
6    A.   -- navigable picture.
7    Q.   Okay.
8         And, likewise, are you doing any analysis?
9    A.   No, sir.
10   Q.   Do you have any commentary for the client?
11   A.   No, sir.
12   Q.   Do you provide any -- any input on the data?
13   A.   No, sir.
14   Q.   Other than gathering -- you know, putting the
15 drone up, taking the pictures, is your company adding any
16 other work product to this so-called project?
17   A.   Color correction, that's it, you know, to the
18 photos.  And that's only if they pay.
19   Q.   In paragraph 8 on page 3, 360 Virtual Drone
20 Services LLC is a North Carolina limited liability company
21 wholly owned by you; correct?
22   A.   Yes, sir.
23   Q.   And the next page, paragraph 14  "Using cameras,
24 drones can take photographs of - and collect data about -
25 buildings, land, construction sites, and other property."
```

**132**

```
1         Is there anything that we haven't already
2  discussed that explains that allegation?
3    A.   I don't think so.
4    Q.   And then metadata is mentioned in paragraph 17.
5  Do you see that?
6    A.   Yes, sir.
7    Q.   Okay.
8         So in your complaint, you say:  "Metadata are
9  secondary data about an image (for example, the time and
10 date an image was captured or the GPS coordinates for where
11 it was captured).  Virtually any picture taken with a modern
12 smartphone contains metadata.  Similarly, drone-captured
13 images can include metadata as well, including data about
14 ground elevation, heat, locations, and distances."
15        Do you see that?
16   A.   Yes, sir.
17   Q.   Okay.
18        And what is the -- give me an example of an image
19 that is taking a picture that includes metadata about ground
20 elevation.
21   A.   An example of a photo?
22   Q.   Yeah.  I'm trying to understand what you're
23 referring to here.
24   A.   And where was that?  Which?
25   Q.   17, at the end of 17.  Because you're talking
```

133

1 about an image. When you say "image," you mean like a JPEG
2 image; right?
3    A.   A photo, yes.
4    Q.   Okay.
5         And give me an example of what you're referring to
6 where you allege that drone-captured images can include
7 metadata, including data about ground elevation.
8    A.   Okay. You just want an example of that?
9    Q.   Yes.
10   A.   Any photo I take with my drone has that in it.
11   Q.   Okay.
12        How so? I'm trying to get you to explain it to me
13 because I don't know what that means.
14   A.   Let's see. So photos have information in them.
15 So you can go to a photo and click on -- if you're in Apple,
16 right-click into info and it will bring up information about
17 this photo as listed in your GPS coordinates, the time it
18 was taken, the elevation it was taken, and there's probably
19 a few more pieces of information it has that I can't think
20 of now.
21        But any photo I would take with my drone has this
22 in the photo.
23   Q.   Right.
24        But you're saying -- when you say "ground
25 elevation" --

134

1    A.   Altitude.
2    Q.   -- you mean the height that the picture was taken
3 from?
4    A.   Yes, sir.
5    Q.   Oh, okay.
6         But nothing about the elevation of the ground.
7    A.   Oh, I see what you're saying. So elevation to the
8 ground versus altitude. No.
9         This -- in the picture, the metadata would be the
10 altitude of the picture.
11   Q.   Okay.
12   A.   Yeah. Sorry. I didn't see what you were saying
13 with elevation. But, yeah.
14   Q.   And then what do you mean by "heat"?
15   A.   If it's a thermal picture, that's how it -- the
16 heat sensor actually collects the image and creates it by a
17 thermal imaging sensor which is not actually a photo; it's
18 actually a sensor, heat.
19   Q.   And then when you say "location data," are you
20 talking about where on the earth this picture was taken?
21   A.   GPS coordinates, yes, sir.
22   Q.   Okay.
23        And "distances," what do you mean by that?
24   A.   Distances would just be in the GPS data from
25 where, like, the coordinates where that picture is at.

135

1    Q.   Okay.
2         So all of this can be summarized as GPS data and
3 altitude other than the heat?
4    A.   Yes. I would just put it all under the umbrella
5 of metadata.
6    Q.   Okay.
7         And have you received any warning or notice from
8 the board that you're not allowed to take pictures that show
9 the elevation of the picture -- or the altitude of the
10 picture?
11   A.   Say that one more time, make sure I understand.
12 I'm sorry.
13   Q.   Bad question.
14        Have you received any warning or notice from the
15 board that you're not allowed to take and sell pictures that
16 tell a user at what altitude the picture was taken from?
17   A.   Yes. I was told I couldn't take it with any
18 metadata. So I could deliver the client a picture -- if
19 there was a monetary value trade, which is what I do, I
20 could not charge a client and then give them a picture if it
21 had metadata. When I asked William Casey what I had to do,
22 his answer was I had to strip the metadata out of the photo,
23 then deliver it to the client.
24   Q.   And so other than your conversation with the
25 investigator -- and the entirety of that conversation is

136

1 William Casey allegedly told you you've got to strip
2 metadata from pictures?
3    A.   Yes, sir.
4    Q.   Okay.
5         Other than that, have you been provided any type
6 of warning or notice that you're not allowed to sell
7 pictures that show the altitude that the picture was taken
8 from?
9    A.   Just this warning letter here This is the one I
10 got.
11   Q.   The June letter?
12   A.   Yes, sir.
13   Q.   Okay.
14        And have you received any warnings or notices that
15 you're not allowed to sell pictures, JPEG pictures, that
16 show the -- that have GPS coordinate information in it?
17   A.   Not written on any paper, no, sir.
18   Q.   Okay.
19        And then the next paragraph says: "Using this
20 metadata" -- the one we just talked about in 17 --
21   A.   Yes, sir.
22   Q.   -- "computer software can use drone-captured
23 images to calculate the distance from Point A to Point B."
24        Can you explain that to me?
25   A.   Just as we went over earlier, in the DroneDeploy

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

137

1 software, they have tools in there where you can measure the
2 distances. I couldn't explain the intelligence behind the
3 software or how it works, but that's inside of their
4 platform.
5 Q. Yeah.
6 So what you're saying is that these JPEGs that are
7 taken, those pictures are taken and they're run through a
8 program or they're processed by DroneDeploy?
9 A. Yes, sir.
10 Q. And DroneDeploy creates for you an orthomosaic
11 map, and that data or that work product that's generated,
12 you could pull that up and you could plot points on the map
13 and you could -- if you wanted to, and you could figure out
14 certain circumstances?
15 A. Yes. DroneDeploy has that as one of their tools.
16 Q. Okay.
17 And it's not really the metadata itself that
18 they're using, but it's -- they're taking all these photos
19 and stitching them together and they're creating this map.
20 And based on this map, you're able to plot points and you
21 could, if you wanted to, create distances?
22 A. So that is using the metadata to do that. They
23 are using the metadata to perform those functions inside of
24 their application. So -- but yes, that is what they're
25 doing. They're using the metadata in order to distinguish

138

1 distances and measurements and volumes, and they have other
2 stuff you can pull from there as well.
3 Q. They're actually doing more than that, though;
4 right? They're actually taking the photos, including
5 whatever this metadata is that you contend is there?
6 A. Yes, sir.
7 Q. And they're processing and creating an orthomosaic
8 map that then would allow them to do the measure or
9 calculate distance from Point A to Point B?
10 A. Yes, sir. In other words, that metadata is also
11 being used to create a tool where you can measure.
12 Q. Did you ever use that tool?
13 A. I used it for my fun, just to see, like, "Wow, I
14 can't believe this technology can do this," but that's it.
15 Q. Were you ever asked to perform that calculation
16 for a client?
17 A. No.
18 Q. Have you ever performed that calculation for a
19 client?
20 A. No.
21 Q. You said the software can calculate the size of
22 objects as well. Were you ever asked to do that?
23 A. No.
24 Q. Did you ever perform or calculate the size of
25 objects using that software?

139

1 A. No.
2 Q. And then you go on and you give an example. You
3 say: "For example, a drone can photograph a stockpile of
4 building materials. In doing so, the drone can capture
5 metadata on materials' location and elevation. That data,
6 in turn, can be used quickly to calculate the approximate
7 volume of the stockpile as a whole, often called 'volumetric
8 calculation.'"
9 Do you see that?
10 A. Yes, sir.
11 Q. Did you ever do this?
12 A. No, sir.
13 Q. Were you ever asked to do this?
14 A. No, sir.
15 Q. And there's probably -- if we're on paragraph 18,
16 if you go to DroneDeploy software, you could probably create
17 hundreds of examples, could you not --
18 A. Absolutely.
19 Q. -- and put those in as paragraphs in this
20 complaint?
21 A. Yes, sir.
22 Q. Okay.
23 You go on to say another example is
24 "Drone-captured images and data can also be used," I guess
25 by DroneDeploy, right, "to create 3D digital models of land

140

1 and structures."
2 A. Yes, sir.
3 Q. And that's another capability of the software but
4 that's not something you were ever asked to do?
5 A. No, sir.
6 Q. And it's not something you've ever done?
7 A. No, sir. I wish.
8 Q. And then another example, in 20, is: "Drones can
9 use heat sensor imaging to identify thermal leaks in large
10 buildings and storage units"; right?
11 A. Yes, sir.
12 Q. And those are JPEGs or photos with this type of
13 capability?
14 A. Yes. Thermal imaging.
15 Q. And you don't analyze anything?
16 A. No, sir.
17 Q. You don't editorialize?
18 A. I don't. On thermals, I do absolutely nothing to
19 them. Matter of fact, I don't even have a thermal camera.
20 The company actually flies me a thermal camera to clip on my
21 drone.
22 Q. You provide no input, commentary?
23 A. Just the deliverable of that data.
24 Q. You take the -- you use your drones, you take the
25 photos, and you send them the photos?

**141**

1     A.   Yeah.

2     Q.   Okay.

3          I mean, that sounds like -- other than the

4     orthomosaic maps that you're generating from DroneDeploy it

5     sounds like you're hired to take photos and video and you

6     just send them the photos and video?

7     A.   A lot of times, yes.

8     Q.   And other than sending a client a photo or video

9     that was taken -- again, without analysis, without

10    commentary, without editorializing, without any input --

11    you're just sending them photos that you were taking?

12    A.   I mean, unless they hire the option of me color

13    correcting and editing the photo.  But yes, on these jobs,

14    we're talking about how these orthomosaic captures, the heat

15    imaging systems, that was all me delivering the data for the

16    client to them.  They did all of the processing and they did

17    the delivery to the client.  I was not even ever aware of

18    who the client was.

19    Q.   And then as I understand it, the scope of the

20    modifications you made to your business after receiving the

21    June 13th, 2019, letter is that you no longer generated

22    orthomosaic images from drones --

23    A.   I just, like, turn down if they call now.

24    Q.   Other than that, though, your business model is

25    the same?

**142**

1     A.   Yeah.  I still do video and photos and stuff like

2     that for marketing.

3     Q.   Do you still do -- have you done any heat sensor

4     images?

5     A.   No, sir.

6     Q.   Have you been asked to do it?

7     A.   No, sir.  I wish that would take off but it hasn't

8     yet.

9     Q.   If you're asked to do that, would you feel

10    comfortable doing that?

11    A.   As long as it wasn't an orthomosaic map, I would

12    Q.   Okay.

13         And so essentially -- and I don't want to try to

14    oversimplify this whole lawsuit factually, but factually,

15    you're -- the thing that you're not able to do that you did

16    before is the orthomosaic maps?

17    A.   Yes.  And then, like I said, the 360 stitching

18    pictures, the terminable, mappable 360 photo.

19    Q.   But that's not in your lawsuit.

20    A.   It would be if you are considering the stitching.

21    Q.   Okay.

22         I guess, paragraph 28, another example of work

23    that you did previously was taking aerial photographs, not

24    orthomosaic maps, and adding rough boundaries for the

25    property that you were asked to photo; correct?

**143**

1     A.   Yes.

2     Q.   And that's something you did prior that you don't

3     do anymore?

4     A.   No.  I just take pictures.  I let the Realtors

5     know if they want the lines on they'll have to do it, which

6     they are fine in doing.

7     Q.   And you're not licensed as a land surveyor in

8     North Carolina; correct?

9     A.   No.  No.  Nor do I want to be.

10    Q.   Just so I'm clear on what you've done to make

11    changes to your business model, you no longer use

12    DroneDeploy to generate orthomosaic maps?

13    A.   No, sir.

14    Q.   And you no longer draw lines on photos?

15    A.   No, sir.

16    Q.   Other than that, you're operating the same as you

17    were before?

18    A.   Yes, sir.

19    Q.   And one other thing -- I guess the third time is,

20    you no longer do the 360-degree or do you still do that?

21    A.   The 360 navigable photos?  No.

22    Q.   360 navigable?

23    A.   Yeah, that's the best way to describe it, I guess,

24    because you can turn to navigate in them.  But no, due to

25    the stitching.

**144**

1     Q.   And why do you not do that?  Who told you you

2     couldn't do that?

3     A.   Mr. William Casey.

4     Q.   Okay.

5          Other than Mr. Casey, did anyone say you can't do

6     that?

7     A.   Nope.  He's the only one I talked to.

8     Q.   And if you were successful in your lawsuit, what

9     would you -- how would you change your business going

10    forward?

11    A.   I would start advertising and looking to get some

12    of these things I mentioned I wanted to do, like the parking

13    lot paving inspections; I still get calls for those.

14    Roofing inspections; I still get calls for those.  And

15    progress -- progression maps for, you know, developers or

16    real estate people who develop in neighborhoods and property

17    managers who have, like, shopping centers; I get calls for

18    that.

19    Q.   And when you --

20    A.   So I would try to advertise and point back to

21    those people to let them know that now I'm clear from the

22    State and I'm available to do these maps if you still want

23    them.

24    Q.   And so essentially you would advertise that you

25    are cleared or available to do orthomosaic maps?

Michael Jones      Michael Jones - 7/21/21        July 21, 2021
360 Virtual Drone, et al. v Ritter, et al         5:21-CV-0137-FL
145

1      A.  Orthomosaic mapping, yes, sir.

2      Q.  And in order to do that mapping -- and just so

3 that we're clear, that would be something where you would

4 take certain information from the client and you would input

5 it into the computer program?

6      A.  Yes, sir.

7      Q.  And you would make selections on altitude and

8 speed and maybe some other items and essentially push a

9 button and fly the drone -- it would create a flight plan

10 and then you'd fly the drone?

11     A.  Yes, sir.

12     Q.  And then you would fly the drone, collect the

13 data, you would take the data transfer it to your computer,

14 and then you would run it through DroneDeploy software, and

15 that software would generate an orthomosaic map, and then

16 you'd take that work product by -- that was generated

17 by DroneDeploy and you'd send it to the client?

18     A.  In PDF.

19     Q.  In PDF?

20     A.  Or JPEG, could do either.

21     Q.  And that information that you're providing to the

22 client doesn't have any work product of your own in the form

23 of analysis or commentary or any type of data.  You're not

24 providing them with distances or --

25     A.  No.  No, sir.

1      Q.  Let me ask you to turn to page 19.  Paragraph 93

2 says: "Plaintiffs want to create, process, and communicate

3 information - for example, aerial images, 3D digital models,

4 and data about land and structures."

5      Do you see that?

6      A.  Yes, sir.

7      Q.  All right.

8      And when you say "create, process, and

9 communicate," is it the same example that we talked about

10 with using DroneDeploy software?

11     A.  Yes, sir.

12     Q.  Okay.

13     And on top of the DroneDeploy software, you're

14 talking about just taking regular old JPEGs or aerial

15 images?

16        MR. GEDGE:  Object to form.

17     Q.  Okay.

18     A.  I'm sorry.  I didn't get the question.

19     Q.  Yeah.

20     So on top of the example of creating an

21 orthomosaic map using DroneDeploy, are you also talking

22 about just generating aerial images in the form of JPEGs?

23     A.  Yes.  I would continue to do what I'm doing now as

24 far as my workflow now on top of this.

25     Q.  And it's your contention to the Court that the

1 creation, processing, and dissemination of orthomosaic maps

2 is speech?

3      A.  Yes.

4      Q.  And you're talking about speech on your behalf,

5 right, 360 degrees -- 360 Virtual Drone Services LLC and/or

6 Michael Jones?

7      A.  Yes, sir.

8      Q.  Okay.

9     And tell me about your speech.  What is -- what

10 part of that process in generating orthomosaic maps are we

11 talking about your personal speech?

12     A.  I'm not sure how to answer.

13     Q.  Okay.

14     Because I've asked if you -- you know, do you --

15 what input do you have into it, what type of commentary do

16 you have, what type of analysis do you have, how do you

17 affect or alter the map that is created by DroneDeploy.

18     And I've essentially received, "I don't do

19 anything except take the inputs from the client and

20 create -- run the drone, process the data, and DroneDeploy

21 sends it to me and I just send it to the client."

22     A.  Uh-huh.

23     Q.  Is that true?

24     A.  Yeah.  But I don't get the question you're asking

25 after that.  I don't -- I'm sorry.

1      Q.  Yeah.  That's the predicate for the question.

2     Is that all true, how I explained it?  And if it's

3 not, if it's not accurate, let me know.

4      A.  Say it one more time, if you don't mind, so that

5 I'm clear.

6      Q.  I'll do my best.

7     So you're taking inputs from the client; right?

8      A.  Uh-huh.

9      Q.  You are using DroneDeploy software; correct?

10     A.  Okay.  Yes.

11     Q.  You're inputting certain information from the

12 client on altitude, the software is generating certain

13 automatic things for you like speed?

14     A.  Yes, sir.

15     Q.  The client is telling you how they want the

16 overlay and what distance they want you to complete --

17 they're giving you that information; right?

18     A.  Yes, sir.

19     Q.  And you're feeding that into the program to create

20 this flight plan?

21     A.  Yes.

22     Q.  You push a button, the flight plan is done; right?

23     A.  Yes, sir.

24     Q.  And then the drone flies the flight plan?

25     A.  Yes, sir.

**149**

1    Q.   And collects data.  You take the data, you run it
2    through DroneDeploy software, and they spit out this
3    orthomosaic map and you send it to the client?
4    A.   Yes.
5    Q.   Where is your personal speech in all that that
6    you're saying is being violated?
7    A.   I don't know if I feel comfortable answering
8    because I don't know laws that well.  I would hate to
9    misword something and it not be accurate.  So I would -- I
10   don't know how to answer that.
11   Q.   Well, it's your lawsuit; right?
12   A.   Mine and 360, the same.
13   Q.   Okay.
14        And you're saying that by not being able to
15   create, process, and disseminate this orthomosaic map, it's
16   violating your First Amendment rights?  That's what your
17   lawsuit says; right?
18   A.   Yes, sir.
19   Q.   Okay.
20        And I'm just trying to -- as best you can do,
21   explain to me how that is.  What speech are you personally
22   worried about that you're trying to protect?
23   A.   That's -- to me, that's too deep into the law  I
24   mean, I wouldn't feel comfortable even starting to give you
25   any answer on that.

**150**

1    Q.   Yeah.  I'm not asking you to give me a legal
2    analysis on the First Amendment.
3    A.   Yeah.
4    Q.   I'm just asking for your own -- what speech are
5    you worried about that you're saying to Judge Flanagan, "I
6    need you to protect this speech that's subject to First
7    Amendment protections" from your viewpoint?
8    A.   Again, I don't know how to answer it.  Sorry.
9    Q.   Okay.
10        So you don't have to -- can you identify any
11   speech for me that you're worried about?
12   A.   Again, that's getting into the law thing.  I would
13   rather him take care of that part, as far as that.
14   Q.   Right.
15        And I can't -- unfortunately, I can't depose him.
16   A.   Sure.
17   Q.   I would love to do that but I'm not allowed to.
18   A.   I understand.
19   Q.   It's your lawsuit, and if you can't identify
20   speech, that's fine --
21   A.   Yeah.
22   Q.   -- but I just want you to do the best you can to
23   tell me, "This is what I'm concerned about, this is what I'm
24   trying to protect, this is the speech I'm identifying," if
25   you can.  If you're not able to do that, then you just

**151**

1    say --
2    A.   I'm not comfortable doing it.  That's my best
3    answer.  Yeah.
4    Q.   Okay.
5        Do you know if the board ever asked you for any
6    examples of your work product?
7    A.   They never asked me.  When I met with William
8    Casey, I could clearly see all the data he had of mine;
9    so -- but I never asked for it, but they did have it.
10   Q.   What data did they have?
11   A.   Stuff off my work site, stuff I sent in,
12   screenshots of different screens from my website or the
13   Droners.io.  Everything I see in here, I mean, I could see
14   that in his folder as he was working.  So -- but I was never
15   asked for it; he had it prior to getting there.
16   Q.   Did you ever provide an example of an orthomosaic
17   map?
18   A.   No.
19   Q.   Did it matter from -- as best you understand it,
20   from the board's perspective as to whether or not the map
21   was of an industrial site, of a commercial site, of a farm,
22   of a home?  Did any of that matter?  In other words, the
23   specific content of the thing?
24   A.   Not that I'm aware of, they didn't specify that
25   any of it made any difference.

**152**

1    Q.   Okay.
2        So the type of information specifically that was
3    being produced, it didn't -- do you know if -- whether the
4    board ever communicated to you that it mattered what type of
5    project you were working on?
6    A.   No, sir.
7        (Recess taken, 2:24 to 2:35 p.m.)
8    Q.   Mr. Jones, I just want to make sure I'm clear on
9    your lawsuit.
10        But you're seeking the ability, are you not, under
11   paragraph 77, to provide orthomosaic maps to paying clients?
12   A.   Yes.
13   Q.   Okay.
14        And you would do that using DroneDeploy?
15   A.   Honestly, I'd use something else  DroneDeploy is
16   not a leading division in that field  Pix4D is the top one.
17   Q.   And prior to receiving the June 2019 letter, you
18   were using DroneDeploy?
19   A.   I was using DroneDeploy, yes, sir.
20   Q.   And you were -- as I understand it, you were
21   inputting certain information into the software in order to
22   generate this preflight plan; right?
23   A.   Yes.
24   Q.   And at the end of the day when you got the data
25   from them and they did the -- they process this orthomosaic

153

1  map, you turned it into a PDF and you sent that to the
2  client?
3      A.   Yes, sir.
4      Q.   And do you know -- when they get that PDF, do you
5  know what they can do with the PDF -- the client?
6      A.   I'm thinking they could do many things with it,
7  but monitor progress is one, you know -- like we went
8  through the list earlier, safety, quality control -- those
9  are just several things they can do with it.
10     Q.   And you mentioned the -- one option would be,
11 although you never did this, but you could send them the
12 link with the log-in information and they could access
13 DroneDeploy and do all kinds of calculations; right?
14     A.   Kind of like a Google Share Map or if you ever had
15 a DocuShare. So it's not really -- they don't log in to
16 your account, but you make them kind of an admin user on
17 this profile. Then they have access to do it. And you can
18 see -- everyone can see all of their actions, every note as
19 they go in. For example, they may go in and put a note in
20 that says, "Here on this map, this pile needs to be moved by
21 Friday." The site manager would see it, I would see it,
22 everybody involved with it -- that's kind of how it works.
23     Q.   And in that hypothetical -- that's a hypothetical;
24 right?
25     A.   Yes.

154

1      Q.   You never did that?
2      A.   Yeah, I never did get that far.
3      Q.   In that hypothetical, you would provide the client
4  information or data that they could then access to perform
5  all kinds of surveying calculations; right?
6      A.   Different tools. I'm not sure what you're
7  considering surveying. On the DroneDeploy site, they have
8  many tools that the user or I could use.
9      Q.   Right.
10          To do all kinds of calculations?
11     A.   Elevations.
12     Q.   Distances?
13     A.   Volumetrics.
14     Q.   Correct.
15     A.   Yes, sir.
16     Q.   Things that would, even in your view, right, when
17 you reviewed the statute, would fall under what the
18 North Carolina legislature has defined as "land surveying"?
19     A.   Let me try and make sure I understand the
20 question.
21          You are asking me do I think the board is saying
22 all this is classified under surveying and I can't do it?
23     Q.   No.
24          I'm not saying that. With -- your hypothetical,
25 providing --

155

1      A.   Okay.
2      Q.   Not providing the PDF, but providing the link and
3  access to DroneDeploy --
4      A.   Okay.
5      Q.   -- and the ability to perform all kinds of
6  measurements and calculations, would you agree that you're
7  giving the client the ability to perform surveying?
8      A.   I'm not sure I want to define what surveying is
9  because I don't see it as surveying, but the board may have
10 a definition of surveying that they say ...
11     Q.   Well, the legislature defined it; right?
12     A.   I'm not sure who.
13     Q.   Okay.
14          Well, there's the Exhibit 5 -- do you have that in
15 front of you? Chapter 89C?
16     A.   This one?
17     Q.   Yes.
18          Do you understand that this is a general statute
19 that was enacted by the North Carolina legislature?
20     A.   Yes.
21     Q.   Okay.
22          And if you flip to the second page, under 89C-3,
23 do you see where it has:  "7, Practice of land surveying"?
24     A.   Yes.
25     Q.   Okay.

156

1          And the legislature indicated that "providing
2  professional services such as consultation, investigation,
3  testimony, evaluation, planning, mapping, assembling, and
4  interpreting reliable scientific measurements and
5  information relative to the location, size, shape, or
6  physical features of the earth" -- do you think the data
7  you're providing the client would allow someone to perform
8  these type of measurements and information relative to the
9  location, size, shape, or physical features of the earth?
10     A.   Well, again, I can read this document I can see
11 what this document's saying, what they're saying is this;
12 but no, I don't agree that what I was providing -- to
13 provide the client the option to go into DroneSurvey [sic]
14 and pull a measurement is not, you know, giving them access
15 to perform a surveying task.
16     Q.   Are you providing the client data with the ability
17 or someone else the ability to perform these measurements,
18 if you know?
19     A.   With the -- am I providing them with the ability
20 to perform the measurements? I'm providing them with the
21 software that you have the option to do that in.
22     Q.   Correct.
23     A.   Yes.
24     Q.   All right.
25          And do you know that the information you're

Michael Jones     Michael Jones - 7/21/21
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21     July 21, 2021
5:21-CV-0137-FL

157

1 providing them is reliable or contains reliable scientific
2 measurements?
3     A.   Do I know if the measurements are scientific? Is
4 that --
5     Q.   Yeah.
6          Do you know if the map, the orthomosaic map that
7 you're providing in the hypothetical with the ability to
8 access the DroneDeploy software, do you know if you're
9 providing them with reliable scientific data?
10    A.   Some of it, yes.
11    Q.   Okay.
12         And how do you know that? How have you been able
13 to confirm that?
14    A.   Just with the measurement that I mentioned
15 earlier, by pulling the tape on the ground and then
16 confirming the measurement from the photos captured.
17    Q.   So you took a -- one orthomosaic map that was --
18    A.   I measured -- sorry.
19    Q.   You took one photo or one orthomosaic map, you
20 plotted two points on that orthomosaic map, created a
21 distance, and then you went out and measured it.  And
22 because that one time was accurate, you're saying that
23 that's confirmed that this is an accurate scientific
24 measurement that you can provide to your clients?
25    A.   No.  I would not provide a measurable map to the

158

1 clients with any data telling them they could measure it or
2 it could be used for measurement.  I would make that clear
3 from the get-go, which I have always done.
4          So yeah, it -- that does provide them with the
5 option to measure.  Do I think it's stepping on the
6 surveying?  I don't  I mean, to answer you question, yes, I
7 measured my driveway, I measured several orthomosaic maps
8 that I did with the tape and confirmed it.
9          Do I know that's scientific from doing those
10 measurements?  I mean, those -- that data informs me that
11 that is correct, yes.  As far as delivering it to the
12 client, I don't think I have a place to deliver it to the
13 client with saying you can measure off of it or anything.
14         So they're kind of two separate questions.  You're
15 asking me is the software capable of being able to do what
16 they're saying?  Yes, it is.
17         Do I break the surveying law by giving a client
18 something they could possibly go measure with?  I don't see
19 that at all.
20    Q.   When you say "they" are saying, it's --
21    A.   The board.
22    Q.   Okay.
23    A.   Sorry.
24    Q.   But are you not relying on DroneDeploy or whatever
25 software you would use to determine whether all of this is

159

1 scientifically reliable?
2     A.   The DroneDeploy is using that metadata in the
3 photos so I trust the metadata in the photos 150 percent.
4 That can't be incorrect; it's metadata in the photos.
5     Q.   Are you -- under paragraph 77 are you seeking to
6 provide clients with anything other than a PDF copy of the
7 orthomosaic map?
8     A.   No.  I'm just -- want to continue what I was
9 doing, which was delivering the PDF of an orthomosaic map.
10    Q.   As part of your lawsuit, are you trying to collect
11 data, provide that data to the client with the ability to
12 perform all of these calculations that we're talking about
13 for location, size, shape, and physical features of the
14 earth?
15    A.   No.
16             (Exhibit 7 marked.)
17    Q.   And quickly I'm going to show you what has been
18 marked as Exhibit Number 7  And this is a document that was
19 generated -- or that we located on the internet that was
20 generated, a PDF document by DroneDeploy.
21    A.   Uh-huh.
22    Q.   And it says this -- and I know you can't identify
23 it, but I want to walk through it to see if this is
24 consistent with your experience with DroneDeploy.
25    A.   Yes, sir.

160

1     Q.   "This document is designed to serve as a
2 beginners' guideline to providing (sic) raw imagery in
3 DroneDeploy.  It covers flight planning, flight execution,
4 image processing, image export, and use in ArcGIS."
5          Do you see that?
6     A.   Yes, sir.
7     Q.   Okay.
8          And then the first topic, they talk about flight
9 planning.  And you and I have talked about that throughout
10 this deposition.  And that's something you did using the
11 software; correct?
12    A.   Yes, sir.
13    Q.   And it looks like they have a dashboard.
14         Does that dashboard -- is that similar to the
15 dashboard you were using?
16    A.   Yes, sir.  It looks familiar.
17    Q.   Okay.
18    A.   Unless they upgraded or something, pretty close.
19    Q.   And then the first thing you talked about is
20 selecting the area of the flight; right?
21    A.   Yes, sir.
22    Q.   Okay.
23         And it says on page 2:  "Once you create this
24 area, the flight path of the drone will be automatically
25 created, with the ability to change its direction under

**161**

1  advanced settings"; right?

2     A.  Yes, sir.

3     Q.  Okay.

4     Did you use the advanced settings?

5     A.  Some jobs required the advanced settings; some

6  didn't.

7     Q.  And it says here: "You can alter more settings

8  for your flight plan, such as: slidelap."

9     Do you know what sidelap is?

10     A.  That's what I mentioned earlier in the

11  overlapping -- the front, back, and sidelap -- there's

12  front, back, and side overlaps on each photo.

13     Q.  And that's something that you had to --you either

14  went with what was standard or you made changes to it;

15  correct?

16     A.  Yes, sir.  If it wasn't -- if the client suggested

17  anything different than what was default in the program, I

18  entered what the client wanted.

19     Q.  How about frontlap?

20     A.  Same.

21     Q.  So frontlap, you would go with what was the

22  recommended setting or you would ask the client what they

23  wanted to do?

24     A.  Yeah.  Just to be clear, so it has a default in

25  there; I'm not sure what the default is.  But if the client

**162**

1  had -- normally a client did have, "We want 70 percent front

2  overlap, 60 percent side overlap, and that's it," and if it

3  was different than what was default, then I changed it.

4     Q.  Flight speed is another calculation that you would

5  either go with the default --

6     A.  If I'm not mistaken, the DroneDeploy -- I don't

7  think you control specifically the flight speed.  I think

8  that is determined by a couple of other parts, that that

9  determines the flight speed.  I think Pix4D you can adjust

10  the flight speed.  I could possibly be wrong on that.

11     Q.  DroneDeploy, this document on page 2 at the

12  bottom, does say: "Flight speed: recommended flight speed

13  is 15 miles per hour or less."

14     A.  There you go.

15     Q.  Okay.

16     So it's something -- does that jogyour memory as

17  to whether flight speed was something you would have to

18  input?

19     A.  I would have to open the program and look at it to

20  remember which one it is that you can adjust or the other

21  settings actually determine the flight speed.

22     Q.  Fair enough.

23     A.  I want say the overlapping and the how many passes

24  you made determined the flight speed, but ...

25     Q.  And then the next page, it has multiple camera

**163**

1  settings.

2     Do you know what that input is?

3     A.  Where are we at now?

4     Q.  On page 3, under -- the top is "starting

5  waypoint."

6     A.  "Manual camera settings"?

7     Q.  Yeah.

8     A.  Okay.

9     Q.  Do you know what that is?

10     A.  So this is that you could basically -- in

11  photography, you have manual and you have automatic.

12  Automatic, the computer decides everything manual, I decide

13  everything -- the aperture, the F-stops, the shutter speed.

14  And that's basically what that is; you can either let

15  DroneDeploy use the autocamera or you can set it and

16  determine all those things manually yourself.

17     Q.  And what did you do?

18     A.  Manually.  Always manually on photos.

19     Q.  And then the second area or topic under this paper

20  is "Flight Execution."

21     A.  Okay.

22     Q.  Do you see that?

23     A.  Yes, sir.

24     Q.  It says: "Once at the site, power on the drone,

25  acquire the GPS, and calibrate the compass."

**164**

1     A.  Yes, sir.

2     Q.  And as best I understand it, the drone is flying

3  the program that was set by you and it's being controlled by

4  the software?

5     A.  Yes, sir.

6     Q.  Okay.

7     A.  But I do have control of it at all times if

8  anything happens.

9     Q.  And then the next page, do you see number 3,

10  "Image Processing"?

11     A.  Yes, sir.

12     Q.  All right.

13     And this sounds like what you were describing

14  earlier, where you upload the images froman SD card to your

15  computer; correct?

16     A.  Yes, sir.

17     Q.  "For best quality maps, manually review the photos

18  and delete any that are not nadir," n-a-d-i-r, "(looking

19  straight down), as well as any that are blurry, show part of

20  the horizon, or have lighting issues."

21     Did you do that?

22     A.  Yeah.  You have to click over your photos to make

23  sure, you know, the photo turned out okay.

24     Q.  And did you delete photos that didn't turn out

25  okay?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

165

1    A.   I mean, occasionally there was one that, you know,
2  maybe took with the shutter door half open.  Usually it was
3  pretty head on, though.
4    Q.   And then you would select the photos that you
5  wanted to upload into DroneDeploy?
6    A.   Yes.
7    Q.   Okay.
8         And then it says:  "Continue on to processing.
9  Specify the map type as 'terrain' or 'structures.'"
10        What would you typically select?
11   A.   Terrain.
12   Q.   And why would you select terrain?
13   A.   Structures are for if you're going for the 3D
14 models.  Remember I was telling you earlier it was kind of
15 flowing and captured in a different pattern, that makes it
16 a -- capture more of a 3D kind of cloud.
17   Q.   And the next page says:  "When you are ready,
18 begin processing.  This will take several hours."
19        Is that your experience, it takes several hours?
20   A.   Yes, sir.
21   Q.   And then under 4, 'Export Image,' it says:  "Once
22 processing is complete, you will see the final, stitched
23 area -- stitched image of the area.  This can be viewed as a
24 2D map (pictured), a 3D model, NDVI imagery as an indicator
25 of plant health or, elevation model."

166

1         Is that true?
2    A.   Yes, sir.
3    Q.   And then do I understand your testimony to say
4  that you would take the 2D map and turn it into a PDF?
5    A.   Yes.
6    Q.   Okay.
7         Next page, it says:  "You have the choice of
8  exporting it as a GeoTIFF, JPEG, or PDF, depending on what
9  you need as a final product."
10        And it sounds like you selected PDF?
11   A.   Yes, sir.
12   Q.   And that's what you're looking to do going
13 forward?
14   A.   JPEG or PDF.  The client probably is not even
15 knowledgeable of the difference; so PDF are probably the
16 choice just standard across the board.
17   Q.   And then the next -- number 5 is "Use in ArcGIS:
18 Once the image is exported, you will receive an e-mail with
19 a link to download.  Once downloaded, unzip the folder in
20 your desired location.  Create a new project in ArcMap or
21 ArcPro and add the image."
22        Do you know what they're talking about here?
23   A.   Yes, I do.
24   Q.   Okay.
25        What is this?

167

1    A.   I never had to do that.
2         That's if you wanted to put, like, a KML-type
3  extension and it would create -- you could look at this map
4  project on, say, Google Earth.  It would actually overlay
5  your map product over the standard image it had if you had
6  the metadata to put it there.
7    Q.   And that's not something you used?
8    A.   No, I never used it.
9    Q.   Okay.
10        (Exhibit 8 marked.)
11   Q.   I want to show you what has been marked as Exhibit
12 Number 8.  Exhibit Number 8 is an e-book that is put out by
13 DroneDeploy on making great maps.
14        And it is -- it says:  "We start this e-book by
15 describing the basic process behind Map Engine."
16        Is that what you use, Map Engine?
17   A.   I'm assuming Map Engine is just what they call
18 their processing software.
19   Q.   And then if you flip to page 5 --
20   A.   Yes, sir.
21   Q.   -- it says:  "It is important to first understand
22 the basic concept between drone photogrammetry."
23        Do you know what drone photogrammetry is?
24   A.   Yes.
25   Q.   Okay.

168

1         What is that?
2    A.   The stitching together of multiple photos -- well,
3  using a drone obviously.
4    Q.   Do you know how it works?
5    A.   For the most part, I mean ...
6    Q.   When they talk about here -- can you explain what
7  your knowledge is about how this process works?
8    A.   The stitching, like building a map?
9    Q.   Drone photogrammetry.
10   A.   Yeah.  It's pretty much what we described several
11 times, that you go, collect the photos with the drone, you
12 come back, put it in a software that stitches the photos
13 together via the metadata, creates an orthomosaic map, and
14 export that multiple types of files to deliver to your
15 client.
16   Q.   Do you understand how the software works?  Because
17 they explain --
18   A.   Okay.
19   Q.   What's your understanding of how the software
20 works?
21   A.   It stitches everything together in a cloud-based
22 structure from where it's actually located in space, like if
23 you're doing 3D structures, then it takes -- it has point
24 clouds of whatever you're doing, the map building,
25 structures, terrain, and then it inputs that together in a

1  navigable whole image.

2      Q.    And then DroneDeploy talks about key points.

3            Do you know what that means when they're using key

4  points to do this process?

5      A.    I mean, I'm assuming key points are just things

6  you need to know, like certain parts of the process.  I

7  don't know what they're referring to as key points.

8      Q.    Do you know anything about key points?

9      A.    No, sir.

10     Q.    Have you ever been trained in key points as it

11 relates to drone photogrammetry?

12     A.    No, sir.

13     Q.    This talks about choose the correct flight

14 planning modes, and it has nonstructures, flight mode,

15 structures mode -- is that something we just talked about a

16 minute ago?

17     A.    Yes.  Terrain and structure, yes, sir.

18     Q.    And then if we go to page 9, there's a section on

19 POI, point of interest.

20           Do you know what they're referring to here?

21     A.    Yes, sir.

22     Q.    Okay.

23           What are they referring to?

24     A.    Point of interest -- if you were taking, say, a

25 5-acre field with a building in the middle of it and you

1  were doing an orbit around it to capture the data, the point

2  of interest would be the building, the part that you stay

3  focused on.

4      Q.    Have you seen this e-book before?

5      A.    No, sir.

6      Q.    When you said you studied or looked on, you know,

7  Google or went to YouTube on learning about DroneDeploy, do

8  you remember anything specific that you watched or read?

9      A.    Like, I studied most of the maping stuff through

10 Drone U, which is Drone University, but they're called

11 Drone U, and they have just, you know, courses you can take

12 on mapping, on creating maps, photogrammetry.  I just went

13 through those and took all those courses and am still in the

14 process of learning it all.

15     Q.    If you would flip to page 17, this is the advanced

16 panel section of the e-book.

17     A.    Okay.

18     Q.    Have we talked about that before already, the

19 advanced panel and some of the inputs that you would have to

20 make in order to get the flight plan ready?

21     A.    We mentioned advanced planning a while ago, yes.

22     Q.    Okay.

23           How about resolution?  Was there any way to alter

24 resolution or do you know how resolution worked within

25 DroneDeploy software?

1      A.    Not in the DroneDeploy software, no.

2      Q.    How about within the equipment that you used for

3  the clients?

4            Did you know how to alter or make any changes to

5  resolution or generate a work product that had a certain

6  resolution?

7      A.    Yeah.  I mean, the resolution is going to be

8  whatever the resolution of the camera is in the drone; so I

9  don't know how you could alter that.

10     Q.    Okay.

11           Does resolution have anything to do with altitude?

12     A.    No.

13     Q.    And then after creating the flight plan,

14 there's -- Chapter 8 on page 40 is "Processing."

15     A.    Okay.

16     Q.    On page 42, "Processing Modes" -- I think we

17 talked about this earlier, but they have two main processing

18 modes that you can choose to process your data in, terrain

19 mode and structures mode.

20     A.    Yes.

21     Q.    Okay.

22           And you generally pick terrain mode?

23     A.    Terrain, yes.

24     Q.    And then page 44, chapter 9, "Quality Check Your

25 Data and Map."  It says:  "Once your map completes

1  processing, there are steps you can take each and every time

2  to help you understand how accurate your data is and the

3  reasons behind its accuracy.  These steps are the basic

4  troubleshooting steps that DroneDeploy support uses when you

5  reach out with a question regarding the quality of your

6  map."

7            Did you ever take any steps to check your data and

8  map or troubleshoot the data and map?

9      A.    After the map was processed, I never did because

10 my -- those maps I was creating were never that -- the

11 accuracy was never that important because I was -- it was

12 just for visual purposes.  So whatever the process was when

13 I got finished was always good enough for me.

14     Q.    Why do you say that?  Why do you say the accuracy

15 was never important?

16     A.    Because the clients I was delivering the products

17 weren't using anything that accuracy would be required for.

18 They wouldn't need the accuracy to see the picture.  The guy

19 just wants to see, like, hey, did my cement pile

20 get delivered, did they set that building like they wanted.

21 Like, there's no accuracy in that.  It's just the building's

22 there visibly or it's not.

23     Q.    And when you are hired, do you have engagement

24 letters with your clients?

25     A.    Define "engagement letters."  What do you mean?

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

173

```
1     Q.    A contract?
2     A.    Contracts?  Yes, sir.
3     Q.    Okay.
4           And do you still have copies of those contracts?
5     A.    No, probably not.  I probably wasn't hard on
6  contracts that early in the business as far as, you know,
7  locking down stuff.  I do it more now since I've grown
8  but --
9     Q.    How about e-mails?  Did you have e-mails with your
10 clients talking about, "Hey, I need you to do this"?
11    A.    Maybe that Steve guy, Steve Adair, possibly.  But
12 me and him talked a lot on the phone.
13    Q.    Did any client ever hire you to provide any type
14 of data other than they would use for, what you say,
15 visualization?
16    A.    No.
17    Q.    Do you know if the data you provided them was
18 accurate?
19    A.    To what?
20    Q.    To --
21    A.    It was an accurate picture, yes.
22    Q.    Okay.
23          Do you know if it was accurate enough to do other
24 types of calculations other than just using it for
25 visualization?
```

174

```
1     A.    I wouldn't use it for anything or suggest them use
2  it for anything except visualization.
3     Q.    And why is that?  Why wouldn't you do that --
4  suggest that?
5     A.    Because that's not the intent of the product.
6     Q.    What was the intent of the product?
7     A.    A visual representation.
8           (Recess taken, 3:03 to 3:05 p.m.)
9     Q.    Mr. Jones, I appreciate your time today.
10    A.    Thank you.
11    Q.    And really appreciate you staying patient with me.
12    A.    Yes, sir.
13    Q.    There's a lot of technical stuff that I don't have
14 a background in, and so I appreciate you --
15    A.    Same here.
16    Q.    -- sitting through and listening to my questions
17 and answering my questions.
18          Is there anything -- are there any of those
19 questions that you answered that you would like to either
20 change your testimony or say, "Hey, I'm not sure I
21 understood that question," that you can think of?
22    A.    Not off the top of my head  I was pretty honest,
23 I think, in the questioning.  If I didn't understand it, I
24 told you.
25    Q.    And is there anything that you weren't asked about
```

175

```
1  that you think is important related to the lawsuit that you
2  filed against the board?
3     A.    Not that I can think of.
4     Q.    Thank you.
5           MR. HANNA:  I don't have anything further.
6           MR. GEDGE:  I may just have a few questions.
7           (Recess taken, 3:06 to 3:13 p.m.)
8                   EXAMINATION
9  BY MR. GEDGE:
10    Q.    All right, Michael.  Just to clarify a couple of
11 points.
12          You want to be able to take photographs using your
13 drone; is that right?
14    A.    Yes.
15    Q.    You want to be able to use those photographs to
16 create orthomosaic maps; is that right?
17    A.    Yes, sir.
18    Q.    You want to be able to provide those orthomosaic
19 maps to paying customers?
20    A.    Yes, sir.
21    Q.    Would those orthomosaic maps communicate
22 information?
23    A.    Yes, sir, I think so.
24    Q.    You want to use photos taken with your drone to
25 create 3D digital models; is that right?
```

176

```
1     A.    I would like to, yes.
2     Q.    Would you like to provide those 3D digital models
3  to paying customers?
4     A.    I would.
5     Q.    In your view, do those 3D digital models
6  communicate information?
7     A.    They do.
8     Q.    Last question on this point, but you would also,
9  as I understand it, like to use the photos taken with your
10 drone to create images on which you will draw lines roughly
11 approximating the boundaries of property; is that right?
12    A.    Yes.
13    Q.    You want to provide those to willing clients?
14    A.    Yes.
15    Q.    For example, real estate agents?
16    A.    Yes.
17    Q.    Would those images, in your view, communicate
18 information?
19    A.    Yes, they would.
20    Q.    Now, as I understand it from your conversation
21 with Mr. Hanna, the orthomosaic map on DroneDeploy's actual
22 program that you have an account on, those maps contain
23 certain tools that let you -- for example, that let you
24 calculate the volume of a stockpile; is that right?
25    A.    Yes, sir.
```

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

**177**

1    Q.   Okay.
2         And another tool would let you identify the
3    elevation of a point of land --
4    A.   Yes, sir.
5    Q.   -- on a map?
6    A.   Yes, sir.
7    Q.   Okay.
8         And another tool, as I understand it, would let
9    you calculate the distance between Point A and Point B on
10   that map?
11   A.   Yes, sir.
12   Q.   All using the DroneDeploy program?
13   A.   Tools, yes.
14   Q.   All right.
15        Now, as I understand it, you testified that
16   between 2017 and 2019, none of your clients asked you to
17   provide them that information; is that right?
18   A.   No.
19   Q.   None of your clients asked you to give them access
20   to that information?
21   A.   No.
22   Q.   Okay.
23        If in the future a client were to want access to
24   that information, would you like to have the ability to
25   provide that client access to that kind of information?

**178**

1    A.   I would like to, yes.
2    Q.   You might recall a part of your conversation with
3    Mr. Hanna where you were discussing like, a subprovision or
4    a sub subprovision of the North Carolina General Statute.
5         Do you remember that?
6    A.   Yeah, I think so.
7    Q.   Okay.
8         I believe the subprovision had to do with the
9    definition of surveying.
10   A.   Oh, okay.
11   Q.   Is that right?
12   A.   Yes.
13   Q.   Okay.
14        Are you -- you're not a lawyer; is that right?
15   A.   No.
16   Q.   Okay.
17        Are you an expert in parsing complex statutory
18   language?
19   A.   No, sir.
20             MR. GEDGE:  Okay.  I think that's all I have.
21                   EXAMINATION
22   BY MR. HANNA:   (3:17 p.m.)
23   Q.   Just a quick follow-up.
24        You were asked about would orthomosaic maps convey
25   information to the client.

**179**

1    A.   I was asked that, yes.
2    Q.   And you said yes?
3    A.   Yes, I think it does.
4    Q.   And what type of information does it convey to the
5    client?
6    A.   Again, the same list we went over:  Quality
7    control, quality -- management control of the progress,
8    progression of the site -- any of those things is
9    information to the client.  If the client wanted to, you
10   know, find out if this is being done on the site, that's
11   information to the client, I think, under my definition.
12   Q.   Does the orthomosaic map create information?
13   A.   Create information?  It provides information; it
14   doesn't create information.
15   Q.   Does it communicate information?
16   A.   It communicates information, yes.
17   Q.   Does it matter if the map is conveyed to the
18   client in PDF form or whether you provide a link with login
19   instructions?
20   A.   Does it matter?  Is that what you said?
21   Q.   Yes.  Does it make a difference?
22   A.   No.  Not to -- the actual product itself, does it
23   change?  Is that what you're asking?
24   Q.   No.
25        Does it change the type of information that's

**180**

1    communicated.  In other words --
2    A.   Oh, no, no, no.  That's just a format.  But it
3    does not change any information communicated.  PDF is the
4    same as a JPEG.
5    Q.   Does it change what the client can do with the
6    information or what you can do with the information?
7    A.   No.
8    Q.   All right.
9         So the JPEG can be used -- I can use all the same
10   tools on the JPEG that I can use by getting the link and
11   logging in to the program?
12   A.   No.
13   Q.   Okay.
14        So it does make a difference?
15   A.   No.
16   Q.   All right.  I'm confused.
17   A.   Yeah, the question -- the question that you asked
18   is confusing, but it's partly incorrect.
19        So if you're asking does it change or make a
20   difference in the format -- so if I have a JPEG and a PDF
21   and I was going to give this to that young man there, what
22   he could do with it wouldn't make any difference.
23        Then the second question you asked was does it
24   take away the tools.  So now we're talking about two
25   completely separate things.  We're talking about a file here

181

```
 1   and you're asking me does it change whether it's a JPEG
 2   format.  No, it would not change it.
 3            When you take that and go into DroneDeploy, now
 4   you're working on their platform.  You're not working on a
 5   file anymore; you're working on their platform and how that
 6   platform interacts with the files I'm giving it.
 7            Is that clear?
 8   Q.   Yes.
 9   A.   Okay.
10   Q.   And what you've done historically is you've
11   communicated information to them, to the clients, by
12   providing them a PDF copy of the orthomosaic map?
13   A.   Yes, sir.
14   Q.   Okay.
15            And that information that you're communicating to
16   them in the PDF document, are they able to use tools to do
17   all these calculations on volume and distance?
18   A.   No, sir.
19   Q.   Okay.
20            But if you were able to give them access to the
21   program, they could then go in, right, and they could
22   perform all kinds of calculations?
23   A.   If I gave them -- added them as a user to the
24   profile, yes, sir.
25   Q.   You could do that as a user  You could use those
```

182

```
 1   tools to provide -- perform calculations on volume,
 2   distance, all that; right?
 3   A.   Yeah.  Anyone with access to a DroneDeploy account
 4   could do those -- use those tools.
 5   Q.   And, historically, you've been hired to provide
 6   these orthomosaic maps in PDF form?
 7   A.   Yes.
 8   Q.   And in response to your attorney's question, you
 9   said, "I would like to provide client access to tools to
10   perform calculations on volume and distance."
11            Why would you like to do that?
12   A.   Because, I mean, from a business standpoint, it
13   would be a lot of work if they -- if I could get
14   construction sites to sign on monthly to a subscription to
15   have me do progression flights of their job sites and the
16   tool, as far as volumetrics, they could use that to measure
17   stockpiles, dirt, rock, make sure they've been delivered,
18   how -- what has been delivered.  I mean, on and on as far as
19   information.
20            I would like to be able to deliver that to a
21   client, clearing you guys saying it's okay.  In the future,
22   I would like to be able to do that and to deliver the link
23   and make them users on the drone profile where they could
24   use these tools.
25   Q.   What uses could be -- strike that.
```

183

```
 1            How would potential clients be able to utilize
 2   those tools?  Give me some examples.
 3   A.   Well, I just gave you one, for the volumetrics.
 4            Say there's a stockpile of two tons of crush --
 5   two tons of crush-and-run dirt that's supposed to be
 6   delivered on the north corner of this job site  I fly it on
 7   Friday.  The job manager checks Saturday.  There's no dirt
 8   there.  Or there's a half a pile and he checks it and says,
 9   "That's not two tons; it's supposed to be two tons."  That's
10   one.
11            Two, they could lay out a concrete pad for a
12   building and it could be 40 by 35 and they could go in and
13   measure and it could be 40 by 40 and they could say, you
14   know, "You guys built this 5 foot over measurement."
15            That's just a couple of examples.  You could go on
16   for days with things they could do with this.
17   Q.   Could they use it to actually design a concrete
18   pad, say, "Here's an area big enough and we could design a
19   40 by 30 concrete pad"?
20   A.   You'd have to get to the definition of the word
21   "design."  Could they plot out, like, "Hey, I want a cement
22   pad here" --
23   Q.   Right.
24   A.   -- and draw some kind of block to point to that
25   spot.
```

184

```
 1   Q.   Right.
 2   A.   Yes, they could do that.
 3   Q.   Using the tools?
 4   A.   As far as, like, planning to the point where, you
 5   know, the concrete workers could go out and, using
 6   DroneDeploy, they could tell all the dimensions and all
 7   that, I don't think you could do that.
 8   Q.   I'm just saying could they take the software --
 9   the tools and the orthomosaic map and plot out, yeah, I'd
10   like to put a building here, I'd like to put a concrete pad
11   here, and actually map it out?
12   A.   No.  They couldn't do that anymore than you could
13   with a regular photo if I slid this over and said, "Map out
14   a couple of garages on it for me."  That's the ability --
15   they would be able to do it digitally, you know, where you
16   could take a pencil and draw a square and say, "I want a
17   building here."  They could go in DroneDeploy with a mouse
18   and draw a square and say, "I want the building here."
19            But as far as, like, putting up any kind of
20   details, "Hey, this pad needs to be 4-foot thick, and this
21   here" -- you can't do that.
22   Q.   So the difference, though, using the software,
23   they can go in and plot points, and they would be able to
24   plot a point here and that would show you a concrete pad
25   would be this measurement, this size by plotting points on
```

Michael Jones
360 Virtual Drone, et al. v Ritter, et al
Michael Jones - 7/21/21
Michael Jones - 7/21/21
July 21, 2021
5:21-CV-0137-FL

185

1  the DroneDeploy tools?
2      A.  I'm uncomfortable with the definition you're using
3  "plotting," because it -- you couldn't do any more plotting
4  in the digital representation as you could if I said, "Plot
5  me something" with a pencil here.
6      Q.  Okay.
7          How about if I go in and say, "I want to measure
8  the distance between two points on the orthomosaic photo"?
9  With the PDF, they can't do that?
10     A.  With PDF, they couldn't.  If they had access to
11  DroneDeploy, they could.
12     Q.  And how would they do that?
13     A.  They would use what's called the measuring tool
14  inside that program.
15     Q.  Could they use the measuring tool to measure a
16  location for a concrete pad?
17     A.  You can measure anything on the map with the
18  measuring tool.
19     Q.  Could you measure it -- use that tool to measure a
20  location for a second building?
21     A.  To measure, did you say?
22     Q.  Yeah.  Measure it, like, the space to place a
23  second building.
24     A.  Yes.
25     Q.  Okay.

186

1      So there's all kinds of usages that could be
2  undertaken by the client in orderto -- or you or anyone who
3  has access, they could do all kinds of calculations on
4  volume and surface area --
5      A.  Yes.
6      Q.  -- and measured distances.
7      A.  Yes.
8      Q.  And you want the ability to do that?
9      A.  I would like to be able to provide the map for
10  them, you know, and then sell, you know, the map and the
11  access to the tools so -- in the future so they could use
12  the tools on the map that I created.
13     Q.  Okay.
14         So they could perform all kinds of calculations;
15  correct?
16     A.  Yes, sir.
17     Q.  All right.
18         It would allow you or the clients to perform
19  certain measurements on the site?
20     A.  You could measure distance with the tool, yes,
21  sir.
22     Q.  Size, shape, or physical features of the earth you
23  could measure?
24     A.  I'm not sure about shape as far as
25  three-dimensional stuff.

187

1      Q.  Location, size, or physical features of the
2  project -- meaning the dirt pile that you referenced,right,
3  you could perform those calculations?
4      A.  Yes.  With the tools in DroneDeploy, you could do
5  the volumetrics, the distance -- those are the few tools I
6  think they have.  Volumetrics, distance, and area I think
7  you can perform.
8      Q.  And you can perform conventional ground
9  measurements?
10     A.  Yes.
11     Q.  You could locate property lines, could you not?
12     A.  No.
13     Q.  You could not?
14     A.  Not in this map, no.
15     Q.  Okay.
16         Could you perform any type of elevation
17  calculations?
18     A.  Yes.
19     Q.  Could they take the data and modify it to --
20  essentially to create a -- chart a location where they might
21  want to put a concrete pad in and then actually take that
22  data, the tools, and generate yet another map showing where
23  that would be?
24         When I say "they," the client or yourself?
25     A.  It couldn't generate another orthomosaic map off

188

1  that map, if that's you're asking.
2      Q.  Okay.
3          Could they create a PDF of where -- of the
4  plotting of the points or the distances that were generated?
5      A.  If they had access to DroneDeploy tools, then they
6  could do the same as I could.  They could export the map in
7  a PDF or JPEG or TIFF form.
8      Q.  And that's something you would like them to be
9  able to do?
10     A.  I would like, yes.
11     Q.  And you want to be able to take photos and lay out
12  the property lines in the photos?
13     A.  I would like to, because real estate agents, you
14  know, they do it and have been doing it for years.  So when
15  they hire somebody, usually what they say to them is, you
16  know, "This is the house and we'd like the property lines
17  around it."
18         So at this point, I'm just telling them, you know,
19  I can't do that.  But they do it anyway after I give them
20  the pictures.
21     Q.  And you want to be able to have the ability --
22     A.  I would like to be able to do it for them.
23     Q.  Yeah, I know.  Right.
24         You want to be able to set up the boundary of the
25  property line on the photos that you take?

189

```
1      A.   Yes.
2           And just for visual purposes, you know.  If they
3  have a neighborhood with 60 houses in it and I fly over it
4  with the drone, they need some kind of representation of,
5  "Hey, I'm talking about this house."  So, you know, it may
6  be a square red -- a red square around that property.
7      Q.   Do you have an example of a 3D digital model that
8  you've created --
9      A.   No.
10     Q.   -- from DroneDeploy?
11     A.   No, sir.
12     Q.   Do you know what -- you testified in response to
13 your lawyer's question that it would -- that type of 3D
14 digital model would communicate information.
15     A.   Yes.
16     Q.   Do you know what type of information it would
17 communicate?
18     A.   Measurements, height.  You know, as far as, like,
19 being able to look at a structure from the side of it, you
20 can rotate around it so you can look at the face of
21 buildings.  I never got that much into 3D modeling.  I
22 thought it was a fantastic thing that technology could
23 provide, you know, the tools to do, but I just never found
24 any work for it.
25     Q.   Anything other than -- that you can think of --
```

190

```
1  does it communicate any other information other than
2  measurements and height?
3      A.   Visual representation, of course.  I mean, you can
4  turn the entire thing around, look at it from different
5  views inside the software -- you know, rotate it like a
6  model, flip it upside down.
7      Q.   And this is the kind of data that you want to be
8  able to produce and send to clients?
9      A.   I would like to, yes, sir.
10     Q.   Okay.
11          And would you -- would that 3D modeling that you
12 provide them, would that -- do you know what kind of a
13 format that's provided in?  You know, what kind of file?
14     A.   They're different, 3D -- in OBJ files, there's a
15 few different ones.  I'm not diverse enough into it to
16 know -- I know OBJ was one of the file extensions.  Any 3D
17 model-type extension, and then you have a 3D model viewer to
18 view those.
19     Q.   And so --
20     A.   I haven't got that far down the road yet to figure
21 out what I would deliver it as.
22     Q.   So your lawsuit seeks to have the ability to fly
23 your drone, collect the data, and create 3D digital models
24 in a file format that you would send to a client?
25     A.   Yes, sir.
```

191

```
1      Q.   And that would have measurements and -- height
2  measurements.  Would it have volume measurements?
3      A.   On 3D models?  I wouldn't be comfortable answering
4  because I don't know.  I never got -- I don't think they
5  have volumetrics in it but, to be honest, I don't know if
6  they do or not.
7      Q.   Do you have any background or training in
8  producing 3D models?
9      A.   No, other than what I -- you know, self-taught
10 online.  It's very hard work, very tedious stuff.
11     Q.   Well, sounds like it's just a matter of signing up
12 for a software program and pushing a button.
13     A.   Oh, no.  Not the 3D models.
14     Q.   Okay.
15          Tell me about that.  What program would you use to
16 generate 3D models?
17     A.   I would probably use Pix4D.  It's the standard
18 right now.  I mean, that's canon for doing that for people
19 who create 3D models.
20     Q.   Do you have training in it?
21     A.   No.
22     Q.   So how would you do it?
23     A.   I would learn like I did everything else.  I can
24 learn anything.
25     Q.   Sitting here today testifying, do you know what
```

192

```
1  type of information other than measurements and heightwould
2  be communicated in the 3D model?
3      A.   Just a visual representation.  You know, the
4  ability to navigate the model around and turn it and shift
5  it, move it.
6      Q.   Would you want to be able to -- would that be
7  linked to any type of software program?
8      A.   Well, the 3D models are createdthrough apps like
9  DroneDeploy or Pix4D.  So, I mean, as I said just a minute
10 ago, if I were to proceed in this, I would probably use
11 Pix4D to create the 3D models.
12     Q.   So if you sent me a file of a 3D model, would I
13 have the ability to use tools to do certain measurements?
14     A.   Inside of DroneDeploy, maybe; I'm not positive.
15 Again, I did not delve that much into the 3D model  I mean,
16 I did a little.  I could never find any clients that were
17 interested in it.
18          So I'm not positive of all of -- of all the tools
19 in DroneDeploy for the 3D models.  Because in that window
20 when you open up the dashboard, that's a different view, so
21 you click orthomosaic, then you switch to the 3D model, the
22 whole screen changes, and I don't think you have those tools
23 available.  But I would have to open the website up and look
24 now to give you an accurate answer.
25          And so the way it was phrased, you want to be able
```

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

193

1   to -- the goal of your lawsuit, what you're asking the Court
2   to do is give you the ability to create orthomosaic maps and
3   communicate that information to a client?
4       A.   Yes.
5       Q.   A paying client?
6       A.   Yes.
7       Q.   And you also want to be able to give the clients
8   the ability to access tools in whatever program you're using
9   to perform whatever calculations they would want to perform?
10      A.   Yes.
11      Q.   And then the second thing is you want to be able
12  to have the ability, through this lawsuit, to create images
13  of land on behalf of paying clients with lines drawn showing
14  boundaries --
15      A.   Yes, sir.
16      Q.   -- of the property?
17      A.   Yes, sir.
18      Q.   Showing the property lines of the property?
19      A.   Yes, sir.
20      Q.   Okay.
21      A.   And if I could just, like, highlight on that, what
22  I want to do on that is I want to be able to provide the
23  clients with some sort of representation to pinpoint what
24  they're marketing.
25           I mean, just -- in this picture of this house, if

194

1   she wants that, I want to be able to put a line around it
2   without the board saying, "Hey, you're drawing property
3   lines," because I'm not drawing property lines because the
4   line is this wide, it would be 25 feet wide in real life.
5   You understand what I'm saying?
6            So I'm just looking to have the right to be able
7   to give the client something visually, to show, "Hey, I'm
8   selling this house."  And right now, the board's saying,
9   "You can't draw lines on the paper because you're doing
10  property lines."
11           And it isn't so much I want to do property lines,
12  I just want to have the ability to put a mark around this
13  property and say, "This square is what we're selling."
14      Q.   Your lawsuit is asking the Court to allow you to
15  create images, digital images; right?
16      A.   Yes.
17      Q.   For paying clients; correct?
18      A.   Yes.
19      Q.   Drawing on those images lines indicating the
20  approximate position of property boundaries?
21      A.   Yes, sir.
22      Q.   Okay.
23           And how would you do that?  How would you
24  determine the approximate property boundary?
25      A.   I would look through GIS on that property in that

195

1   county.
2       Q.   Do you have any training in this?
3       A.   No formal training, but it's -- there's nothing to
4   use.  I mean, you just type in the address and go to it and
5   all of the information is given there.
6       Q.   Do you have any training in using GIS?
7       A.   No.
8       Q.   And then the third thing you're asking the Court
9   to do is allow you to capture aerial images of land and
10  structures along with location data, coordinates, elevation
11  data, and volume data and making those images available to
12  paying clients?
13      A.   Yes, sir.
14      Q.   And as we talked about earlier, you're talking
15  about -- you're still doing that today, you're taking
16  pictures and you're providing the images to the pictures
17  [sic]?
18      A.   Yes, sir.
19      Q.   You're concerned that if the image contains any
20  type of metadata, you don't want to get in trouble for that?
21      A.   Yes, sir.
22      Q.   Okay.
23           And then the fourth thing you have is the 3D
24  digital models.
25      A.   Yes.

196

1       Q.   Okay.
2            Anything else?
3       A.   That's it.
4       Q.   All right.
5            And you want to be able to not only give them the
6   files for those four, let me say items 1 and 4, which is the
7   orthomosaic maps and the 3D digital models, but you want to
8   be able to give them access to any tools so they can perform
9   whatever calculations --
10      A.   Yes.
11      Q.   -- they would want to do?
12      A.   That DroneDeploy would offer them, yes, sir.
13      Q.   All right.
14           MR. HANNA:  I don't have anything further.
15           MR. GEDGE:  I'm all set.
16           We will read and sign.
17           THE STENOGRAPHER:  If you would like to order
18  a transcript, a verbal recognition of that, and then when I
19  have it ready, I'll send it to you.
20           MR. GEDGE:  I would like to order a
21  transcript.
22           THE STENOGRAPHER:  Thank you very much.
23           (Deposition concluded, 3:38 p.m.)
24           (Signature reserved.)
25

Michael Jones
360 Virtual Drone, et al. v Ritter, et al

Michael Jones - 7/21/21

Michael Jones - 7/21/21

July 21, 2021
5:21-CV-0137-FL

197

198

WITNESS'S SIGNATURE PAGE

I have read the foregoing pages, which contain a correct transcription of answers made by me to the questions therein recorded, with the exception(s) and/or addition(s) reflected on the correction sheet attached hereto, if any.

Signed, this the _____ day of _____, 2021.

_____

* * * * * *

STATE OF: _____

COUNTY OF: _____

Subscribed and sworn to me this, the ___ day of _____, 2021.

_____

Notary Public

My Commission expires: _____
(seal)

E R R A T A   S H E E T

Case:                 360 Virtual Drone Services LLC/Michael Jones
                      v Ritter et al.

Deposition of:Michael Jones

Please read this deposition transcript with care, and if you find any corrections or changes you wish made, list them by page/line number below. Return the errata sheet to this office as soon as executed as the Rules only allow a limited time to make changes.

To assist you in making any corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach to this errata sheet.

| Page/Line | Reads | Change to | Reason |
|-----------|-------|-----------|--------|
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |
| _____ | | | |

7.21.21/vlp

STATE OF NORTH CAROLINA    )
                           )
COUNTY OF WAKE             )

CERTIFICATE

I, Victoria L. Pittman, BA, FAPR, RDR, CRI, CVR-CM-M, do hereby certify that the foregoing testimony was duly sworn to; that I reported in voice shorthand the foregoing pages of the above-styled cause, and that they were prepared by computer-assisted transcription under my personal supervision and constitute a true and accurate record of the proceedings;

I further certify that the Witness requests to review the transcript;

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

WITNESS my hand in the Town of Wake Forest, County of Wake, North Carolina.

_____
Victoria L. Pittman, Freelance Court Reporter
and Notary Public (No. 19972060078) in and for Wake
County, North Carolina and the State at large.
My Notarial commission expires: 7/31/22.