```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                    WESTERN DIVISION
              CIVIL ACTION NO. 5:21-cv-0137-FL
 3                                       )
     360 VIRTUAL DRONE SERVICES LLC      )
 4   et al.,                             )
                                         )
 5                                       )
         Plaintiffs,                     )
 6                                       )
     V.                                  )
 7                                       )
                                         )
 8   ANDREW L. RITTER, in his            )
     official capacity as Executive      )
 9   Director of the North Carolina      )
     Board of Examiners for              )
10   Engineers and Surveyors,            )
     et al.,                             )
11                                       )
                                         )
12       Defendants.                     )
13
14
15
16
17       REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION
18                          of
19                  ANDREW L. RITTER
20               (Taken by Plaintiffs)
21          Thursday, January 20th, 2022
22                    1:52 p.m.
23
24
25       Reported by: Leslie Christian Lentkowski
```

EXHIBIT 5

1   APPEARANCES:

2   On Behalf of the Plaintiffs:

3      Samuel B. Gedge, Esquire (via videoconference)

        James T. Knight II, Esquire (via videoconference)

4      Institute for Justice

        901 North Glebe Road

5      Suite 900

        Arlington, Virginia 22203

6      703-682-9320

        sgedge@ij.org

7

   On Behalf of the Defendants:

8

      Douglas W. Hanna, Esquire (via videoconference)

9      Graebe Hanna & Sullivan, PLLC

        4350 Lassiter at North Hills Avenue

10     Suite 375

        Raleigh, North Carolina 27609

11     919-863-9091

        dhanna@ghslawfirm.com

12

   Also Present:

13

      John M. Logsdon, PLS

14     North Carolina Board of Examiners for Engineers and

   Surveyors

15

16

17

18

19

20

21

22

23

24

25

1                    E X A M I N A T I O N S

2     Witness                                          Page

3     Andrew L. Ritter

4         By Mr. Gedge                                      4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2     Whereupon,

3                ANDREW L. RITTER, having been previously

4     sworn by declaration under penalty of perjury,

5     testified as follows:

6                          EXAMINATION

7     BY MR. GEDGE:

8          Q.   Mr. Ritter, we will turn over to the entity

9     deposition.  And so do you understand that you're also

10    here today to testify not just about your personal

11    knowledge but also as a representative of the Board of

12    Examiners for Engineers and Surveyors?

13         A.   Yes.

14         Q.   Okay.  I will introduce the notice of

15    30(b)(6) deposition.  All right.  I just posted

16    Exhibit 38, and it's under the folder that says "Andrew

17    Ritter," not deposition of board of engineers.  Let me

18    know if you have any trouble finding it.

19         A.   38?

20         Q.   Yes.

21         A.   I got it.

22         Q.   Have you seen this document before?

23         A.   Yes.

24         Q.   Okay.  This is the notice of 30(b)(6)

25    deposition to the board, right?

1      A.   Yes.

2      Q.   Do you understand that you have been

3  designated as the representative of the board to

4  testify on the board's behalf as to Topics 1, 2, 3, 4,

5  5, 6, 7, 8, 9, 10, 12, 13, and 14?

6      A.   Yes.

7      Q.   And are you prepared to testify as the

8  board's representative on those topics?

9      A.   Yes.

10     Q.   Can you tell me briefly what steps you've

11  taken to prepare to testify on the board's behalf

12  today?

13            MR. HANNA:  Object to the question if

14  it at all covers any discussions he may have had with

15  his attorney.

16  BY MR. GEDGE:

17     Q.   And to the extent you can answer that

18  without telling me about your conversations with

19  Mr. Hanna.

20     A.   Okay.  I've -- the preparation I did was

21  read the materials that are in front of me.

22     Q.   And by that, do you mean the notice of

23  deposition itself?

24     A.   If that's what this is, yes.

25     Q.   Right.  Exhibit 38?

1     A.   Yes.

2     Q.   Okay.  Did you review any other materials

3 in preparation to testify as the board's designee?

4     A.   I'm not sure what you mean, but I read the

5 360 drone report.  That may be the extent of it.  I

6 read some of the materials that have been sent to me.

7 I mean, there's been so much sent, so I've read

8 materials that have been sent to me.

9     Q.   Okay.  And when you said "the 360 drone

10 report," was that Mr. Schall's expert report?

11    A.   No.  But I did read Schall's expert report.

12    Q.   Okay.  Sorry.  When you referred to the 360

13 drone report, was that the investigative report or --

14    A.   Yes, our investigative report.

15    Q.   Gotcha.  Okay.  How long did you take to

16 prepare for the entity part of the deposition?

17             MR. HANNA:  Objection to form.

18 BY MR. GEDGE:

19    Q.   I'll do it again.  How much time did you

20 spend preparing for this part of the deposition that we

21 just started?

22             MR. HANNA:  Object to form.

23 BY MR. GEDGE:

24    Q.   You can answer it if you understand what I

25 said.

1        A.   I can't guess.  I don't know how much time.

2        Q.   Did you spend more than five minutes

3   preparing for this deposition?

4        A.   I did.  I spent more than five minutes.

5   It's not hours.

6        Q.   Okay.  Somewhere between five minutes and

7   an hour.  Is that fair?

8        A.   That's fair.

9        Q.   Okay.  As we discussed earlier, you're the

10  executive director of the board, right?

11       A.   Yes.

12       Q.   And you've worked for the board as

13  executive director since 2001?

14       A.   Correct.

15       Q.   Okay.  And in other capacities since 1993?

16       A.   Correct.

17       Q.   I'm going to post Exhibit 39.  Do you have

18  that in front of you?

19       A.   Yes.

20       Q.   Okay.  Have you seen Exhibit 39 before?

21       A.   Yes.

22       Q.   Okay.  Can you tell me what it is?

23       A.   Can I tell you what it is?  Can I just read

24  the title?  "Defendant's responses to plaintiff's first

25  set of interrogatories."

1    Q.   And I understand that you signed a document

2  attesting to the truth of these responses; is that

3  right?

4    A.   Yes.

5    Q.   I'll just post that as well.

6         I posted Exhibit 40, which I think is your

7  verification.  If you want to take a look and confirm,

8  I would appreciate it.

9    A.   Yes.  I'm confirming it's a verification.

10   Q.   Turning to Exhibit 39, the interrogatory

11 responses, I would like us to scroll down to

12 Interrogatory 10.  Just a second.  On Page 13, you'll

13 see Interrogatory 10.

14   A.   Page 13, you said?

15   Q.   Yes.

16   A.   Okay.

17   Q.   Let's read it for the transcript.  So

18 Interrogatory 10 asks the defendant to state each

19 governmental interest that you contend is advanced by

20 preventing plaintiffs from creating, processing, and

21 disseminating data about land and structures (including

22 data about distances, coordinates, elevations, and

23 volumes), right?

24   A.   Yes.

25   Q.   So you're welcome to read the response --

1  kind of the boldface response to that.  It's about

2  three or four pages long.  I'll tell you the part I'm

3  interested in is just toward the very bottom of that

4  first page.  I'm happy for you to read as much of it as

5  you want, and once you've done that, let me know and we

6  can talk about it.

7         A.    You're referring to the bottom of Page 13?

8         Q.    Yeah.

9         A.    I'm ready for your question.

10        Q.    Okay.  Great.  So there's a fair amount of

11 lead-up in here, but the final full sentence on Page 13

12 says, "The purpose of the Act is to 'safeguard life,

13 health, and property, and to promote public welfare.'"

14 Do you see that?

15        A.    Yes.

16        Q.    Am I correct that those are the

17 governmental interests that the defendant contends the

18 act exists to further?

19               MR. HANNA:  Object to form.

20               THE WITNESS:  Yeah.  I kind of lost

21 you on the question.

22 BY MR. GEDGE:

23        Q.    Okay.  So the interrogatory asks the

24 defendant to state governmental interests, right, that

25 are advanced by regulating certain kinds of information

1  under the licensure statute, right?

2           A.    Yes.

3           Q.    And my question for you is if we look at

4  this sentence, it says, "The purpose of the Act is to

5  'safeguard life, health, and property, and to promote

6  the public welfare.'"  My question for you is is

7  safeguarding life, health, and property and promoting

8  the public welfare, are those the governmental

9  interests that are furthered by the act -- by this act?

10          A.    Yes.

11          Q.    Okay.  Can you identify any other interests

12  that the act serves?

13          A.    Yes.

14          Q.    Okay.  What interests?

15          A.    What 89-C does is it -- we have a sentence

16  that reads -- and, again, I'm paraphrasing.  I don't

17  have it in front of me.  Gross negligence,

18  incompetence, and misconduct -- we're telling the

19  public that we may -- we're hiring a licensed surveyor,

20  there's a bar, and the licensed work is going to be

21  above that bar.  It's going to be above incompetence,

22  gross negligence, and misconduct.  And if it's not

23  above the bar, then the board can hold the licensee

24  responsible for his actions.

25               We're also establishing a minimum level of

1    competence via the three E's -- the education, exam,

2    and experience.  When somebody gets licensed, what

3    we're telling the citizens of North Carolina is they

4    have met a minimum level of competence, and the work

5    they're going to receive from that licensee meets that

6    minimum level of competence.  If it doesn't, again,

7    then the board by statute has the ability to remedy the

8    situation.

9         Q.   All of that makes sense to me.  It honestly

10   sounds kind of like that all falls under the broader

11   umbrella of safeguarding life, health, and property and

12   promoting the public welfare.  Is that fair to say?

13        A.   I wouldn't disagree with that.  Yes, I

14   would agree with that.

15        Q.   Beyond what you just described, are there

16   any other governmental interests that are served by the

17   statute?

18        A.   Not that I can think of.

19        Q.   I talked with Mr. Schall about this a

20   little bit yesterday, and I did touch on the board's

21   view too.  I understand the board's position to be that

22   providing a client with a 3D digital model or a

23   measurable orthomosaic map -- providing a client with

24   that kind of information counts as surveying, right?

25        A.   Yes.  As you described it, I think it meets

1    the statutory definition of surveying.

2           Q.   My question is would it be surveying for a

3    non-licensee to create a measurable orthomosaic map of

4    their own property for their own personal use?  Does

5    that also fall within the definition of surveying?

6           A.   Oh, boy.  I don't know.  There's -- there

7    is a line of what you can do for yourself that's okay,

8    and you cross it at a certain point where it becomes

9    available for public consumption.  So as you described

10   the question, if I did an orthomosaic map for my

11   property and it wasn't available for public

12   consumption, I don't think that's surveying in

13   North Carolina.  If it becomes available for public

14   consumption, I believe that would cross the line.

15          Q.   Okay.  What do you mean by "public

16   consumption"?  Selling it to somebody else or something

17   else?

18          A.   If you survey your boundary and you record

19   that down at the Register of Deeds Office, your

20   boundary is also somebody else's boundary.  So even

21   though you're surveying your property, if it's out

22   there for public consumption, your boundaries are also

23   somebody else's boundaries.

24          Q.   That makes perfect sense.  I mean, I assume

25   that -- well, maybe you can tell me.  If a non-licensee

1  just walks down to the local Register of Deeds with,

2  like, a crayon drawing map of their backyard and tries

3  to register it as a survey, I assume that the Register

4  of Deeds isn't going to accept that, right?

5        A.    No, that's not correct.  The Register of

6  Deeds would accept it.

7        Q.    Good.  So maybe you can explain that.  How

8  does that work?

9        A.    So the Register of Deeds is not my

10  bailiwick, so to speak.  What I understand about the

11  Register of Deeds Office is their job is not to check

12  that crayon drawing.  Their job is to record that

13  drawing.

14        Q.    Is it your understanding that they check to

15  see whether a plat or a survey has been stamped by a

16  surveyor?

17        A.    I do not know.  And, again, we don't -- the

18  Register of Deeds is considered the Secretary of

19  State's Office in North Carolina, and what a Register

20  of Deed does and does not do, I do not know.

21        Q.    That's fair.

22        A.    I did not know if that's a requirement.  I

23  do not know if a map that's attached to a deed has to

24  be -- I don't know if the Register of Deeds requires

25  that to be signed and sealed.

1     Q.   From the board's perspective, the board

2 would say that that has to be signed and sealed?

3     A.   We would say that map has to be signed and

4 sealed.

5     Q.   Okay.  I think I understand kind of the

6 line we're drawing there between, you know, your

7 personal map down to the courthouse.

8          But am I right that -- I think we're on the

9 same page.  If you're not presenting your orthomosaic

10 map to the world for public consumption in one way or

11 another if you made an orthomosaic map of your own

12 property for your own use on your own land, am I right

13 that that does not fall within the definition of

14 surveying?

15     A.   Following your scenario, that would be

16 correct.

17     Q.   Okay.  I think Mr. Schall had the opposite

18 view yesterday -- maybe not the opposite.  As I

19 understood, he was saying he thought that technically

20 it would qualify, but then he didn't think anyone at

21 the board would care enough to do anything about it.

22          As I understand it, your view seems a

23 little bit different in that you just don't think it

24 qualifies in the first place.  Am I understanding that

25 correctly?

1       A.   Well, that goes back to my original --

2                  MR. HANNA:  Let me interject and just

3    say that I object to the form and the summary of

4    Mr. Schall's testimony.  To the extent that you heard

5    that testimony, you can answer.

6                  THE WITNESS:  Well, it goes back to my

7    original issue.  There's a line there, and I would need

8    some really -- some micro-specifics to tell you where

9    the line is.  We get scenarios here where somebody is

10   building a place of assembly on their own property, and

11   if you bring the public in to that place of assembly,

12   all of a sudden does that take it away from the owner's

13   right to not have to do things according to the law

14   because it's their own property?  So there is a line

15   there.  I do not know where Mr. Schall was drawing the

16   line.  Like I said, I'm going to stick with my answer

17   before.  Sometimes it's okay, but sometimes you cross

18   the line.  I need some micro-specifics.

19   BY MR. GEDGE:

20       Q.   And what kind of specifics would be helpful

21   to you in making that analysis?

22       A.   If you drew an orthomosaic map and nobody

23   knew about it, how would I know about it?  If you drew

24   an orthomosaic map for yourself and I knew about it,

25   how did I know about it?  Those are the micro-specifics

1　this board would look at.  If it ended up in the

2　board's hands, the question is how did it end up in the

3　board's hands?  And usually that means it wasn't just

4　for the owner's use.  Somehow it ended up in the public

5　domain.  If it ended up in the public domain, we would

6　would to take a look at what its use and intent was

7　for.

8　　　　Q.　Okay.  This will probably sound a bit

9　familiar from yesterday, but does the board have

10　evidence that it's more common here in Virginia than in

11　North Carolina for members of the public to be harmed

12　by inaccurate orthomosaic maps?

13　　　　A.　Yeah.  I no information on what happens in

14　Virginia.

15　　　　Q.　Okay.  And, again, you're testifying as the

16　board's representative, right?

17　　　　A.　Correct.

18　　　　Q.　Okay.  Similar question.  Does the board

19　have any evidence that inaccurate orthomosaic maps

20　cause more instances of harm in Virginia than they do

21　in North Carolina?

22　　　　A.　My answer is going to be the same.  I have

23　no information on Virginia.

24　　　　Q.　Okay.  And, likewise, I assume the board

25　does not have any evidence that inaccurate orthomosaic

1  maps cause more severe harm in Virginia than in

2  North Carolina?

3       A.   I have no information on what transpires in

4  Virginia.

5       Q.   Similar question for the 3D digital models

6  -- does the board have any evidence that it's more

7  common in Virginia than in North Carolina for members

8  of the public to be harmed by inaccurate 3D digital

9  models?

10       A.   I have no information on what goes on in

11  Virginia.

12       Q.   Okay.  Does the board have any evidence

13  that inaccurate 3D digital models cause more instances

14  of harm in Virginia than they do in North Carolina?

15       A.   I have no information on what goes on in

16  Virginia.

17       Q.   Thank you for indulging me.  This will not

18  go on forever.  Just a few more.

19            Does the board have any evidence that

20  inaccurate 3D digital models cause more severe harm in

21  Virginia than they do in North Carolina?

22       A.   I have no information on what goes on in

23  Virginia.

24       Q.   Moving to Kentucky, is your answer the

25  same?

1    A.    Yes, sir.

2    Q.    Okay.  Mississippi?

3    A.    Yes.

4    Q.    All of the states in the union?

5    A.    Yes.  My answer would be my only

6    information will be for what happens in North Carolina,

7    and I have no information on what goes on outside of

8    our borders.

9    Q.    Does the board -- as I understand it, the

10   board does not have any evidence comparing how common

11   it is for members of the public to be harmed by

12   inaccurate orthomosaic maps in North Carolina versus

13   any other state in the nation?

14   A.    That's correct.

15   Q.    And the board does not have any evidence

16   comparing how common it is for members of the public to

17   be harmed by unlicensed orthomosaic maps in

18   North Carolina versus any other state in the nation?

19   A.    That's correct.

20             MR. HANNA:  Object to the form.

21   BY MR. GEDGE:

22   Q.    And by "unlicensed orthomosaic maps," I

23   mean they are maps that are created by someone who is

24   not a licensed surveyor.

25             MR. HANNA:  Object to form.

1          THE WITNESS:  I didn't quite
2    understand that one.
3    BY MR. GEDGE:
4          Q.   Oh, sure.  I was just clarifying.
5               I think my question referred to unlicensed
6    orthomosaic maps, and what I meant by that term is a
7    map that's created by somebody who's not a licensed
8    surveyor.  Does that make sense?
9          A.   Maybe you can say the whole question again.
10         Q.   Sure.  Does the board have any evidence
11   comparing how common it is for members of the public to
12   be harmed by unlicensed orthomosaic maps in
13   North Carolina versus any other state?
14              MR. HANNA:  Object to form.
15              THE WITNESS:  No.
16   BY MR. GEDGE:
17         Q.   Does the board have any evidence comparing
18   how common it is for members of the public to be harmed
19   by inaccurate 3D digital models in North Carolina
20   versus any other state?
21              MR. HANNA:  Object to form.
22              THE WITNESS:  No.
23   BY MR. GEDGE:
24         Q.   Does the board have any evidence comparing
25   the -- how common it is for members of the public to be

1  harmed by inaccurate volumetric calculations in

2  North Carolina versus any other states?

3       A.   No.

4                 MR. HANNA:  Same objection to form.

5  BY MR. GEDGE:

6       Q.   Are you familiar at all with how other

7  states define surveying?

8       A.   Not so much.  Some.  Some.  Not so much.  I

9  heard Mr. Schall -- I know a little bit about

10 South Carolina, but that's about it.

11      Q.   I think Mr. Schall testified yesterday that

12 -- and I think he said in the past few years something

13 around 33 states license photogrammetry.  Did you

14 remember him testifying to that?

15      A.   Yes.

16      Q.   Do you have any reason to think he's wrong

17 about that?

18      A.   No.

19      Q.   I think he said that 17 states -- I think

20 within the past few years, 17 states did not license

21 photogrammetry, right?

22      A.   Yes.  I heard him say that.  I don't have

23 information whether that's accurate or not.  I have no

24 reason to doubt it.

25      Q.   It's my understanding that some states

1  create an exemption from licensure for employees when

2  they're simply performing surveying on their employer's

3  property.  I don't think North Carolina has that

4  exemption, but am I wrong on that?  Does North Carolina

5  have an exemption that resembles that?

6          A.   Yes, we do.  Now -- go ahead.  I'm sorry.

7          Q.   Explain that.

8          A.   Well, the answer is yes, and then the

9  second part is maybe.  The previous question, if you're

10  working for your employer and the work product is for

11  your employer, you don't need to be licensed except if

12  that product is going to be used for public

13  consumption.

14          Q.   I'm sorry.  It's probably my fault, but can

15  you repeat that?

16          A.   So we have what's called the industrial

17  exemption in North Carolina, which says if you're

18  performing this service for your employer, not for the

19  public, you don't need to be licensed.  However, if

20  your work product is to be out in the public for public

21  consumption, then the industrial exemption does not

22  apply.

23              So an example of that is more common in the

24  engineering world where you'll do the engineering for

25  your company, but you can't call that person on the

1    phone and ask him for engineering services.  You see

2    that more on the engineering side.  You don't see it

3    much on the surveying side because there's not much

4    surveying that's not going to be out in the public.  So

5    if you're working for Duke Energy and you're surveying

6    the easement lines, those easements are going to be in

7    the public and the industrial exemption doesn't apply,

8    and that work of surveying has to be signed and sealed.

9         Q.   Okay.  I see.

10                   MR. HANNA:  Just for my clarification,

11   Sam, what topic are you under right now from the

12   30(b)(6)?

13                   MR. GEDGE:  Let me pull it up.  It's,

14   I think, 6 -- between 6 and 9.  All of them with the

15   notes.

16                   MR. HANNA:  6, 7, 8, and 9 seem to be

17   about the basis for each governmental interest that the

18   board contends is advanced by North Carolina's

19   surveying licensing law, but I thought -- you seem to

20   be getting into the industrial exemption or what's in

21   the -- I'm not sure it relates to governmental

22   interests, but go ahead.  I didn't -- this is not a

23   topic that we covered prior to coming here, so go

24   ahead.  You can go a little bit.  I just -- this is

25   getting a little far field.

1            MR. GEDGE:  That's fine.

2   BY MR. GEDGE:

3        Q.   Mr. Ritter, we're talking about the

4   industrial exemption.  Give your best answer.  It seems

5   like you're familiar with it.  I lost track a little

6   bit, but just to make sure I understand how the

7   industrial exemption works, let's say you have a

8   company that owns a piece of land and they're planning

9   to build a private facility for themselves on that

10  piece of land, and as part of that, they construct it

11  themselves.  They are digging a hole, and one of their

12  employees does some volumetric calculations as part of

13  helping his employer build this facility.  Is that --

14  would that be the kind of scenario that would fall

15  within the industrial exemption, or am I not --

16       A.   To my knowledge, that --

17            MR. HANNA:  I want to object again to

18  that question.  I'm not sure that's covered by the

19  notice of deposition, but you can answer.  Go ahead.

20            THE WITNESS:  To my knowledge, that

21  would be an activity that would not require a license.

22  If you're establishing the volume of that hole for your

23  employer on his property, it's my belief that that

24  doesn't need a license and that comes under the

25  industrial exemption.

1  BY MR. GEDGE:

2      Q.   Okay.  But if the employer instead were to

3  hire 360 Virtual Drone Services to do those same

4  volumetric calculations, am I understanding correctly

5  that that would not fall within the industrial

6  exemption?

7      A.   That is correct.

8      Q.   As though the person actually performing

9  the calculations doesn't have a surveyor license?

10     A.   Well, we would require 360 Drone to have a

11  surveyor license to do it.

12     Q.   Exactly.  But just to clarify, in each of

13  those scenarios if the employee is performing those

14  volumetric calculations without a surveyor license,

15  that's okay because he falls within the industrial

16  exemption, right?

17     A.   Yes.  That's in the statute as an

18  exemption.

19     Q.   Okay.  And am I correct that if 360 Virtual

20  Drone performs those same volumetric calculations for

21  the employer, they would be in violation because they

22  are not an employee of the property owner?

23     A.   Correct.  They would not come under the

24  industrial exemption clause.  Therefore, they would

25  need a license to do that.

1      Q.   Okay.  Thank you.  I think we're getting
2  pretty close, Mr. Ritter.  Why don't we take another
3  five minutes and I can see how much more we have, and
4  we can hopefully wrap it up.  Sound good?
5                      MR. HANNA:  Sounds good.
6                      (A break was taken.)
7  BY MR. GEDGE:
8      Q.   Mr. Ritter, I posted Exhibit 31 in your
9  folder.  It's Mr. Schall's expert report.  As I
10  understand it, you have looked at that before; is that
11  right?
12     A.   Yes.
13     Q.   Just scroll down to pages -- well, Page 15.
14  We can start out -- I'll give you a chance to get
15  there.
16     A.   Okay.
17     Q.   On Page 15, there's a section of the report
18  that's entitled "Specific Issues Raised in the
19  Complaint."  Have you had a chance to read this section
20  specifically?
21     A.   Yes.
22     Q.   Okay.  In this section, Mr. Schall offers
23  opinions on what kinds of services or products do and
24  do not qualify as surveying under the North Carolina
25  statute.  Is that a fair characterization?

1      A.   Yes.

2      Q.   Okay.  Does the board disagree with any

3   part of Mr. Schall's opinion in this section?

4      A.   I don't think so.

5      Q.   I guess just for clarity, by "this

6   section," I mean the section starting with "Specific

7   Issues Raised in the Complaint" and going through to

8   the end of the report on Page 16.

9      A.   Okay.  I was on Letter A.

10     Q.   Well, we can go chunk by chunk.  It sounds

11  like you looked over Letter a.  The board doesn't

12  disagree with Ms. Schall's opinion there?

13     A.   Correct.

14     Q.   Okay.  You can march on to Letter B, and

15  once you've had a chance to look at that, I will have

16  the same question.

17     A.   So under Letter B, I think his opinion is

18  correct as well.

19     Q.   Okay.  And Letter C?

20     A.   His opinion is correct as well.

21     Q.   Okay.  And same for D?

22     A.   Yes, sir.

23     Q.   Okay.  Does providing orthomosaic maps to a

24  client for free as opposed to for compensation also

25  fall within the definition of surveying in the board's

1  view?

2        A.    89-C is silent on cost.  Whether it's free

3  or you charge, it doesn't change what the product is.

4        Q.    Okay.  So the analysis is the same

5  regardless of whether money changed hands?

6        A.    That's correct.

7        Q.    When we were discussing your testimony in

8  your personal capacity, we talked about disclaimers a

9  little bit.  Do you remember that?

10        A.    Yes, sir.

11        Q.    So now that you're sitting here as the

12  board or on the board's behalf, is it fair to say that

13  you are not aware of any instance where the board has

14  informed a non-licensee that they can provide

15  orthomosaic maps to a client as long as they include

16  some kind of disclaimer language on their map?

17              MR. HANNA:  Just for the record, when

18  you say "orthomosaic maps," have we defined that?

19              MR. GEDGE:  I'm happy to.  So for

20  purposes of these questions, when I'm saying

21  "orthomosaic maps" --

22              MR. HANNA:  And the reason why I asked

23  that is because initially Mr. Jones testified that he

24  provided orthomosaic maps, but then he testified that

25  he essentially turned it into a PDF and provided it in

1    that form.  And so I just think that it's important

2    when these kinds of questions are being asked or

3    hypotheticals are being given that the precise product

4    or data that is being discussed is properly identified.

5    BY MR. GEDGE:

6         Q.   So, Mr. Ritter, for purposes of these

7    questions, I'll use "orthomosaic map" in the shorthand,

8    but what I mean is an orthomosaic map that's qualified

9    as surveying.  So whether that's an orthomosaic map

10   that has coordinate metadata in it or geo-referencing

11   information, it is a map that on its own, you, the

12   board, would say is surveying.  Does that make sense?

13        A.   Yes, sir.

14        Q.   Okay.  So I guess circling back to my

15   question, that is -- as the board's designee, can you

16   point to any instance where the board has informed a

17   non-licensee that they can give an orthomosaic map to a

18   client as long as they include some kind of disclaimer

19   language on that map?

20        A.   I don't recall that happening.

21        Q.   Okay.  I have a similar question for 3D

22   digital models.  As the board's designee, can you point

23   me to any instance where the board has informed a

24   non-licensee that they can provide 3D digital models to

25   a client as long as they include certain disclaimer

1  language with that?

2      A.   Not that I recall.

3      Q.   Just to close the loop on that line of

4  questioning about other states, the board does not have

5  any information about harms caused by unlicensed

6  surveying in other states; is that right?

7              MR. HANNA:  Object to form.

8              THE WITNESS:  No.

9  BY MR. GEDGE:

10     Q.   Okay.  It might have been that I asked a

11 bad question, but I still think that -- I'll ask

12 another question.

13             Does the board have any information about

14 harms caused by unlicensed surveying in other states?

15             MR. HANNA:  Object to form.

16             THE WITNESS:  I don't think I

17 understand the question.  If I could ask you a question

18 if that's okay -- what do you mean by information

19 presented at the board?

20 BY MR. GEDGE:

21     Q.   Not by the board, but is the board in

22 possession of any evidence about the number of

23 instances of photogrammetry malpractice in different

24 states?

25     A.   No.

1        Q.    Okay.  Give me one minute.

2              That's all I have for now, Mr. Ritter.

3    I'll let Mr. Hanna ask any questions if he would like.

4                    MR. HANNA:  I have no questions.

5                    MR. GEDGE:  Thank you, Mr. Ritter.  I

6    appreciate it.

7                    (Proceedings concluded at 2:41 p.m.)

8                    (Signature reserved.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   CERTIFICATE OF REPORTER
2   STATE OF NORTH CAROLINA  )
3   COUNTY OF WAKE           )
4
5            I, Leslie Christian Lentkowski, the officer
6   before whom the foregoing remote videoconference
7   30(b)(6) deposition was taken, do hereby certify that
8   the witness whose testimony appears in the foregoing
9   remote videoconference 30(b)(6) deposition was taken by
10  me to the best of my ability and thereafter reduced to
11  typewriting under my direction; that I am neither
12  counsel for, related to, nor employed by any of the
13  parties to the action in which this remote
14  videoconference 30(b)(6) deposition was taken, and
15  further that I am not a relative or employee of any
16  attorney or counsel employed by the parties thereto,
17  nor financially or otherwise interested in the outcome
18  of the action.
19           4th day of February, 2022.
20
21                         Leslie Christian Lentkowski
22
                           _____
23                         LESLIE CHRISTIAN LENTKOWSKI
                           Notary Public in and for
24                         County of Wake
                           State of North Carolina
25                         Notary Public No. 201221300088
```