IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

| | |
|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES,<br><br>  Plaintiffs,<br><br>v.<br><br>ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors,<br><br>  Defendants. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Defendants, through counsel, respectfully submit this Opposition to Plaintiffs'

Motion for Summary Judgment.

## NATURE OF THE CASE

Plaintiffs' summary judgment frames the dispute as follows: Plaintiffs "seek a

judgment that secures their right to create and sell aerial maps, 3D models, and real-

estate photographs with lines approximating property boundaries." [Doc. 36 at p. 16

of 31]. However, Plaintiffs lack standing and this case must be dismissed for lack of

subject matter jurisdiction.

1

1.     As to the real-estate photographs, Plaintiffs' brief acknowledges that the case no longer presents a controversy.  [Doc. 36 at p. 28 of 31].

2.     As to 3D models, Plaintiffs never provided such a service or offered to provide such a service.  [SOF ¶ 29].  Plaintiffs do not argue otherwise.  There is no case or controversy regarding 3D models.

3.     Finally, as to aerial maps, Plaintiffs never provided this service to a client.  [SOF ¶¶ 22-23].  All Plaintiffs can argue is that they offered to provide this service but were unable to get this business off the ground.  [Doc. 36 at p. 5 of 31].  Notwithstanding the fact that Plaintiff Virtual Drone advertised that it performed "Surveying and Mapping" services, no such services were ever provided to a client.  Plaintiffs never provided "measurable maps" or othromosaic maps to a client. [SOF ¶¶ 22-23].  Plaintiffs must identify an actual problem or controversy that needs judicial intervention.  Plaintiffs cannot do so.  There is no actual case or controversy before this Court.

Plaintiffs challenge the regulation of land surveying in North Carolina and the state legislature's authority to pass laws governing the practice of land surveying within the state's boundaries.  Plaintiffs do so while arguing that "[t]his is a case about information."  [Doc. 36 at p. 5 of 31].  What this case is not about is speech.

Plaintiffs argue that they only want to "disseminate information" in the sale of commercial maps.  [Doc. 36 at p. 6 of 31 ("Jones can't sell his maps (or 3D models, a related product he'd like to develop) because of the information they communicate.").  The issue is whether the sale of measurable maps constitutes the practice of land

surveying. North Carolina law defines the practice of land surveying to include "mapping, assembling, and interpreting reliable scientific measures and information relative to the location, size, shape, or physical features of the earth . . . by aerial photography, by global positioning via satellites, or by a combination of any of these methods, and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description or project." *See* N.C.G.S. § 89C-3(7)(a). Moreover, the practice of land surveying includes "[d]etermining the configuration or contour of the earth's surface or the position of fixed objects on the earth's surface by measuring lines and angles and applying the principles of mathematics or photogrammetry." *See* N.C.G.S. § 89C-3(7)(a)(5). Plaintiffs want to create and sell orthomosaic maps (measurable maps that allow users to measure distances, elevations and area). [Doc. 36 at p. 5 of 36]. Plaintiffs acknowledge that the aerial mapping "would convey certain information – location data about distances, coordinates, volumes, elevations." [Doc. 36 at p. 18 of 31]. The commercial products Plaintiffs seek to offer to consumers falls under the definition of land surveying. *See* N.C.G.S. § 89C-3(7)(a).

## ARGUMENT

## I. THE STATUTORY FRAMEWORK FOR LICENSING PROFESSIONAL LAND SURVEYORS IS NOT SUBJECT TO STRICT SCRUTINY

### A. The Act regulates conduct not protected speech

North Carolina regulates the profession of land surveying through its Engineering and Land Surveying Act (the "Act"). [SOF ¶ 1]. "The Act prohibits any

3

person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board." [SOF ¶ 1].

Plaintiffs assert a single cause of action under the First Amendment's Speech Clause "to create useful information (aerial images and related data) and disseminate that information to willing customers."[1] In so doing, Plaintiffs challenge the licensing framework for the profession of land surveyors as it relates to the Plaintiffs' attempt to offer aerial surveying. The specific issue involves Plaintiffs' attempt to offer "information" to clients through the sale of aerial maps (measurable maps). Plaintiffs advance a two-step strategy in order to trigger a heightened standard of review known as strict scrutiny. First, Plaintiffs seek to transform the sale of "information" into protected speech. Plaintiffs argue that the Act burdens protected speech. [Doc. 36 at p. 18 of 31]. This is not so. Second, Plaintiffs then label the Act as content-based to trigger a strict scrutiny review of the professional licensing laws in North Carolina. Plaintiffs' legal strategy has no merit.

Plaintiffs bear the burden of establishing that the Act burdens speech, not conduct. *Cornelius v. NAACP Legal Def. & Educ.* Fund, 473 U.S. 788, 797 (1985). Plaintiffs must establish that the action of using pre-programmed software to create a measurable map is protected speech. This, of course, is quite a challenge because the cases cited by Plaintiffs are not factually analogous. In this case, there is no speaker in the traditional sense. The case involves the sale of a computer-generated aerial map. Indeed, it is undisputed that this case does not involve speech in a public

---

[1] ECF Doc. 1, Complaint (Introduction).

forum, such as a sidewalk or public right-of-way. In an attempt to meet their burden, Plaintiffs are left to argue that the "information" embedded in the proposed sale of a commercial map is somehow <u>protected speech</u> subject to heightened First Amendment scrutiny.

Plaintiffs rely upon *Sorrell* – a case challenging Vermont's Prescription Confidentiality Law – to advance their "protected speech" argument involving the creation and sale of measurable maps. *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). The facts in *Sorrell* are not analogous to the facts in this case. The *Sorrell* case involved restrictions targeting unwanted marketing – "speech with a particular content." *Id.* at 564. The alleged controversy in this case has nothing to do with traditional speech, marketing, or the expression of a particular opinion in a public forum. It is nothing more than data in a map[2] that constitutes the practice of land surveying. More importantly, the *Sorrell* case did not involve licensing or the regulation of a profession.

In *Sorrell*, the state of Vermont enacted a law to limit the use of consumers' medical information for marketing purposes. The government argued that it had an interest in protecting consumers' medical privacy by both limiting the disclosure and use of this information. *Id.* at 557. The problem, however, is that the Vermont Law only kept pharmacies from disclosing the confidential information if it was to be used for marketing purposes – it was not a blanket prohibition on the disclosure of consumers' medical information. The Supreme Court concluded that the restriction

---

[2] Plaintiffs argue that "with commercially available software, he or she can process those images into a composite map." [Doc. 36 at p. 1].

5

on sharing consumers' medical information was too narrow to further the interest of physician confidentiality because it allowed the information to be given to anyone, just not for marketing purposes. *Id.* Next, the Vermont Law only barred pharmaceutical manufactures from using confidential information for marketing purposes. The purpose behind the Law was to shut down marketing by the pharmaceutical manufacturers – a form of speech disfavored by the lawmakers. "The law on its face burdens disfavored speech by disfavored speakers." *Id.* at 564. The Court noted that a broader "more coherent" policy might withstand scrutiny, but the narrowness of the Vermont Law unnecessarily burdened speech without furthering the government's stated interest of protecting confidential information. *Id.*

Plaintiffs' reliance on *Sorrell* is misplaced. The controversy in this case has nothing to do with protected speech, such as public speaking on a city sidewalk or the communication of a particular message through public marketing. Plaintiffs' goal of someday creating and selling measurable maps to paying clients is not protected speech. The real issue in this case involves whether the work product of a measurable map meets the definition of land surveying under North Carolina law. The issue is no different than whether the creation and sale of a legal brief by non-lawyer meets the definition of the unauthorized practice of law. The professional licensing laws in North Carolina regulate conduct, such as the creation of a legal brief or a measurable map. It is immaterial as to what the brief argues – the only question is whether the information in the brief meets the definition of the unauthorized practice of law.

6

Recognizing that this is a case about licensure, Plaintiffs next turn to the *Billups* case – a case about tour guide licensing in Charleston. However, the *Billups* case does not involve the regulation of a profession. What made the *Billups* case unique was the fact that the government wanted to restrict traditional speech in a public forum by imposing a license requirement for tour guides. Plaintiffs cite to the *Billups* case for the proposition that the licensing restrictions "undoubtedly burdens protected speech," making it "subject to First Amendment scrutiny." [Doc. 36 at p. 15]. What Plaintiffs ignore is the fact that the "protected speech" in *Billups* involved public speaking on city sidewalks, not the sale of a commercial product like a measurable map. Again, the *Billups* case is not analogous to this case.

Plaintiffs' brief completely ignores the Fourth Circuit case analogous to the present challenge to the State's authority to license the practice of land surveying. *See Capital Associated Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019) (holding that North Carolina's unauthorized practice of law ("UPL") statutes was a regulation of conduct and not the communicative aspects of practicing law). Similar to the professional regulation of land surveying, the Fourth Circuit in *Capital Associated Indus.* correctly noted that the UPL statutes focused on the question of who may conduct themselves as a lawyer. "Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the Supreme Court has treated them differently than restrictions on speech." *Id.* at 207-208. The Court in *Capital Associated Indus.* cited *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) for the

proposition that States have "broad power to establish standards for licensing practitioners and regulating the practice of professions." *Id.* at 207.

The decision to ignore the Fourth Circuit case in *Capital Associated Indus.* is telling. The law firm representing Plaintiffs ("The Institute of Justice") is the same firm that represented the Plaintiffs in the *Billups* case. In *Billups*, Plaintiffs were forced to counter the City's argument that the case involved the sale of goods in the form of tour guide services and not traditional speech (public speaking on a city sidewalk during tours of the City of Charleston). The government argued that a traditional First Amendment speech analysis on the tour guide licensing law might jeopardize other occupational licensing laws such as nurses, doctors, and lawyers. In response, Plaintiffs in Billups cited *Capital Associated Indus.* and argued that the Court had nothing to worry about since the Billups case involved protected speech, not conduct.

> Most occupational licenses, of course, largely regulate *conduct*, not simply the sale of speech. *Cf. Capital Associated Indus., Inc. v. Smith*, __ F.3d __, No. 17-2218, 2019 WL 1746945 (4th Cir. April 19, 2019) (holding that regulation of the practice of law, as applied in that case, was a regulation of conduct rather than of the communicative aspects of law). And this Court has proven more than capable of applying the First Amendment to licensing laws when they are applied to restrict protected speech.

*See* Response Brief of Appellees at pp. 31-32 a copy of which is attached hereto as **Exhibit A**. In this case, there is neither a citation to *Capital Associated Indus.* or an acknowledgement that most occupational licensing laws regulate conduct. "If the government enacts generally applicable licensing provisions limiting the class of

persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to <u>First Amendment</u> scrutiny." *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring).

### B. In the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on speech

As with the UPL statutes in *Capital Associated Indus.*[3], the Act focuses on the question of who can practice land surveying in North Carolina. The Fourth Circuit considered similar unauthorized practice challenge and concluded "that the UPL statues regulate conduct":

> The UPL statues don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of who may conduct themselves as a lawyer. Licensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession.

*Capital Associated Indus.*, 922 F.3d at 208. "North Carolina's ban on the practice of law by corporations fits within *NIFLA's* exception for professional regulations that incidentally affect speech." *Id.* at 207.

Plaintiffs do not have a constitutional right to practice land surveying. "States may regulate professional conduct even though that conduct incidentally involves speech." *Nat'l Inst. Of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372, 201 L. Ed. 2d 835 (2018).

---

[3] "In this case, any impact the UPL statutes have on speech is incidental to the overarching purpose of regulating who may practice law." *Capital Associated Indus.* at 207.

9

In *NIFLA*, the Court addressed a California law requiring certain clinics that primarily serve pregnant women to post notices about what services they did not offer and about free state services. *Id.* at 2368-70. Although the law applied in a professional context, the Court declined to recognize "professional speech" as a separate category of speech. *Id.* at 2371. The Supreme Court in *NIFLA* did "recognize two situations in which states have broader authority to regulate the speech of professionals than that of nonprofessionals." *Capital Associated Indus.* at 207. Under this umbrella of professional speech and occupational licensing, the Court held that "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.; see also Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S. Ct. 1912, 56 L. Ed. 2d. 444 (1978); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 120 L. Ed. 2d. 674 (1992).

In *Ohralik*, the Supreme Court considered an Ohio State Bar Association prohibition on lawyers' in-person solicitation of remunerative employment – "a business transaction in which speech is an essential but subordinate component." *Ohralik*, 436 U.S. at 457. "While this does not remove the speech from the protection of the First Amendment, . . . it lowers the level of appropriate judicial scrutiny." *Id.* In upholding the prohibition, the Court determined that "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns," which "falls within the State's property sphere of economic and professional regulation." *Id.* at 459. The Court concluded that the lawyer's conduct was "subject to regulation in furtherance of important state interests." *Id.*

The second case cited by *NIFLA* for the proposition that States may regulate professional conduct, even though that conduct incidentally involves speech, involved the practice of medicine. *See Casey*, 505 U.S. 833. The opinion in *Casey* explained that the law regulated speech only "as part of the practice of medicine, subject to reasonable licensing and regulation by the State. *Casey*, 505 U.S. at 884; *see also NIFLA*, 138 S. Ct. at 2373.

In analyzing NIFLA, the Fourth Circuit recognized that in the context of regulating professional conduct, incidental burdens on speech are treated differently than restrictions on speech. *Capital Associated Indus.* at 207-208. Plaintiffs' attempt to impose heightened judicial scrutiny of its First Amendment claim fails.

### C.   The Act is content-neutral and seeks to establish minimum qualifications for someone to practice the profession of land surveying

Plaintiffs ignore the actual language of the Act and fail to conduct a proper First Amendment analysis to determine whether the Act is content-neutral. Under the proper First Amendment analysis, courts are required to determine whether a regulation "on its face" draws a distinction "based on the message a speaker conveys." *Id*. The Act draws no such distinction. Instead, Plaintiffs argue that because the measurable map meets the definition of land surveying, the Act is "an easy candidate for strict scrutiny." *See* Doc. 36 at pp. 17-18.

A law that does not "target speech based on its communicative content" is content neutral. *NIFLA* at 2371. Stated another way, a law is content neutral if it "serves purposes unrelated to the content of expression . . . even if it has an incidental

11

11

effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The profession of land surveying has long been recognized in North Carolina and is regulated under the Act. This is a "practice act." The Legislature declared that the practice of land surveying is "subject to regulation in the public interest." N.C.G.S. § 89C-2. Only persons duly licensed by the Board are authorized to practice land surveying or offer to practice land surveying as defined in the Act or to hold themselves out as a land surveyor. N.C.G.S. § 89C-23. The purpose of the Act is to regulate who may practice land surveying and this regulation is accomplished by defining the practice of land surveying. On its face, the Act's regulation of land surveying does not target speech based on the message conveyed in the work product produced by the land surveyor.

If the law is content-neutral on its face, the analysis next requires a court to consider the law's justification or purpose. *Reed.* 576 U.S. at 166. A law may still reflect a content preference if it was "adopted by the government 'because of disagreement with the message [the speech] conveys." *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). In making this determination, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "[A] regulation that serves purposes unrelated to the context of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *McCullen v. Coakley*, 573 U.S. 464, 480, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014) (quoting *Ward*, 491 U.S. at 791). The Act passes this test.

The purpose of the Act is to "safeguard life, health, and property, and to promote the public welfare." N.C.G.S. § 89C-2. Such a purpose reflects conduct (surveying activities), not the expression of a particular message. *See McCullen*, 573 U.S. at 480. The Act applies equally to all who seek offer services to be deemed land surveying. This would be the same for offering legal services without being licensed to practice law. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. A determination that the Act is content-neutral will result in a lower standard of scrutiny. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) (content and viewpoint neutral laws are reviewed under an intermediate scrutiny standard). "Thus, we can say with some confidence that the standard for conduct-regulating laws can't be greater than intermediate scrutiny." *Capital Associated Indus.*, 922 F.3d at 208-209.

## II.     THE ACT PASSES CONSTITUTIONAL SCRUTINY

### A.     North Carolina's interest in regulating the profession of land surveying is at least substantial

In this case, the defendants must show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest. *Id*. at 209 (citing *NIFLA*, 138 S. Ct. at 2375). The North Carolina Legislature declared that the practice of land surveying is "subject to regulation in the public interest." *See* N.C.G.S. § 89C-2. Specifically, the Legislature declared that the purpose of the Act was "to safeguard life, health, and property, and to promote the public welfare". *Id.* Courts have consistently held that "States have a compelling interest in the practice of professions

within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb*, 421 U.S. at 792. In addition to the self-declared purpose set forth in the Act, the record evidence identifies a multiple significant interests advanced by the Act.

First, the regulation and licensing of land surveying in North Carolina works to establish a minimum level of competence (education, exam, and experience). [SOF ¶ 50].

> **We're also establishing a minimum level of competence via the three E's – the education, exam, and experience. When somebody gets licensed, what we're telling the citizens of North Carolina is they have met a minimum level of competence, and the work they're going to receive from the licensee meets that minimum level of competence. If it doesn't, again, then the board by statute has the ability to remedy the situation.**

[Rule 30(b)(6) Deposition of the Board, pp. 10-11]. In so doing, the Act also protects the public from misrepresentations as to professional status or expertise.

Second, the Act works to protect the public from negligence, incompetence, and professional misconduct in the profession of land surveying by holding the licensee accountable. [SOF ¶ 50].

Third, the Act works to protect the "property" rights. *See* N.C.G.S. § 89C-2. "The Supreme Court in *McCullen* recognized that protecting property rights is a legitimate government interest." *People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547, 577 (M.D.N.C. June 12, 2020). The Legislature intended

its rules on the practice of land surveying to protect property interests in North Carolina. *In re Suttles Surveying*, 227 N.C. App. at 70 (2013).

In *Ohralik*, the Supreme Court noted that the state interests implicated in regulating the practice of law was particularly strong. "In additional to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions." *See Ohralik*, 436 U.S. at 460.

### B. The Act is sufficiently drawn to protect the substantial state interests

In a case involving the regulation and licensing of a profession, the Act must be sufficiently drawn to protect the state interests identified above. *Capital Associated Indus.* 922 F.3d at 209 (citing *NIFLA*, 138 S. Ct. at 2375). The appropriate level of constitutional scrutiny requires only a "reasonable fit between the challenged 'regulation' and the state's interest – not the least restrictive means." *Id.* at 209-210 (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010). Likewise, the Supreme Court in *Casey* explained that the regulation of medicine is subject to reasonable licensing and regulation by the State. *Casey*, 505 U.S. at 884. The "reasonable" standard was also cited by the Supreme Court in a case involving the regulation and licensing of lawyers. *See Ohralik*, 436 U.S. at 467.

Plaintiffs argue that the Act fails intermediate scrutiny. Plaintiffs cite *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) for the proposition that intermediate scrutiny requires "a close fit between ends and means." Plaintiffs also cite *Billups* for the proposition that the Board must show that the Act is "narrowly tailored to

serve a significant government interest, and that [it] leave[s] open ample alternative channels for communication of the information." *See* Doc. 36 at p. 19. Plaintiffs misstate the true standard for review of the conduct-regulating Act as set forth in *NIFLA* and *Capital Associated Indus.* – the Board "must show 'a substantial state interest' and a solution that is 'sufficiently drawn' to protect that interest." *Capital Associated Indus.* 922 F.3d at 209 (citing *NIFLA*, 138 S. Ct. at 2375).

Admittedly, Defendants also fell into the trap of defining the appropriate standard of review to require proof that the law is "narrowly tailored to serve a significant governmental interest." *See* Doc. 34 at p. 26. Upon closer inspection, this is not the appropriate standard to apply because time, place, and manner of speech is not relevant to the facts of this case. Unlike *Billups*, there is no dispute involving protected speech in a public place. Also, the law under attack in *McCullen* restricted "access to 'public way[s]' and 'sidewalks,' places that have traditionally been open for speech activities and that the Court has accordingly label 'traditional public fora." *McCullen*, 573 U.S. at 464-465 (internal citations omitted). As to the government power to issue restrictions in a public forum, the Court in *McCullen* stated that "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id.* at 465 (citing *Ward*, 491 U.S. at 791). Because this case does not involve restrictions on speech in a traditional public forum,

the time, place, and manner analysis of intermediate scrutiny is not applicable. Instead, the Supreme Court in NIFLA made it clear that, "[a]ssuming that this is a substantial state interest, the licensed notice is not sufficiently drawn to achieve it." *NIFLA*, 138 S. Ct. at 2375. In analyzing the appropriate standard for a First Amendment claim as to the unauthorized practice of law, the Fourth Circuit made it clear that "narrow tailoring" is not required:

> Although the Court's cases have not been crystal clear about the appropriate standard of review, we do know that the state actors involved were not required to demonstrate a compelling interest and narrow tailoring.

*Capital Associated Indus.*, 922 F.3d at 208.

In the analogous case involving the unauthorized practice of law, the Fourth Circuit concluded that "[b]arring corporations from practicing law is sufficiently drawn to protect" the state interests involved in the case. *Capital Associated Indus.* 922 F.3d at 209. One example cited by the Fourth Circuit was the fact that professional integrity "could suffer if the state allows lawyers to practice on behalf of organizations owned and run by nonlawyers". It is important to note that the court looked at possible adverse outcomes related to the protection of state interests. Plaintiff attempts to impose a standard that does not apply in this case – evidence of prior harms involving unlicensed aerial mapping. [Doc. 36 at p. 6 of 31]. Similar to the argument made in Ohralik, the regulations at issue work as a "prophylactic measure" to prevent harm before it occurs. *See Ohralik*, 436 U.S. at 459. All that is required is a reasonable fit between the Act and the state's interests. *See Capital Associated Indus.* 922 F.3d at 210 ("Because North Carolina has established a

17

reasonable fit between its UPL statutes and a substantial government interest, the UPL statutes survive intermediate scrutiny.").  In the present case, there is sufficient evidence that the prohibition against the unauthorized practice of land surveying is sufficiently drawn to protect the multiple substantial government interests identified.

First, the regulation and licensing of land surveying in North Carolina works to establish a minimum level of competence (education, exam, and experience) in the person's area.  The Act, if followed, would ensure that only land surveyors that meet minimum levels of competency are licensed.  The Act not only protects the clients but others that might use and rely upon the work product (measurable map) published by Plaintiffs.

Second, the Act also protects the public from misrepresentations as to professional status or expertise.  Without the Act and the required minimal qualifications to perform land surveying services, the public would be subject to the old proverb known as *caveat emptor* (let the buyer beware).  This was confirmed by the testimony of Plaintiffs' designated expert witness:

> **Q.    And then obviously there's some risks because we talked about errors.  And the risks are that I really don't know what I'm doing and I provide a faulty work product to this client who's relying on me to provide accurate information, right?**
>
> **A.    There's the potential for that.**
>
> **Q.    And that potential could not only impact my client but it could impact others, meaning**

18

> **their** neighbors, if it's an issue involving boundaries or real estate, correct?
>
> **A.** Potentially, yes.
>
> \* \* \*
>
> **Q.** How is the client -- how is the client protected in that scenario against somebody who really doesn't know what they are doing but is often the client services in the field of photogrammetry?
>
> **A.** That's up to the client.
>
> **Q.** Okay. So buyer beware?
>
> **A.** Okay.
>
> **Q.** Is that true?
>
> **A.** Yes.

[Alex Abate Depo pp. 65-66]. The licensing laws in North Carolina operate to prevent this situation from happening and work to protect the public.

Third, the regulation and licensing of land surveying provides a system of accountability. Because neither Plaintiff is licensed, there is no accountability to the Board for any mistakes made in the work product or any violations of the Professional Rules of Conduct. The Act is sufficiently drawn to allow for accountability of licensed professional land surveyors. The Board has the ability to hold licensees accountable for incompetence or unethical work. [Defendants' Disclosure of Expert Testimony p. 14]. However, the board has no authority over non-licensees such as Michael Jones and Virtual Drone. [ECF Doc. 1-1].

## III. PLAINTIFFS' BRIEF DOES NOT ARGUE THAT THE ACT IS UNCONSTITUTIONAL ON ITS FACE

In arguing that the Act fails either strict or intermediate First Amendment scrutiny, Plaintiffs do not argue that the Act is unconstitutional on its face. The first section of Plaintiffs' argument is stated as follows: "North Carolina's restriction on creating maps and 3D digital models violates Plaintiffs' First Amendment rights." Plaintiffs' brief focuses on the "as applied" argument and the argument section concludes with the following:

> In short, the record makes two points unmissably clear. North Carolina's surveying law burdens speech. And as applied to Plaintiffs, the law fails any level of First Amendment scrutiny.

The second section of Plaintiffs' argument is stated as follows: "The Court may be able to conclude that the parties' dispute has been narrowed as to certain real-estate marketing images and certain aerial maps." Again, no argument is made as to the claim that that Act is unconstitutional on its face.

## CONCLUSION

For the reasons set forth above, Defendants hereby request that the Court deny Plaintiffs' motion for summary judgment.

Respectfully submitted this the 28th day of April, 2022.

FITZGERALD HANNA & SULLIVAN, PLLC

/s/ Douglas W. Hanna

Douglas W. Hanna, NCSB #18225
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1(f)

I hereby certify that this brief, excluding the case caption and the certificate of service, is in compliance with the limit of 8400 words.

This the 28th day of April, 2022.


/s/ Douglas W. Hanna
Douglas W. Hanna

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing **DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the
Clerk of the Court using the CM/ECF system which will send notification of such
filing to the following:

David G. Guidry, Mainsail Lawyers, dguidry@mainsaillawyers.com

Samuel B. Gedge, Institute for Justice, sgedge@ij.org

James T. Knight II, Institute for Justice, jknight@ij.org

This the 28th day of April, 2022.

                     /s/ Douglas W. Hanna
                     Douglas W. Hanna, NCSB #18225