IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-137-FL

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ANDREW L. RITTER, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; JOHN M. LOGSDON, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; JONATHAN S. CARE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; DENNIS K. HOYLE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; RICHARD M. BENTON, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; CARL M. ELLINGTON, JR., in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; CEDRIC D. FAIRBANKS, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; BRENDA L. MOORE, in her official capacity as a member of the North Carolina Board of Examiners for Engineers; CAROL SOLLOUM, in her official capacity as a member of the North Carolina Board of Examiners for Engineers; and ANDREW G. ZOUTWELLE, in his official capacity as a member of the North Carolina Board of Examiners for Engineers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

This matter comes before the court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (DE 31, 35). For the reasons that follow, defendants' motion is granted and plaintiffs' motion is denied.

## STATEMENT OF THE CASE

Plaintiffs, a drone-photography company and its single member, commenced this action March 22, 2021, alleging provisions of the North Carolina Engineering and Land Surveying Act, N.C. Gen. Stat. §§ 89C-1, *et seq.* (the "Act") prohibit them and others similarly situated from creating, processing, and disseminating images of land and structures, in violation of the First Amendment. See N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24. Plaintiffs sue defendants in their official capacities as executive director and members of the North Carolina Board of Examiners for Engineers and Surveyors (the "Board"), the agency responsible for enforcing the Act. Plaintiffs seek declaratory and injunctive relief pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

Defendants' motion for summary judgment challenges the court's subject matter jurisdiction. Alternatively, defendants seek judgment in their favor with reliance upon: 1) testimony by Andrew L. Ritter ("Ritter"), in his capacity as executive director of the Board and as Rule 30(b)(6) deponent for the Board; plaintiff Michael Jones ("Jones") in his personal capacity and as Rule 30(b)(6) deponent for plaintiff 360 Virtual Drone Services, LLC ("360 Virtual Drone"); and Alex Abatie ("Abatie"), plaintiffs' designated expert witness on drones and mapping; 2) discovery responses; and 3) defendants' disclosure of expert testimony by Mark S. Schall ("Schall").

In support of its motion, plaintiffs introduce: 1) plaintiff Jones's declaration; 2) plaintiffs' webpage; 3) a map created by plaintiff Jones with and without a scale bar; 4) the Board's 2018 and 2019 letters to plaintiffs; 5) an email by plaintiff Jones to a potential client; 6) letters from the Board to other drone companies; 7) deposition testimony of David S. Tuttle ("Tuttle"), in-house counsel to the Board; 8) email correspondence between Tuttle and a drone operator regarding application of the Act; 9) testimony by William Casey ("Casey"), the Board's assigned investigator; Clyde Anthony Alston ("Alston"), another Board investigator; and Schall; 10) the Board's investigative report of plaintiffs and other drone companies; 11) defendants' response in discovery; and 12) a declaratory and advisory opinion from Mississippi and Kentucky, respectively, exempting activities from the definition of the practice of land surveying.

## STATEMENT OF UNDISPUTED FACTS

North Carolina regulates land surveying through the Act.[1]  (Pl. Resp. Stmt. Facts (DE 45) ¶ 1 (citing N.C.G.S. §§ 89C-1, et seq.)).  The Act establishes the Board to administer its provisions and forbids "any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board."  (Id. ¶¶ 2, 5).  Land surveying is designated as a "profession," and encompasses "a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, photogrammetric (aerial) surveying, and topographic surveying."  (Id. ¶ 4).  The Board also "publishes policies to include or exclude activities that fall within, or outside, the definition of the practice of land surveying."  (Id. ¶ 45).  Pursuant to the Act, those who practice land surveyance without a license are subject to investigation by the Board.  (Id. ¶ 6).

---

[1]      Where a fact asserted in the movants' statement of material facts is undisputed, the court cites to the opposing parties' responsive statement of facts, where it indicates the fact is admitted, undisputed, or without opposing fact.

Abutting this regulatory scheme is the recent "rise of a thriving commercial-drone industry" in which drones "take photographs of—and collect data about—buildings, land, construction sites and other property." (Def. Resp. Stmt. Facts (DE 43) ¶ 1). Operators then are able to create a map of properties over which they fly by combining the photographs captured into a single, high-resolution photograph, called an "orthomosaic" map, which is a type of map described by the parties as a "measurable" map. (Id. ¶ 2). The photographs can include embedded "geo-referenced" information, and the orthomosaic maps resulting then are capable of conveying to the user "information about the land" mapped. (Id. ¶ 3). For instance, users can measure the distance from one point to another, or estimate the area or elevation of a piece of land. (Id.). Images captured by drones also can be used to create "photorealistic 3D models of land and structures." (Id. ¶ 5). These three-dimensional models too can include "geotagged" information for the purpose of measurement. (Id.).

Jones began providing photography and videography services in North Carolina in 2016, and eventually incorporated "drone-based aerial photography" into his business. (Id. ¶¶ 6, 8). In October 2017, Jones founded 360 Virtual Drone as a single-member company. (Id. ¶ 8). Through his newly founded company, Jones branched out into drone-based, "aerial mapping services," creating a profile on a "popular commercial-drone website, Droners.io, and selected 'Surveying & Mapping' as one of his project categories." (Id. ¶ 9). On this website he advertised "video, pictures and orthomosaic maps (Measurable Maps) of [construction] sites," writing "[w]ith this information, construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the changes and progression of the site as it forms over time." (Id. ¶ 10).

Over the course of the following year Jones was hired to fly his drone over a Walmart distribution center and capture images, then used by a drone data company "to create a thermal

4

map of the roof." (Id. ¶ 11).  He also was hired to capture aerial images of a shopping-mall parking lot, which images "likewise could be used to create an aerial map."  (Id.).  At some point during this time, Jones began making orthomosaic maps himself, in one instance processing images taken periodically for a repeat customer into an aerial map and pitching the product to the client.  (Id. ¶ 12).  The client chose not to make use of the maps, but Jones continued to advertise mapping as one of 360 Virtual Drone's offerings.  (Id.).

Jones is not a licensed land surveyor and 360 Virtual Drone is not licensed as a surveying business.  (Id. ¶¶ 13-14).  In December 2018, Jones received a letter from the State Board of Examiners stating that it had "authorized an investigation" of 360 Virtual Drone to determine whether it was in violation of the Act by "practicing or offering to practice land surveying in North Carolina without a license."  (Id. ¶ 17).  Between 2016 to 2020, the Board issued at least half a dozen comparable letters to other drone operators, similarly placing them on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed is a violation of the Act,  (Id. ¶¶ 18-20), along lines:

> If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include, but are not limited to: collection of survey data; aerial surveying and mapping services; any resulting map or drawing; 3D models; and aerial photogrammetry.

(Id. ¶ 19).  One drone operator submitted questions in response, and the Board's in-house counsel provided the following answers by email, appearing below in blue:

5

> Mr. Armstrong,
>
> As to your questions:
> 1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.
> If there is no meta data or other information about coordinates, distances, property boundaries or anything that falls within the definition of land surveying in GS 89C-3(7) then simple taking and providing the photographs does not require a land surveying license.
>
> 2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.
> No, this would be within the definition of land surveying.
>
> 3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.
> No, this would be within the definition of land surveying.
>
> 4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.
> No, this would be within the definition of land surveying.
>
> 5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.
> No, this would be within the definition of land surveying, as further explained in the Board's Volume Computation Surveys Policy.
>
> Would it make a difference I delivered the photographs to the developer stating that the images are not a licensed survey?
> No, it would still be within the definition of land surveying.

(Tuttle Email (DE 38-17)).

Jones promptly responded to the Board's investigation letter, and February 7, 2019, the assigned board investigator met with Jones for an interview. (Def. Resp. Stmt. Facts (DE 37) ¶ 27). What was discussed during that interview is disputed. Jones contends the investigator advised him that "giving a client an aerial photograph that contains geospatial metadata," "stitching aerial photographs together to create an orthomosaic map," and giving a client aerial images on which he had drawn lines approximating property boundaries all would qualify as the unlicensed practice

6

of surveying.  (Jones Decl. (DE 38-3) ¶¶ 30-32).  The board investigator denies having offered Jones guidance on what he legally could and could not do.  (Casey Dep. (DE 20) 44:15-45:3).

Jones thereafter was informed by letter dated June 13, 2019:

> After a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board.

> At its regular meeting on June 12, 2019 the Board concurred with the recommendation of the Review Committee, which was to place 360 Virtual Drone Services, LLC on notice that practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice land surveying in North Carolina without being licensed with the Board, is a violation of G. S. 89C-24, 55B and 57D.

> If the company fails to come into compliance, further action may be pursued by the Board as authorized in G. S. 89C-10(c) and 89C-23 to apply to the court for an injunction or pursue criminal prosecution. The activities include, but are not limited to: mapping, surveying and photogrammetry; stating accuracy; providing location and dimension data; and producing orthomosaic maps, quantities, and topographic information. In addition, marketing disclaimer is not appropriate as the services still fall within the practice of land surveying.

(Def. Resp. Stmt. Facts (DE 37) ¶ 35).  The letter also noted the following:

> You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56 .1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful.

(Pl. Resp. Stmt. Facts (DE 45) ¶ 33).

In response to the Board's June 13, 2019, letter, Jones stopped developing his mapping business.  (Def. Resp. Stmt. Facts (DE 37) ¶ 36).  He ceased offering aerial maps and declined jobs to capture images for others intending to make such maps.  (Id.).  Jones "refrained from branching out into other mapping-related work as well—for instance, using aerial images to create 3D digital

7

models." (Id.). He additionally stopped adding lines on real-estate marketing images to approximate property boundaries. (Id.).

The Board's present position is that plaintiffs cannot provide clients with "aerial orthomosaic maps" unless they are stripped of location information and any data by which a recipient could make measurements on the maps. (Id. ¶ 39). Unlicensed persons also cannot provide clients with three-dimensional digital models of land or structure. (Id. ¶ 46). They can, however, produce "marketing images that contain lines indicating the approximate position of property boundaries." (Id. ¶ 52).

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[2]

Once the moving party has met its burden, the non-moving party then must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

---

[2]        Internal citations and quotation marks are omitted from all citations unless otherwise specified.

8

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

1.      Plaintiffs' Article III Standing

Defendants contend plaintiffs have not suffered an injury in fact and the court accordingly lacks standing. This is not correct. Plaintiffs have standing.

The United States Constitution extends the subject matter jurisdiction of the federal judiciary to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. Spokeo, Inc. v. Robins, 578 U.S.

330, 338 (2016). Thus, lack of standing is a deficiency that places litigation outside the court's subject matter jurisdiction. See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 185 (4th Cir. 2013).

The party invoking federal jurisdiction bears the burden of established the following three elements, together amounting to the "irreducible constitutional minimum of standing:"

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). Standing requirements are somewhat more relaxed in First Amendment cases, which leniency manifests itself most commonly in the injury-in-fact requirement. Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013); see Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984); Benham v. City of Charlotte, N.C., 635 F.3d 129, 135 (4th Cir. 2011). The injury-in-fact requirement is the element primarily at issue here.

Plaintiffs seek to enjoin the Board from enforcing N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 against the creation of two- and three-dimensional maps with geospatial data or otherwise allowing for measurements of the land pictured.

The United States Court of Appeals for the Fourth Circuit recognizes two ways in which litigants may establish the requisite ongoing injury when seeking to enjoin government regulation. First, they may allege an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and that there exists a credible threat of prosecution thereunder.  Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018); see Susan B. Anthony, 573 U.S. at 159.  "Second, they may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship—establishing, that is, a chilling effect on their free expression that is objectively reasonable."  Abbott, 900 F.3d at 176; see Cooksey, 721 F.3d at 235 ("In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.").  "Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead."  Id.

Under the first approach, although the plaintiff need not engage in conduct that arguably violates the law to satisfy the injury-in-fact requirement, intentions to engage in the conduct must be concrete.  See Susan B. Anthony, 573 U.S. at 159.  "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the actual or imminent injury."  Lujan, 504 U.S. at 564 (emphasis in original).  "To establish a credible threat of prosecution, plaintiffs must allege fears of state prosecution that are not imaginary or speculative and are actual and well-founded [enough to establish] that the statute will be enforced against them."  Maryland Shall Issue, Inc. v. Hogan, 971 F.3d 199, 217 (4th Cir. 2020).

The second approach requires plaintiffs to make sufficient showing of self-censorship, by establishing a "chilling effect" on their free expression.  Cooksey, 721 F.3d at 235.  "[S]ubjective or speculative accounts of such a chilling effect, however, are not sufficient."  Benham, 635 F.3d at 135; Laird v. Tatum, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an

adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). "Any chilling effect . . . must be objectively reasonable." Benham, 635 F.3d at 135. "Government action will be sufficiently chilling when it is likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights." Id.

In accordance with the first approach, plaintiffs have demonstrated concrete and particular intention to create two-dimensional, orthomosaic maps and maps otherwise facilitating measurement, for instance by scale bar. Prior to receiving notice from the Board, plaintiffs advertised on their website "video, pictures, and orthomosaic maps (Measurable Maps) of [construction] sites. (Def. Resp. Stmt. Facts (DE 37) ¶ 10). On one occasion, plaintiff Jones created an orthomosaic map and pitched it to a repeat client. (Id. ¶ 12). Although the client chose to pass, plaintiffs continued to advertise the service on the website. Id. Plaintiff Jones also previously had provided clients with aerial maps with scale bars included allowing for basic measurement of the land. (Jones Decl. (DE 38-3) ¶ 38). Plaintiffs' intent to create these products thus cannot be described as conjectural or hypothetical.

Plaintiffs also have demonstrated a credible threat of prosecution where they previously were investigated by the Board for advertising and creating these products, and where the Board still maintains that aerial mapping conveying location data about distances, coordinates, volumes, and elevations falls under the definition of surveying. (See Def. Resp. Stmt. Facts (DE 37) ¶ 39 ("The Board's current position is that Plaintiffs can create aerial orthomosaic maps but cannot give the maps to anyone if the maps contain location information, georeferenced data, or any information that a recipient could use to make measurements on the maps."); (Def. Resp. (DE 42) at 3 ("The commercial products Plaintiffs seek to offer to consumers falls under the definition of land surveying.").

Whereas plaintiffs previously have advertised and produced orthomosaic, or measurable, maps for clients, plaintiff Jones has not made three-dimensional models for clients. Prior to the investigation, however, he had begun practicing making such models for himself with images captured by his drone. Once Jones understood following the investigation that the Board considered three-dimensional mapping unlawful in the absence of a surveyors' license, he stopped developing that part of his business:

> I'm not going to expose myself to having the Board come after me again, so I'm not going to develop a 3D model side of my business while it's illegal. But if I could do it without the Board coming after me, I would start building up my skills with 3D modeling and start developing a 3D modeling side of my mapping business too.

(Jones Decl. (DE 38-3) ¶ 39).

Article III does not require a plaintiff to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." Steffel v. Thompson, 415 U.S. 452, 459 (1974); see MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.") (emphasis in original).

Here, plaintiff Jones has proffered evidence that he intended to create three-dimensional maps for clients, and indeed had begun practicing their production, but his efforts were "chilled" by the Act and the Board acting pursuant to it. Where the Board has expressed, and still maintains that construction of such three-dimensional models falls under land surveyance, the chilling effect plaintiffs experienced was "non-speculative and objectively reasonable." Cooksey, 721 F.3d at 236. Indeed, the Board cautioned plaintiffs that if the company continued with its practices the Board could pursue further action including criminal prosecution. Such is "likely to deter a person of ordinary firmness from" continuing to create three-dimensional models. Id.

13

In sum, plaintiffs have established injury in fact with respect to creation of two-dimensional and three-dimensional maps with geospatial data. With injury-in-fact established, the causation and redressability elements of standing easily are satisfied here. Plaintiffs declare that if not for the Act and the Board's interventions they would offer orthomosaic maps to clients again and would develop their business with respect to three-dimensional modeling. (Jones Decl. (DE 38-3) ¶¶ 34, 38-39). An injunction against enforcement of the challenged sections of the Act would remove the threat to plaintiffs' planned activities, satisfying the redressability requirement. Plaintiffs accordingly have standing.

In opposition, defendants contend plaintiffs must establish that they previously have engaged in the course of conduct arguably affected with a constitutional interest and that they have ceased engaging in those activities out of fear of liability. Defendants argue plaintiffs cannot make that showing respect to orthomosaic maps and three-dimensional models as the only service plaintiffs in fact ceased providing were aerial photos with approximate property boundaries. Defendants, however, mischaracterize both the evidence on record and the appropriate standard. First, the record shows that plaintiffs did in fact produce an orthomosaic map for a client. Though the client passed, the map still was produced and was offered, demonstrating a concrete intention to engage in that part of the market. Though plaintiffs had not similarly created a three-dimensional for a client, plaintiff Jones created models for himself, and the record reflects that his endeavors reasonably were chilled by the Board's investigations.

Where the court has subject matter jurisdiction, it proceeds to the merits.

2.    First Amendment

Under the Act, as interpreted and enforced by the Board, only licensed land surveyors may create aerial orthomosaic maps three-dimensional digital models of land and structures; and aerial images containing location, distance, volumetric, and elevation data. See N.C. Gen. Stat. §§ 89C-

2, 89C-3(7), 89C-23, and 89C-24; (Def. Stmt. Resp. Stmt. Facts (DE 43) ¶ 39).  Plaintiffs contend

that on their face and as applied to them, challenged provisions of the Act violate the right to create,

use, and disseminate information under the First Amendment. The court disagrees.

"The First Amendment, applicable to the States through the Fourteenth Amendment,

prohibits laws that abridge the freedom of speech."  Nat'l Inst. of Fam. & Life Advocs. v. Becerra,

138 S. Ct. 2361, 2371 (2018).  As an initial matter, where plaintiffs raise both an as applied and

facial challenge, a threshold consideration is the difference between these challenges:

> The difference between a facial challenge and an as-applied challenge lies in the
> scope of the constitutional inquiry. Under a facial challenge, a plaintiff may sustain
> its burden in one of two ways. First, a plaintiff asserting a facial challenge "may
> demonstrate 'that no set of circumstances exists under which the law would be
> valid, or that the law lacks any plainly legitimate sweep.'" Second, a plaintiff
> asserting a facial challenge may also prevail if he or she "show[s] that the law is
> 'overbroad because a substantial number of its applications are unconstitutional,
> judged in relation to the statute's plainly legitimate sweep.'" Under either scenario,
> a court considering a facial challenge is to assess the constitutionality of the
> challenged law "without regard to its impact on the plaintiff asserting the facial
> challenge." In contrast, an as-applied challenge is "based on a developed factual
> record and the application of a statute to a specific person[.]"

Educ. Media Co. at Virginia Tech v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013).  Plaintiffs

suggest that their facial challenge rests upon much the same argument and evidence as their as

applied challenge, contending that their First Amendment rights have been abridged by the Board,

and other similarly situated drone owners have been harmed by the Board in much the same way.[3]

Their facial and as applied challenge thus collapse into one initial inquiry for the court: did the

Board violate plaintiffs' First Amendment rights?  Only upon that violation being established must

the court consider whether other drone owners have been similarly harmed, and whether the

---

[3]     Plaintiffs fail to make specific argument with respect to their facial challenge in their motion for summary
judgment.  (But see Compl. (DE 1) ¶ 112 ("On their face, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24
sweep up a broad swath of speech, including orthomosaic images, 3D digital models, oblique aerial images, and
images containing data about locations, distances, elevations, and sizes of land or objects.  In this way, North
Carolina's land-surveying licensing law is substantially overbroad, as it sweeps in significant amounts of speech that
North Carolina has no conceivable interest in regulating.").

application of the rules against plaintiffs and those drone owners is numerically "substantial" as compared to "the statute's plainly legitimate sweep," thus rendering the challenged provisions facially unconstitutional. Educ. Media Co., 731 F.3d at 298 n.5. The court accordingly will first determine whether the statutes as applied to plaintiffs violate their First Amendment right to freedom of speech.

"An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." Sorrell v. IMS Health Inc., 564 U.S. 552, 568 (2011). The "First Amendment draws no distinction between the various methods of communicating ideas," and case law establishes photographs and videos, as well as the process of their capture, are speech protected by the First Amendment. Superior Films, Inc. v. Dep't of Educ., 346 U.S. 587, 589 (1954) (Douglas, J., concurring); see Burstyn v. Wilson, 343 U.S. 495, 502 (1952) (holding that movies are a protected form of speech); Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). The court sees no reason for distinguishing under the First Amendment between images captured by earlier technology and those captured remotely by drone. See United States v. Miller, 982 F.3d 412, 417 (6th Cir. 2020) ("Courts often must apply the legal rules arising from fixed constitutional rights to new technologies in an evolving world."); Nat'l Press Photographers Ass'n v. McCraw, 594 F. Supp. 3d 789, 804 (W.D. Tex. 2022) ("[C]ourts have never recognized a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded . . . . This reasoning holds just as true for photographs and videos captured by drone[.]" (emphasis added)).

Thus, the court holds as a matter of law that plaintiffs have established that the use of drones to capture images for the purpose of conveying "orthomosaic" or "measurable" information is protected expression and, by regulating this activity, the Act implicates the First Amendment.

As a general matter, in determining whether a regulation abridges the freedom of speech courts distinguish between content-based and content-neutral regulations of speech. Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Id. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." Id. Content-based regulations are "presumptively unconstitutional" and subject heightened scrutiny. Id. "[A] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Id. at 165.

By comparison, content-neutral speech regulations are those that are "justified without reference to the content of the regulated speech." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47, 49 1986 (emphasis omitted in the first quotation). These regulations are subject to a lesser scrutiny under the First Amendment, requiring that they be "narrowly tailored to serve the government's legitimate, content-neutral interests." Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). But see Reed, 576 U.S. at 166 (strict scrutiny applies to a law neutral on its face if the purpose or justification for it is content-based).

Relevant to the instant action, however, is recognition by the Supreme Court of the United States in Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA"), 138 S. Ct. 2361 (2018) that while the Court's precedents "did not recognize such a tradition for a category called 'professional

speech,'" pursuant to which category the lower courts had applied lesser standards of scrutiny to professionals' speech to clients,

> [t]his Court has afforded less protection for professional speech in two circumstances . . . . First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their "commercial speech." <u>See, e.g.,</u> <u>Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio</u>, 471 U.S. 626, 651 (1985); <u>Milavetz, Gallop & Milavetz, P.A. v. United States</u>, 559 U.S. 229, 250 (2010); <u>Ohralik v. Ohio State Bar Assn.</u>, 436 U.S. 447, 455-456 (1978). Second, under our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech. <u>See, e.g.</u>, <u>id.</u>, at 456; <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.).

<u>Id.</u> at 2372 (internal citations omitted in part) (holding neither exception was implicated in the case).

In <u>Capital Associated Industries, Inc. v. Stein</u>, the Fourth Circuit applied the latter of those two exceptions, holding that North Carolina's ban on the practice of law by corporations fit within <u>NIFLA</u>'s exception for professional regulations that incidentally affect speech. 922 F.3d 198, 207 (4th Cir. 2019). The plaintiff, Capital Associated Industries ("CAI"), was a trade association of employers with the mission of "fostering successful employment relationships." <u>Id.</u> at 202. One of its most popular services was a call center by which members could speak to human resources experts. <u>Id.</u> CAI wanted to expand its offerings so it could answer questions regarding employment and labor law, as well as offer help in drafting legal documents. <u>Id.</u> To that end, CAI sued state prosecutors to enjoin the enforcement of state unauthorized practice of law statutes against it, contending in relevant part that the statutes unlawfully burdened its freedom of speech. <u>Id.</u>

The Fourth Circuit compared the ban on corporations practicing law to other laws regulating professions previously considered by the Supreme Court:

> Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the Supreme Court has treated them differently than

restrictions on speech. For example, while obtaining informed consent for abortion procedures implicates a doctor's speech, the state may require it "as part of the practice of medicine, subject to reasonable licensing and regulation." <u>Planned Parenthood of Se. Pa. v. Casey</u>, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, & Souter, JJ.). Bans on discrimination, price regulations, and laws against anticompetitive activities all implicate speech—some may implicate speech even more directly than licensing requirements. But the Supreme Court has analyzed them all as regulations of conduct. <u>See Expressions Hair Design v. Schneiderman</u>, 137 S.Ct. 1144, 1150-51 (2017); <u>Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.</u>, 547 U.S. 47, 62 (2006); <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 502 (1949).

<u>Id.</u> at 207-08. In determining that the unauthorized practice of law statutes similarly targeted conduct rather than speech, the Fourth Circuit found significant that the statutes did not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients." <u>Id.</u> at 208. "Instead, they focus more broadly on the question of who may conduct themselves as a lawyer." <u>Id.</u>

Looking to the specific provisions challenged, section 89C-2 declares that "[i]n order to safeguard life, health, and property, and to promote the public welfare, the practice of engineering and the practice of land surveying . . . [are] subject to regulation in the public interest," pursuant to which it is:

unlawful for any person to practice or to offer to practice engineering or land surveying in this State, as defined in the provisions of this Chapter, or to use in connection with the person's name or otherwise assume or advertise any title or description tending to convey the impression that the person is either a professional engineer or a professional land surveyor, unless the person has been duly licensed.

N.C. Gen. Stat. § 89C-2. Section 89C-3(7) defines the practice of land surveying as

professional services such as consultation, investigation, testimony, evaluation, planning, mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape, or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth, . . . and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project,

N.C. Gen. Stat. § 89C-3(7), enumerating activities included.

Section 89C-23 describes penalties for violating the Act:

19

Any person who shall practice, or offer to practice, engineering or land surveying in this State without first being licensed in accordance with the provisions of this Chapter, or any person, firm, partnership, organization, association, corporation, or other entity using or employing the words "engineer" or "engineering" or "professional engineer" or "professional engineering" or "land surveyor" or "land surveying," or any modification or derivative of those words in its name or form of business or activity except as licensed under this Chapter or in pursuit of activities exempted by this Chapter, or any person presenting or attempting to use the certificate of licensure or the seal of another, or any person who shall give any false or forged evidence of any kind to the Board or to any member of the Board in obtaining or attempting to obtain a certificate of licensure, or any person who shall falsely impersonate any other licensee of like or different name, or any person who shall attempt to use an expired or revoked or nonexistent certificate of licensure, or who shall practice or offer to practice when not qualified, or any person who falsely claims that the person is registered under this Chapter, or any person who shall violate any of the provisions of this Chapter, in addition to injunctive procedures set out hereinbefore, shall be guilty of a Class 2 misdemeanor.

N.C. Gen. Stat. § 89C-23. Finally, section 89C-24 provides for the licensure of corporations and business firms that engage in the practice of engineering or land surveying. N.C. Gen. Stat. § 89C-24.

Akin to the regulations at issue in Stein, the challenged provisions of the Act are part of a generally applicable licensing regime that restricts the practice of surveying to those licensed. See Stein, 922 F.3d at 207; Goldfarb v. Va. State Bar, 421 U.S. 773, 792 (1975) ("We recognize that the States have . . . broad power to establish standards for licensing practitioners and regulating the practice of professions.")). Although surveying, like the practice of law, has "communicative and non-communicative aspects," the Act does not control what surveyors may tell their clients, instead "focus[ing] more broadly on the question of who may conduct themselves as a [surveyor]." Stein, 922 F.3d at 208; see N.C. Gen. Stat. § 89C-13 (providing general requirements for licensure).

Thus, consistent with Stein, the provisions at issue here fit within NIFLA's exception for professional regulations that regulate conduct with an incidental impact on speech. Stein, 922 F.3d at 208. "Licensing laws inevitably have some effect on the speech of those who are not (or cannot

be) licensed," like plaintiffs. Id. "But that effect is merely incidental to the primary objective of regulating the conduct of the profession." Id.

The court in Stein held that "intermediate scrutiny" is the appropriate standard for reviewing conduct regulations that incidentally impact speech, reasoning as follows:

> Although the Court's cases have not been crystal clear about the appropriate standard of review, we do know that the state actors involved were not required to demonstrate a compelling interest and narrow tailoring. And NIFLA itself provides ample support for the view that strict scrutiny shouldn't apply to the UPL statutes. As noted, the NIFLA Court chose not to decide whether strict or intermediate scrutiny applied to the law at issue. 138 S.Ct. at 2375-77. But the Court did highlight laws regulating "professional conduct" as an area in which it "has afforded less protection for professional speech." Id. at 2372 (emphasis added). Thus, we can say with some confidence that the standard for conduct-regulating laws can't be greater than intermediate scrutiny.

Id. at 208-09. Citing to NIFLA, the court required that the defendant show "a substantial state interest" in regulating the unauthorized practice of law and a solution that is "sufficiently drawn" to protect that interest. Id. at 209.

The court held that North Carolina's ban on the practice of law by corporations survived that standard, concluding that "North Carolina's interest in regulating the legal profession to protect clients is at least substantial." Id.

> Professional integrity could suffer if the state allows lawyers to practice on behalf of organizations owned and run by nonlawyers and to collect legal fees from clients. Nonlawyers would likely supervise lawyers representing third-party clients at CAI, which could compromise professional judgment and generate conflicts between client interests and the corporation's interests.

Id. The court held that the state's "solution" was "sufficiently drawn" to protect that interest where the state had "proscrib[ed] law practice by organizations that pose the most danger, while exempting organizations that pose little danger." Id.

Applying Stein and NIFLA here, North Carolina also has a "substantial state interest" in regulating the unauthorized practice of surveying. As a general matter, the regulation of the practice of surveying safeguards property rights, which rights governments have a legitimate

interest in protecting. <u>McCullen v. Coakley</u>, 573 U.S. 464, 486 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interests in . . . protecting property rights[.]"); <u>see</u> <u>In re Suttles Surveying, P.A.</u>, 227 N.C. App. 70, 76 (2013) ("As N.C. Gen. Stat. § 89C–2 makes clear, the Legislature intended its rules on the practice of surveying to protect property interests in North Carolina.").

That interest expressly is declared in section 89C-2, wherein it provides that the practice of land surveying is "subject to regulation in the public interest" in order to "safeguard life, health, and property, and to promote the public welfare." N.C. Gen. Stat. § 89C-2. The record evidence reflects that the Act establishes a minimum level of competence, thereby protecting the public from negligence, incompetence, and professional misconduct. <u>See</u> N.C. Gen. Stat. § 89C-13 (creating education, examination, and experience requirements for licensure); (Defs. 30(b)(6) Test. (DE 39-5) 10:15-25, 11:1-8 ("We're [] establishing a minimum level of competence via the three E's – the education, exam, and experience.")); <u>see also</u> <u>Ohralik v. Ohio State Bar Ass'n</u>, 436 U.S. 447, 460 (1978) ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions."). The Act also protects the public from misrepresentations as to professional status or expertise, and additionally creates a system of accountability by instilling with the Board authority to hold licensees accountable for malpractice.

> When somebody gets licensed, what we're telling the citizens of North Carolina is they have met a minimum level of competence, and the work they're going to receive from that licensee meets that minimum level of competence. If it doesn't, again, then the board by statute has the ability to remedy the situation.

(Defs. 30(b)(6) Test. (DE 39-5) 10:15-25, 11:1-8); <u>see</u> N.C. Gen. Stat. § 89C-10 (instilling with the Board the power to investigate licensees); N.C. Gen. Stat. § 89C-21 ("The Board may reprimand the licensee, suspend, refuse to renew, refuse to reinstate, or revoke the certificate of licensure, require additional education or, as appropriate, require reexamination, for any engineer

22

or land surveyor, who is found guilty of . . . [f]raud or deceit . . . [g]ross negligence, incompetence, or misconduct in the practice of the profession[.]")

On the record before it, and as applied to plaintiffs, the Act is "sufficiently drawn" to that interest where plaintiffs' actions only are restricted to the extent they seek to create maps or models conveying location information or property images capable of measurement. Stein, 922 F.3d at 209. Where plaintiffs seek only to convey images, including images with lines indicating the position of property boundaries, the Act does not apply. See N.C. Gen. Stat. § 89C-3(7); (Def. Resp. Stmt. Facts (DE 37) ¶ 52). Though "[a]nother state legislature might balance the interests differently," "intermediate scrutiny requires only a reasonable fit between the challenged regulation and the state's interest—not the least restrictive means." Stein, 922 F.3d at 209-10. As defendants have established a reasonable fit between the Act and a substantial government interest, the Act survives intermediate scrutiny.

Plaintiffs in opposition describe the challenged provisions of the Act as content and identity-based restrictions on speech. Where the court has determined that the statutes regulate conduct, however, the court "need not engage with these descriptors." Stein, 922 F.3d at 209 n.4 (rejecting the same argument). Plaintiffs also argue defendants fail to satisfy intermediate scrutiny under Billups v. City of Charleston, S.C., 961 F.3d 673 (4th Cir. 2020) as they have not demonstrated that "less-speech-restrictive alternatives" actually were "tried and considered" and deemed inadequate before enacting the Act. Id. at 681. The court in Billups, however, did not analyze the regulation in issue under the NIFLA's exception for regulations of professional conduct with an incidental effect on speech, pursuant to which states have "broader authority" to regulate. Stein, 922 F.3d at 207. Under that exception, the Fourth Circuit in Stein did not require that defendants demonstrate consideration of alternatives, instead looking only for a "reasonable fit," even where "[a]nother state legislature might balance the interests differently." Id. at 209-

210.  <u>Compare</u> <u>id.</u> at 208-209 (holding that state actors in <u>NIFLA</u> and related cases "were not required to demonstrate a compelling interest and narrow tailoring" and requiring instead that the defendant show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest), <u>with</u> <u>Billups</u>, 961 F.3d at 685 (requiring that the regulation be "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information").

Pursuant to the <u>NIFLA</u> exception as applied by <u>Stein</u>, the Act is constitutional as applied to plaintiffs, and defendants' motion for summary judgment on plaintiffs' as-applied challenge is accordingly allowed.  Where plaintiffs' facial challenge was based upon others similarly situated to plaintiffs, that challenge too fails on the same basis.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 31) is GRANTED and plaintiffs' motion for summary judgment (DE 35) is DENIED.  Judgement shall be entered in favor of defendants, and each side shall bear its own costs.  The clerk is DIRECTED to close this case.

SO ORDERED, this the 31st day of March, 2023.

LOUISE W. FLANAGAN
United States District Judge